# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **NORDETEK ENVIRONMENTAL, INC. :**<br>**19925 Stevens Creek Blvd** :<br>**Suite 100** :<br>**Cupertino, CA 95014,** :<br>**And** :<br> :<br> :<br>**PAUL G. CHRISTY** :<br>**1395 Wisteria Drive** :<br>**Malvern, PA  19355,** :<br> :<br> :<br>**Plaintiffs,** :<br> :<br>**v.** :<br> :<br>**RDP TECHNOLOGIES, INC.** :<br>**2495 Boulevard of the Generals** :<br>**Norristown, PA  19403-5236** :<br> :<br>**Defendant.** : | **C.A. No.: 09-**<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR INJUNCTIVE AND
## DECLARATORY RELIEF, AND MONEY DAMAGES

Plaintiffs primarily seek injunctive and declaratory relief to protect Plaintiff Nordetek Environmental, Inc.'s ("Nordetek") intellectual property rights to exclusively, *inter alia*, use, market and sell certain products in the United States, and Plaintiff Paul G. Christy's right to, *inter alia*, be employed in the use, marketing and sale of such products. Plaintiffs also seek money damages from Defendant arising from its misconduct.

Plaintiff Nordetek, the exclusive licensee of Norwegian corporation P.R. Stephansen AS ("Stephansen"), seeks to enjoin Defendant's willful infringement of the intellectual property, and illegal marketing and sale of the product that Stephansen has exclusively licensed to Nordetek pursuant to the License Agreement attached as "Exhibit A" hereto (the "Nordetek License Agreement"). Nordetek is owned by Plaintiff Paul Christy, a former director and employee of

Defendant who resigned after almost 30 years of employment with Defendant after discovering and confirming the repeated theft of his identification, that Defendant provided false financial statements to its banks and bonding companies, and Defendant's intentional failure to pay Stephansen the royalty payments to which Stephansen was contractually entitled, resulting in Stephansen's termination of that license agreement with Defendant in August 2009. Defendant has caused and is causing Plaintiffs to suffer significant monetary damages.

A key component of the Nordetek License Agreement is Plaintiff Christy's ability to provide the services required. Accordingly, Plaintiff Christy is also seeking injunctive and declaratory relief that he is not subject to a two-year non-competition provision that Defendant is improperly and falsely promoting in the marketplace. Plaintiff Christy resigned from Defendant on September 18, 2009, as set forth in the resignation letter attached as "Exhibit B" hereto. Plaintiff Christy is entitled, as a matter of law, to pursue his chosen and lifelong occupation from Nordetek's California office, and any asserted restrictions on that right must be declared invalid and unenforceable. Further, Defendant and its principals must be enjoined from any further communications, statements or other indications that Plaintiff Christy does not have the right to pursue his livelihood, including having Nordetek serve as the exclusive licensee of Stephansen under the attached license agreement, or otherwise disseminating false information to the marketplace that interferes with Plaintiffs' rights.

## PARTIES AND JURISDICTION

1.      Nordetek is a Delaware corporation with its principle place of business in Cupertino, California. Pursuant to the Nordetek License Agreement, Nordetek owns the exclusive license to intellectual property and products of Stephansen, which is the owner of intellectual property relating to systems for reacting calcium oxide with water, metering lime

slurry and storing lime, used in environmental projects throughout the defined territory in the license agreement.  Pursuant to the attached Nordetek License Agreement, and after repeated demands in writing had failed, Stephansen directed Plaintiff Nordetek to bring this action to enjoin any further use, sale, manufacture and/or marketing of its products and the trademark TEKKEM by Defendant, and to compel the return of Stephansen's trade secrets.

2.    Plaintiff Paul Christy is an adult individual presently residing in this district, having returned to this area from California earlier in 2009, with his principal place of business in Cupertino, California as an employee and owner of Plaintiff Nordetek.

3.    Defendant RDP Technologies, Inc. is a Pennsylvania corporation with a principal place of business in this district.

4.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 (federal question) and §1338 (patent infringement), and under the principles of supplemental jurisdiction, 28 U.S.C. §1367(a).

5.    This Court has personal jurisdiction over the Defendant because its principal place of business is in this district.

6.    Venue is proper in this district pursuant to 28 U.S.C. §1391 and §1400(b) as Defendant's headquarters are in this district.  Venue is also proper in this district as a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND FOR ALL CLAIMS

7.    Plaintiff Christy is a former employee and director of Defendant.  Plaintiff Christy resigned from Defendant on September 18, 2009 as a result of his constructive termination arising from the egregious fiduciary, and potentially criminal, misconduct engaged in by the principal of Defendant, and thus affecting his credibility in the marketplace.  *See* "Exhibit B."

3

8.    Plaintiff Christy is the son of the founder of Defendant and a 43% shareholder of Defendant.  He has been a shareholder of Defendant since July 1, 1982.  He was an employee of Defendant his entire adult life, beginning at age 21 (1980) until his resignation on September 18, 2009.  *See* "Exhibit B."

9.    From 1982 until 1996, Defendant's shareholders were parties to an agreement requiring a buy/sale of shares of Defendant upon death or termination of employment in Defendant.  On November 1, 1995, in connection with estate planning for Defendant's shareholders, all of whom were sons of the founder, the three Christy brother shareholders signed an Amended and Restated Shareholder Agreement (the "1995 Shareholder Agreement") setting forth contingent rights to the purchase of Defendant's shares upon the death or termination of employment of any shareholder.

10.    Plaintiff Christy received no consideration whatsoever for signing the 1995 Shareholder Agreement.  Plaintiff Christy's position with Defendant was the same for the several proceeding years as it was for the several years after the 1995 Shareholder Agreement.

11.    The 1995 Shareholder Agreement included a two year non-compete provision which provided "shareholders should not engage directly or indirectly in any manner or capacity whatsoever (including principal, agent, partner, officer, director, shareholder, employee, consultant or otherwise) in any business competitive with the business of the corporation in the United States, Canada or anywhere in the world that the corporation is currently doing business, does business in the future or where the corporation is pursuing business possibilities."

12.    In a 1996 Stock Redemption Agreement (the "1996 Redemption Agreement"), between Defendant and Robert W. Christy, Jr., Defendant and the shareholders agreed that "…any other agreements, either written or in oral, by and among Robert, the corporation and the

4

shareholders in the corporation shall be terminated and considered null and void as of the date of this agreement and none of the parties in any such agreement shall have any rights or obligations pursuant thereto."

13.     Defendant and its shareholders have not executed any agreement with a non-compete provision since the 1995 Shareholder Agreement, which was specifically terminated, and rendered null and void by the 1996 Redemption Agreement.

14.     Stephansen owns intellectual property relating to systems for reacting calcium oxide with water, metering lime slurry and storing lime (the "Product"), including U.S. Patent 5,746,983.  Stephansen also owns the trademark TEKKEM (U.S. Reg. No. 2,607,699) which is used in connection with the Product.

15.     On August 15, 1997, and later updated on January 25, 2001, Stephansen and Defendant entered into a certain License and Distribution Agreement (the "RDP Agreement") appointing Defendant the sole distributor of Stephansen's Product in the United States, Canada, Mexico, Australia and New Zealand (the "Territory") and exclusive licensee to use certain technology, know-how and patents to improve, manufacture, market, sell and distribute the Product in the Territory.  A copy of the RDP Agreement is attached as "Exhibit C" hereto.

16.     The patent that Stephansen licensed to Defendant was U.S. Patent 5,746,983.

17.     Additionally, Stephansen also appointed Defendant a licensee to use the trademark TEKKEM.

18.     The RDP Agreement was intended to remain in effect until August 31, 2013. Thereafter, the RDP Agreement would automatically renew for an additional five year terms.

19.     Stephansen could terminate the RDP Agreement by written notice to Defendant if, *inter alia*, Defendant failed to pay the license fees required by the RDP Agreement.

20.    Specifically, Stephansen could terminate the RDP Agreement at any time for a default by Defendant, such as failing to pay the required license fees, effective on the date specified in the notice of termination, provided that at least thirty (30) days prior to giving notice, Stephansen notified Defendant of the default and Defendant failed to remedy the default within the thirty (30) day period.

21.    Upon the termination of the RDP Agreement for any reason, the licenses and appointments in the agreement shall terminate, and within thirty (30) days thereafter, Defendant is required to give Stephansen written notice of the number of units of the product in its inventory, the costs of sales with respect to such products, and return to Stephansen all materials in its possession that constitute or describe confidential trade secret information of Stephansen. Further, the agreement provided that if it was terminated, then Stephansen shall not be liable to Defendant for any damages, indemnification, expenditures, loss of profits of any kind sustained or arising out of such termination, with both parties irrevocably waiving any such rights to the full extent permitted under the laws of the United States and any other jurisdiction. Defendant also agreed not to bring any action or proceeding of any nature whatsoever in any court before any tribunal or under any arbitration proceeding seeking or claiming any such damage or loss.

22.    The RDP Agreement is governed by Pennsylvania law. *See* "Exhibit C."

23.    On June 29, 2009, Plaintiff Christy filed suit in state court against Defendant and its principals for breaches of fiduciary duty, including Defendant's making improper royalty payments to Stephansen, along with personal claims for theft of his identity, including the use of Plaintiff's name and personal information to fraudulently obtain a North Carolina drivers license for Defendant principal Richard Christy after his Pennsylvania drivers license was suspended for a conviction of driving under the influence of alcohol. This suit is presently in discovery.

**Stephansen Discovers Defendant's Misconduct and Terminates RDP License Agreement, Resulting in Plaintiff Christy's Constructive Termination as a Defendant Employee.**

24.     On July 7, 2009, Stephansen notified Defendant that it had not received the fees required by the RDP Agreement, and demanded that the fees be "corrected now" and calculated from year 2000, as well as several incorrect values owing on the fee schedule.   The notice required that Defendant not only pay the outstanding fees but also provide a full accounting for nine years of sales.

25.     On July 24, 2009, Defendant claimed ignorance of the history and falsely blamed Plaintiff Christy for not providing information necessary to calculate the fees, when Defendant's other principal and director knew and had intentionally and purposefully directed the improper royalty payments to Stephansen.

26.     On August 27, 2009,  Stephansen sent a follow-up letter advising Defendant that its July 7, 2009 notice of default had been unanswered, and that since thirty (30) days had elapsed since the notice of default, and the default had not remedied, that Stephansen was, pursuant to the RDP Agreement, terminating the RDP Agreement effective September 1, 2009. *See* "Exhibit D" hereto.

27.     Stephansen further directed Defendant to remit payment in full for all past due and current royalties plus interest, and to proceed without delay with the termination tasks required under the RDP Agreement. *See* Exhibit "D" hereto.

28.     To wrongly shift blame, Defendant's principals immediately blamed Plaintiff Christy for their fraudulent acts, and slandered Plaintiff Christy in his business and reputation.

29.     On September 2, 2009, Plaintiff Christy advised Defendant that he not created any problems with Stephansen, and that Defendant had created its own problems "by failing to notify or copy me on correspondence which you have had directly with [Stephansen]" and that he had

"not been kept informed…in the last 2 years, of the changes that [Defendant] had [unilaterally and surreptitiously] made to the royalty payments."

    30.    To precipitate Plaintiff Christy's resignation and to cause his constructive discharge from the only employment he had ever had in the only field in which he had ever worked, and for the  admitted purpose of setting the stage for Richard Christy's son to take over Defendant, Defendant began a campaign of slandering Plaintiff and harming his business opportunities, including:

        a.    forging Plaintiff's name to Defendant's federal tax return when Defendant knew that he would not sign this document due to his concerns with Defendant's fraudulent misconduct;

        b.    retaining a "valuation" consultant for the company to value the shareholders' shares for purchase before any shareholder had resigned, thus previewing the imminent termination of Plaintiff, as confirmed by Defendant's bankers who have been similarly defrauded by Richard Christy's false financial statements with forged signatures and sworn valuations for real estate in Georgia which does not exist;

        c.    locking Plaintiff, as Defendant's titular Treasurer, out of meetings with Defendant's certified public accountant;

        d.    withdrawing over $600,000 from Defendant's lines of credit to fund personal interests and directors' personal income taxes, and concealing those purposes on the Defendant financial statements, including the secretive purchase of a home and concealing income from the estranged spouse of Richard Christy;

    e.     fraudulently misrepresenting to federal insured banks that Defendant was authorized to provide guarantor signatures pursuant to a previously concealed, and never provided "power of attorney" of the estranged spouse of Richard Christy; and

    f.     continuing to publicly misrepresent that Defendant is still the exclusive licensee of Stephansen after Stephansen terminated the license agreement.

31.    As intended in locking Plaintiff Christy out of Defendant to pave the way for his son's takeover of Defendant, Defendant's principal Richard Christy constructively terminated Plaintiff Christy's employment.

32.    On September 18, 2009, Plaintiff Christy effected his constructive termination as an employee and resigned as an employee and director of Defendant, detailing the multiple fraudulent and potential criminal acts then being engaged in by Defendant. *See* "Exhibit B."

33.    As a result of his constructive termination and resignation, Defendant will now attempt to purchase Plaintiff Christy's shares pursuant to a valuation procedure set up six weeks before Plaintiff Christy was forced to resign and pursuant to the 1995 Shareholder Agreement which was, by all parties' agreement, terminated in the 1996 Redemption Agreement.

34.    Forced to explain the resignation of lifelong employee Plaintiff Christy, Defendant began a series of fraudulent communications with contacts throughout the industry, misrepresenting the resignation and slandering Plaintiff, including:

    a.     misrepresenting that Plaintiff Christy is subject to a 2 year non compete provision in the 1995 Shareholder Agreement, entered into without consideration and then terminated in 1996, and without mention of Defendant's unclean hands;

     b.     misrepresenting that Plaintiff "manipulated" information;

     c.     misrepresenting that Defendant and Plaintiff "entered into the buy out provisions of Paul's shareholders agreement… [and] clearly there were issues between Paul and me for over 30 years. I am very happy that this chapter has been closed"; and

     d.     admitting that, contrary to any shareholders agreement, that Richard Christy "did not make [Plaintiff] come to work for Defendant and …did not force him to stay for the past 25 years.…[and] it is my intention to pass the business on to [Richard Christy's son];"

35.     As of this filing, Defendant continues to brazenly market itself, including, *inter alia*, on its website and at a tradeshow in Orlando, Florida, as the exclusive licensee of Stephansen in the Territory, despite clear notice from Stephansen that the license terminated effective September 1, 2009.

36.     On October 2, 2009, Stephansen again directed Defendant to immediately cease and desist from any marketing of its Products and to return its confidential and trade secret information, as the license agreement was terminated on September 1, 2009.

37.     Defendant refuses to honor Stephansen's demand, apparently asserting that the termination was "wrongful" because the July 7 notice of default was not specific, a claim that it waived in the license agreement with Stephansen and which its own documents confirm knowledge of the default.  Regardless, the termination of the RDP Agreement has occurred, and Defendant must cease its infringement.

38.     Stephansen, forced to protect its intellectual property, asked Plaintiff Christy's company to become the licensee for its Products in the Territory and assigned to it the right to

prosecute its intellectual property interests.

39.    As such, Plaintiff Nordetek is currently the exclusive distributor of Stephansen's Product in the Territory and exclusive licensee of Stephansen's technology, know-how and patents to improve, manufacture, market, sell and distribute the Product in the Territory. *See* "Exhibit A" hereto.

40.    The license that Stephansen issued to Plaintiff Nordetek specifically includes U.S. Patent 5,746,983 and the trademark TEKKEM.

## COUNT I

## PATENT INFRINGEMENT PURSUANT TO 35 U.S.C. § 271

## NORDETEK v. DEFENDANT

41.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth below.

42.    Stephansen is the owner of all right, title and interest in and to U.S. Patent 5,746,983 (the "'983 Patent").

43.    Plaintiff Nordetek is the exclusive licensee of the '983 Patent in the United States and elsewhere. *See* "Exhibit A."

44.    Defendant has either directly infringed, committed contributory infringement of, or induced infringement of, and continues to directly infringe, commit contributory infringement of, or induce infringement of, the '983 Patent by, *inter alia*, making, using, offering to sell and/or selling systems for reacting calcium oxide with water, metering lime slurry and storing lime which are covered by one or more claims of the '983 Patent in the United States.

45.    Defendant has been on notice of the '983 Patent since at least as early as August 15, 1997, and has been on notice of Stephansen's termination of the RDP Agreement since at least as early as August 27, 2009, and therefore Defendant's infringement has been, and

continues to be, willful and deliberate.

46.    Defendant's conduct is also clearly willful based on the continuing brazen manner with which it promotes the aforementioned systems on its website, in marketing materials and at trade shows.

47.    Defendant has been, and is now, willfully infringing the '983 Patent in this District and elsewhere, causing damage and irreparable harm to Plaintiff Nordetek, and will continue to do so unless enjoined by this Court.

WHEREFORE, Plaintiff Nordetek respectfully demands an award in its favor and against Defendant, and requests: (i) entry of declaratory judgment that Defendant has infringed the '983 Patent; (ii) entry of declaratory judgment that Defendant's infringement of the '983 Patent has been, and continues, to be willful and deliberate; (iii) entry of an order preliminarily and permanently enjoining Defendant and its respective directors, officers, employees, agents and all persons in active concert or participation with them from further acts which would infringe the '983 Patent; (iv) entry of judgment that the present case is 'exceptional' under 35 U.S.C. § 285, and award of attorneys' fees and costs to Plaintiff Nordetek; (v) an award of damages in an amount adequate to compensate Plaintiff Nordetek for Defendant's infringement of the '983 Patent, and in any event no less than the amount of a reasonable royalty, together with interest as fixed by the Court; (vi) an award of treble damages in accordance with 35 U.S.C. § 284 as a consequence of Defendant's willful infringement; and (vii) such other relief in law and equity as the Court may award to remedy Defendant's conduct.

## COUNT II

### FALSE DESIGNATION OF ORIGIN PURSUANT TO 15 U.S.C. § 1125

### NORDETEK v. DEFENDANT

48.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth below.

49.     Stephansen is the owner of all right, title and interest in and to the trademark TEKKEM, including all common law rights thereto.

50.     Plaintiff Nordetek is the exclusive licensee of Stephansen's rights in and to the trademark TEKKEM pursuant to the Nordetek License Agreement, including all common law rights.

51.     The trademark TEKKEM operates as an indicator of source and/or origin, and has acquired distinctiveness *via* secondary meaning.

52.     Since at least as early as September 1, 2009, Defendant has used the trademark TEKKEM in connection with sales of slaker systems with full knowledge that it is no longer authorized to use such trademark, pursuant to Stephansen's termination of the RDP Agreement. For example, Defendant has used the trademark TEKKEM at trade shows, on marketing materials, and on its website.

53.     Defendant, through its use, display and copying of the mark TEKKEM and/or marks confusingly similar thereto, has without authorization, in connection with its goods and/or services in interstate commerce, made or contributed to the making of false designations of origin, false or misleading descriptions of fact, and/or false or misleading representations of fact, which are likely to cause confusion, mistake, or to deceive as to the affiliation, connection or association of Defendant with Stephansen and/or Plaintiff Nordetek, and/or as to the origin, sponsorship or approval of Defendant's goods and/or services by Stephansen and/or Plaintiff

Nordetek, in violation of Section 43(a)(1)(A) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A)).

54.    Upon information and belief, consumers are likely to purchase slaker systems from Defendant believing that Defendant is affiliated, connected or associated with Stephansen and/or Plaintiff Nordetek, resulting in a loss of goodwill to Stephansen, and loss of business to Plaintiff Nordetek.

55.    Upon information and belief, Defendant's acts as set forth herein constitute unfair competition, and/or induce or contribute to acts of unfair competition.

56.    Upon information and belief, Defendant's unfair acts have been committed in bad faith and with the intent to cause confusion, mistake and/or to deceive.

57.    As a direct and proximate result of Defendant's conduct, Plaintiff Nordetek has been and is likely to be substantially injured in its business including the loss of revenues and profits.

58.    Plaintiff Nordetek has no adequate remedy at law, and unless enjoined by this Court, Defendant and those acting in concert with them will continue to infringe Stephansen's common law rights in the trademark TEKKEM, to Plaintiff Nordetek's irreparable injury.  This threat of future injury to Plaintiff Nordetek, and to Stephansen's goodwill and reputation, requires injunctive relief.

WHEREFORE, Plaintiff Nordetek respectfully demands an award in its favor and against Defendant, and requests: (i) entry of a declaratory judgment preliminarily and permanently enjoining Defendant, its agents, servants and employees, and those people in active concert or participation with it from using, infringing, contributing to, or inducing infringement of Stephansen's common law rights in the mark TEKKEM, or any confusingly similar mark, or using any other false designation, description or representation regarding the source of its goods

and/or services, or stating or implying that Stephansen are associated or connected with such goods and/or services, or otherwise unfairly competing with Plaintiff Nordetek in any manner whatsoever; (ii) entry of declaratory judgment that Defendant's acts of unfair competition have been, and continue to be, willful and deliberate; (iii) entry of declaratory judgment requiring Defendant to offer up for destruction all labels, signs, prints, packages, wrappers, receptacles, uniforms, logo items, and advertisements bearing the mark TEKKEM, or any designation confusingly similar thereto, in its possession or control, as provided by Section 36 of the Lanham Act (15 U.S.C. §1118); (iv) entry of declaratory judgment requiring Defendant to file with the Court and to serve upon Plaintiff Nordetek's counsel within thirty (30) days after entry of any injunction or order issued herein, a written report, under oath, setting forth in detail the manner in which they have complied with such injunction or order pursuant to Section 34 of the Lanham Act (15 U.S.C. §1116(a)); (v) entry of declaratory judgment requiring Defendant to account to Plaintiff Nordetek for any and all profits derived by it, and to compensate Plaintiff Nordetek for all damages sustained by reason of the acts of unfair competition complained of herein; (vi) entry of declaratory judgment awarding Plaintiff Nordetek such damages as it has sustained by reason of Eaton's unfair competition, thus entitling Plaintiff Nordetek to an award of treble its actual damages, plus attorney's fees in bringing and maintaining this action, pursuant to Section 35(a) of the Lanham Act (15 U.S.C. §1117(a)); and (vii) such other relief in law and equity as the Court may award to remedy Defendant's conduct.

## COUNT III

### FALSE ADVERTISING PURSUANT TO 15 U.S.C. § 1125

### NORDETEK v. DEFENDANT

59.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth below.

60.     Stephansen properly terminated the RDP License Agreement on or about August 27, 2009, setting a final termination date for the agreement of September 1, 2009.

61.     Nonetheless, since that time Defendant has continued to represent to customers and potential customers that Defendant is licensed to make, use, sell, manufacture and/or market slaker systems manufactured or approved by Stephansen, including but not limited to TEKKEM slaker systems.

62.     Upon information and belief, Defendant has also represented to customers and potential customers that Plaintiff Nordetek is not authorized to make, use or sell slaker systems manufactured or approved by Stephansen, and that Plaintiff Christy (through Nordetek) is barred from engaging in business related to slaker systems by an alleged non-competition agreement.

63.     Defendant, through the above-referenced statements to customers and potential customers in interstate commerce, is using false and/or misleading descriptions and/or representations of fact in commercial advertising or promotion which misrepresent the nature, characteristics and/or qualities of its and/or Plaintiff Nordetek's goods and/or services in violation of Section 43(a)(1)(B) of the Lanham Act (15 U.S.C. § 1125(a)(1)(B)).

64.     Upon information and belief, Defendant's false and misleading descriptions and/or statements actually deceive or have a tendency to deceive a substantial segment of customers.

65.     Upon information and belief, Defendant's false and misleading statements and/or descriptions are material, and are likely to influence the purchasing decision of actual and prospective customers.

66.     Upon information and belief, Defendant's actions with regard to the above-referenced false and misleading statements and/or descriptions have been committed willfully

and in bad faith and with the intent to cause confusion, mislead and/or deceive.

67.    As a direct and proximate result of Defendant's conduct, Plaintiff Nordetek has been and is likely to be substantially injured in its business including harm to its goodwill and its reputation and the loss of revenues and profits.

68.    Plaintiff Nordetek has no adequate remedy at law, and unless enjoined by this Court, Defendant and those acting in concert with them will continue to cause Plaintiff Nordetek irreparable injury.  This threat of future injury to Plaintiff Nordetek's business identity, goodwill, and reputation requires injunctive relief.

WHEREFORE, Plaintiff Nordetek respectfully demands an award in its favor and against Defendant, and requests: (i) entry of a declaratory judgment preliminarily and permanently enjoining Defendant, its agents, servants and employees, and those people in active concert or participation with it from engaging in false and/or deceptive advertising with regard to slaker systems, or otherwise unfairly competing with Plaintiff Nordetek in any manner whatsoever; (ii) entry of declaratory judgment that Defendant's acts of unfair competition have been, and continue to be, willful and deliberate; (iii) entry of declaratory judgment requiring Defendant to account to Plaintiff Nordetek for any and all profits derived by it, and to compensate Plaintiff Nordetek for all damages sustained by reason of the acts of unfair competition complained of herein; (iv) entry of declaratory judgment awarding Plaintiff Nordetek such damages as it has sustained by reason of Eaton's unfair competition, thus entitling Plaintiff Nordetek to an award of treble its actual damages, plus attorney's fees in bringing and maintaining this action, pursuant to Section 35(a) of the Lanham Act (15 U.S.C. §1117(a)); and (v) such other relief in law and equity as the Court may award to remedy Defendant's conduct.

## COUNT IV

## <u>TRADEMARK INFRINGEMENT PURSUANT TO 15 U.S.C. § 1114</u>

## <u>NORDETEK v. DEFENDANT</u>

69.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth below.

70.     Stephansen owns all right title and interest in and to the registered trademark TEKKEM (U.S. Reg. No. 2,607,699).

71.     Plaintiff Nordetek is the exclusive licensee of the registered mark TEKKEM pursuant to the Nordetek License Agreement.

72.     Defendant is improperly and willfully using the registered trademark TEKKEM in commerce in the advertising and promotion of slaker systems.

73.     Fro example, since at least as early as September 1, 2009, Defendant has used the registered trademark TEKKEM in connection with sales of slaker systems with full knowledge that it is no longer authorized to use such trademark, pursuant to Stephansen's termination of the RDP License Agreement.  For example, Defendant has used the trademark TEKKEM at trade shows, on marketing materials, and on its website.

74.     Defendant's use in interstate commerce of the registered trademark TEKKEM is likely to cause confusion or deception of consumers as to the source, origin, or sponsorship of the slaker systems in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114).  Particularly, customers are likely to purchase Defendant's slaker systems believing them to be those of Stephansen and/or Plaintiff Nordetek, thereby resulting in a loss of goodwill to Stephansen, and a loss of sales to Plaintiff Nordetek.

75.     Defendant's conduct constitutes trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

76.   Plaintiff Nordetek has no adequate remedy at law, and unless enjoined by this Court, Defendant will continue to engage in such acts of trademark infringement, to the irreparable damage and injury of Plaintiff Nordetek.

77.   Upon information and belief, Defendant has engaged in the above-referenced acts of trademark infringement with knowledge of Stephansen's and Plaintiff Nordetek's exclusive rights in the TEKKEM mark, and Defendant continues in such acts of intentional infringement, thus entitling Plaintiff Nordetek to an award of treble its actual damages, plus attorneys' fees in bringing and maintaining this action.

WHEREFORE, Plaintiff Nordetek respectfully demands an award in its favor and against Defendant, and requests: (i) entry of a declaratory judgment preliminarily and permanently enjoining Defendant, its agents, servants and employees, and those people in active concert or participation with it from using the registered mark TEKKEM in commerce, infringing, contributing to, or inducing infringement of the registered mark TEKKEM, and/or engaging in any other actions which would be likely to cause confusion in the marketplace; (ii) entry of declaratory judgment that Defendant's acts of trademark infringement have been, and continue to be, willful and deliberate; (iii) entry of declaratory judgment requiring Defendant to offer up for destruction all labels, signs, prints, packages, wrappers, receptacles, uniforms, logo items, and advertisements bearing the registered mark TEKKEM, or any designation confusingly similar thereto, in its possession or control, as provided by Section 36 of the Lanham Act (15 U.S.C. §1118); (iv) entry of declaratory judgment requiring Defendant to file with the Court and to serve upon Plaintiff Nordetek's counsel within thirty (30) days after entry of any injunction or order issued herein, a written report, under oath, setting forth in detail the manner in which they have complied with such injunction or order pursuant to Section 34 of the Lanham Act (15

U.S.C. §1116(a)); (v) entry of declaratory judgment requiring Defendant to account to Plaintiff Nordetek for any and all profits derived by it, and to compensate Plaintiff Nordetek for all damages sustained by reason of the acts of trademark infringement complained of herein; (vi) entry of declaratory judgment awarding Plaintiff Nordetek such damages as it has sustained by reason of Eaton's trademark infringement, thus entitling Plaintiff Nordetek to an award of treble its actual damages, plus attorney's fees in bringing and maintaining this action, pursuant to Section 35(a) of the Lanham Act (15 U.S.C. §1117(a)); and (vii) such other relief in law and equity as the Court may award to remedy Defendant's conduct.

**COUNT V**

**DECLARATORY RELIEF**

**PLAINTIFFS v. DEFENDANT**

78.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth below.

79.     As set forth above, Defendant has falsely represented to Plaintiffs and others that Plaintiff Christy is subject to a non-competition agreement with Defendant.

80.     Contrary to Defendant's misrepresentations, Plaintiff Christy is not subject to a non-competition agreement.

81.     The 1995 Shareholder Agreement that purportedly contained the non-competition provision, was specifically terminated, and rendered null and void by the 1996 Redemption Agreement.

82.     Further, Plaintiff Christy received no consideration whatsoever in exchange for executing the 1995 Shareholder Agreement.

83.     Defendant has no legitimate business purpose in seeking to enforce a worldwide non-compete provision in the 1995 Shareholder Agreement.

84.    This is an action for declaratory judgment, for the purpose of determining a question of actual controversy which is imminent and inevitable between the parties as set forth above.

85.    Plaintiffs bring this cause of action to request the Court to determine Plaintiff Christy's legal rights to work in his only chosen occupation since 1980. Plaintiffs are requesting a declaration from this Court that Plaintiff Christy is not subject to a non-competition agreement contained in the 1995 Shareholder Agreement.

86.    Alternatively, Plaintiffs are requesting a declaration from this Court that the non-competition provision in the 1995 Shareholder Agreement is unenforceable for lack of consideration, or is otherwise unlawful and unenforceable.

87.    Plaintiffs seek also to enjoin any statements made by Defendant, and those acting on its behalf, which disparage Plaintiffs in their business.

WHEREFORE, Plaintiffs respectfully pray for a declaration from this Court that Plaintiff is not subject to a non-competition agreement with Defendant and to enjoin any statements made contrary to that declaration, and for such other relief as may be warranted.

### JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all claims for which a jury is permitted.

Respectfully submitted,

OF COUNSEL:
ELLIOTT GREENLEAF
    & SIEDZIKOWSKI, P.C.

*/s/ Brian R. Elias*

MARK A. KEARNEY
BRIAN R. ELIAS
DEBORAH H. SIMON
925 Harvest Drive, Suite 300
Blue Bell, PA 19422
215-977-1000

DATED: October 14, 2009                Attorneys for Plaintiffs

**EXHIBIT A**

# Tekkem License Agreement

**THIS AGREEMENT** is entered into this 13th of October, 2009 by and between P.R. Stephansen AS, a corporation under the laws of Norway having a usual place of business at Borgentoppen 71, 1374 Borgen, Norway, (*"Licensor"*) and Nordetek Environmental, Inc., a Delaware corporation having a place of business at 19925 Stevens Creek Blvd, Suite 100, Cupertino, CA 95014 (*"Licensee"*).

**WHEREAS,** Licensor is the sole and exclusive owner of certain "Intellectual Property" related to Slakers that it desires to license exclusively to Licensee from the date hereof within the Territory defined herein.  Licensor has the authority and power to exclusively license and exclusively assign said "Intellectual Property" to Licensee; and

**WHEREAS,** Licensee desires to be the exclusive Licensee of said "Intellectual Property" and "Products" for the period described; and

**WHEREAS,** Licensor and Licensee desire that Licensee pay License Fees based upon the sales price of "Products" sold by Licensee during the period from the date hereof that employ the subject matter of certain patent claims of the "Intellectual Property"

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants of this Agreement, the parties agree as follows:

1. <u>**DEFINITIONS**</u>

1.1.   "*Intellectual Property*" as used herein shall mean and include:
    (a)   U.S. Patent 5,746,983 (the "Patent"), and any foreign counterpart patent thereto which subsists in any country in the Territory.
    (b)   Any patents on improvements to the Patent, whether now in existence or hereafter filed on behalf of the Licensor.
    (c)   Any divisional, continuation or substitute patent applications or reissues and extensions that are based on, or claim priority to, the Patent
    (d)   Any additional patents issued to Licensor or Poju R. Stephansen individually relating to reacting calcium oxide with water.
    (e)   Registered US trademark 2607699 for the mark "Tekkem;" and
    (f)   Any other non-registered or registered trademarks owned or controlled by the Licensor and used in the Territory

1.2.   "*Products*" as used herein consists of
    (a)   Systems for reacting calcium oxide with water, metering lime slurry and storing lime, sold by Licensee that are covered by and fall within the language of any of the claims of an issued patent identified in any of paragraphs 1.1 (a)-(d) above that has not been disclaimed, expired, declared invalid by a court of law or cancelled or declared un-patentable as a final result of a reexamination proceeding before the U.S. Patent Office (individually a "System").
    (b)   All equipment sold by the Licensee as part of a System that includes any devices listed in the patents or claims, or that is as part of the System to prepare and feed lime from calcium oxide.

1.3.   "*Gross Sales Price*" shall mean the Licensee's gross sales (the gross amount of the Agreement or Contract between the Licensee and the customer)

1.4.   "*Customer*" shall mean any party purchasing the Products

1.5.   "*Contract, Contract Sale, and Sale(s)*" all shall mean the agreement between the Licensee and the Customer or third party purchasing the Products from the Licensee.

## Tekkem License Agreement

**2. LICENSE**

2.1.    Licensor hereby grants to Licensee, upon and subject to the terms and conditions of this Agreement, an exclusive license to and under the "Intellectual Property", to make, have made, use, sell, offer for sale, import, export, manufacture, market, distribute and otherwise incorporate in projects, the Products, in the Territory described. This license shall include the right to use the mark "Tekkem," as well as any other trademarks or service marks comprising the Intellectual Property, on the Products and in advertising and marketing materials for the Products. The Licensee hereby agrees to use the mark "Tekkem," and any other trademarks or service marks comprising the Intellectual Property, in accordance with quality control standards as provided by Licensor to Licensee from time to time. Licensee agrees to maintain quality standards for products and services bearing the trademarks and service marks that are at least consistent with the standards of quality Licensee maintains for its other products and services. Licensee agrees to permit Licensor or its appointed agent from time to time and upon reasonable advance notice to inspect the quality and nature of the products and/or services sold by Licensee under the trademarks and service marks to confirm that they conform to the terms of this Agreement. Licensor agrees that the products and/or services sold by Licensee as of the effective date of this Agreement are of high quality, and therefore comply with the quality requirements under this section, and this Agreement.

2.2.    The Territory shall be:
    (a)    United States of America
    (b)    Canada
    (c)    Mexico
    (d)    Australia
    (e)    New Zealand

**3.    IMPROVEMENTS AND MODIFICATIONS**

3.1.    In the event that Licensee develops any improvement to the Products and later incorporates such improvement in an improved or modified version of the Product, such improved Product shall be subject to the payment of the License Fees described herein. All improvements, design changes, modifications, revisions, additions and the like to the Intellectual Property, Products or Systems ("Improvements") developed, conceived or reduced to practice by employees of the Licensee alone, or jointly by employees of the Licensor and Licensee, shall become the property of Licensee ("Licensee Improvements"). Licensee hereby agrees to promptly disclose to Licensor any and all Licensee Improvements and agrees to grant, and hereby does grant, Licensor a non-exclusive license in and to such Licensee Improvements in Norway, Sweden, Denmark & Finland.

3.2.    Licensee shall provide the Licensor a license to incorporate or use any improvements described above, at no fee, for use by the Licensor in the Countries of Norway, Sweden, Denmark and Finland.

**4.    LICENSE FEES CONSIST OF A SLAKER FEE PLUS A ROYALTY FEE**

4.1.    Fixed Slaker fee of $6,000 per Slaker.
4.2.    Additional royalty fee consisting of 3% of the Gross Sales Price of the Product.
4.3.    Fees shall accrue at the time that Licensee enters into an agreement or contract to furnish the Product to a customer.
4.4.    Fees shall be payable and due as set forth in Section 6 below at the time 50% or more of the Gross Sales Price is billed by the Licensee.

Tekkem License Agreement

4.5.  License Fees are based on the Contract Sale amount plus any change orders which are greater than 5% of the Contract Sale amount. No deduction in License Fees are allowed for back charges from the customer, returns, and uncollected amounts

4.6.  All payments due Licensor shall be made in United States currency by check drawn on a U.S. bank.

## 5.    COMMERCIALIZATION AND MARKETING

5.1.  Licensee shall be solely responsible for the manufacture, production, sale, and distribution of the Products and will bear all costs associated therewith.

## 6.    LICENSE FEES

6.1.  The Fees owed Licensor shall be calculated on a semi-annual calendar basis and shall be payable no later than 60 days after the date of the reporting period. Reports shall be based on the prior six months ending on December 31 and June 30 of each year.

6.2.  For each Report, Licensee shall provide Licensor with a written License Fee schedule in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting the projects using the Products of Licensor and the sales price of the Products. Such statements shall be furnished to Licensor regardless of whether or not any Products were sold during the Royalty Period or whether any actual Royalty is owed.

## 7.    BOOKS AND RECORDS

7.1.  Licensor shall have the right, upon 3 days notice, to inspect Licensee's books and records and all other documents and material in Licensee's possession or control with respect to the subject matter of this Agreement. Licensor shall have free and full access thereto for such purposes and may make copies thereof. In no event shall Licensor have the right to examine information with respect to Licensee's costs, pricing formulas, or percentages of markup.

7.2.  In the event that such inspection reveals an underpayment by Licensee of the Fees owed Licensor, Licensee shall pay the difference, plus interest calculated at the rate of ten percent (10%) per annum. If such underpayment be in excess of five percent (5%) for any Royalty Period, Licensee shall also reimburse Licensor for the cost of such inspection.

7.3.  All books and records relative to Licensee's obligations hereunder shall be maintained and made accessible to Licensor for inspection at a location in the United States for at least two years after termination of this Agreement.

## 8.    REPRESENTATIONS AND WARRANTIES

8.1.  Licensor represents and warrants that it is the owner of the entire right, title, and interest in and to the Intellectual Property that is now in existence; that it has the right and power to grant the licenses granted herein; there are no other agreements with any other parties in conflict with such grant; and that it knows of no prior art or party that could invalidate the patents comprising said Intellectual Property.

8.2.  Licensor further represents and warrants that Licensee's contemplated use of the Products as represented to Licensor does not infringe any valid rights of any third party, and that there are no actions or claims for infringement against Licensor with respect to items it manufactures and/or sells embodying the invention of the Intellectual Property of paragraph 1 hereof, anywhere in the world.

## Tekkem License Agreement

8.3.   Licensor further represents and warrants that it is assigning to the Licensee its full right, title and interest to the Intellectual Property in the Territory and that such right, title and interest is intended to confer standing upon the Licensee to enforce the rights of the Licensor in the Intellectual Property in the Territory.

**9.    TERM**

9.1.   Unless terminated earlier pursuant to paragraph 10, the term of this Agreement shall commence on the effective date listed above and continue in full force and effect until expiration, revocation or invalidation of the last patent or the abandonment of the last patent application comprising the Intellectual Property.

**10.   TERMINATION**

10.1.  Licensor shall have the right to immediately terminate this Agreement by giving written notice to Licensee in the event that Licensee files a petition in bankruptcy or is adjudicated a bankrupt or insolvent, or makes an assignment for the benefit of creditors or an arrangement pursuant to any bankruptcy law, or if the Licensee discontinues or dissolves its business or if a receiver is appointed for Licensee or for Licensee's business and such receiver is not discharged within 60 days.

10.2.  Licensor may terminate this Agreement upon 30 days' written notice to Licensee in the event of a breach of any provision of this Agreement by Licensee that, Licensee fails to cure within a period of 30 days following notice from Licensor.

**11.   POST TERMINATION RIGHTS**

11.1.  In the event that License is terminated, Licensee shall immediately cease all activities related to the Product, effective upon receipt of the Notice of Termination.

11.2.  Licensee shall pay, within 30 days of Notice of Termination, all fees accrued on agreements or contracts entered, at the time of the Notice of termination is sent.  Fees shall be due regardless of the billed amount

11.3.  Any licenses given to purchasers or owners of "Products" by Licensee shall remain in effect.

**12.   INDEMNIFICATION**

Licensee agrees to defend, indemnify, and hold Licensor, and its officers, directors, agents, and employees, harmless against all costs, expenses, and losses (including reasonable attorney fees and costs) incurred through claims of third parties against Licensor based on the manufacture or sale of the Products, within the Territory, including, but not limited to, actions founded on product liability.

**13.   INFRINGEMENTS**

13.1.  Upon Licensor's request and its representation and promise that all others shall be excluded from use of the Intellectual Property in the defined Territory, Licensee may, in its discretion, defend the Products and prosecute any infringement of the Licensor's Intellectual Property rights by any third party or its agents in the United States. Licensee shall institute and prosecute such lawsuit(s) in the name of Licensee and, if Licensee shall request, Licensor agrees to join in any such lawsuit(s) as a named party, when and if requested by Licensee to do so.

13.2.  Any lawsuit shall be prosecuted solely at the expense of Licensee and all sums recovered

## Tekkem License Agreement

shall be the property of Licensee.

13.3.    The parties agree to fully cooperate with the other party in the prosecution of any such lawsuit under this section except that the party bringing the lawsuit shall reimburse the other party for the other party's out-of-pocket expenses, but not for time or services incurred as the result of such cooperation.

**14.    ASSIGNMENT AND SUBLICENSING AND SUCCESSORS**

14.1.    The license granted hereunder is personal to Licensee and may not be assigned by any act of Licensee or by operation of law unless in connection with a transfer of substantially all the assets of Licensee or with the consent of Licensor.

14.2.    Any license or sublicense that is provided hereunder by Licensee to the purchaser or owner of Products sold by Licensee hereunder, shall not be treated as a sublicense under this Agreement. Licensee may issue a license to the purchaser or owner of the Products sold by Licensee hereunder, and any such Licenses issued to a purchaser or owner of Products hereunder (i) are understood to carry no additional royalty obligation beyond that paid by Licensee pursuant to paragraph 6 hereof, and (ii) are provided for the life of the patent or patents comprising said Intellectual Property. Licenses issued to purchasers or owners of Products sold by Licensee hereunder, or any sublicensee of Licensee, are exempt from the termination provisions of this Agreement.

**15.    SEVERABILITY**

15.1.    If any provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other provision and such invalid provision shall be deemed to be severed from the Agreement.

**16.    NOTICES**

16.1.    Notice required to be given pursuant to this Agreement shall be in writing and mailed by certified or registered mail, return receipt requested, or delivered by a national overnight express service to the addresses set forth in the first paragraph of this Agreement.

16.2.    Either party may change the address to which notice or payment is to be sent by written notice to the other party pursuant to the provisions of this paragraph.

**17.    ARBITRATION OF DISPUTES**

17.1.    This Agreement is subject to Norwegian law.

17.2.    The Parties accept Asker and Baerum District Court as non-exclusive jurisdiction in first instance.

17.3.    This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents that may be in conflict therewith.

# Tekkem License Agreement

**16.**    **NOTICES**

16.1.    Notice required to be given pursuant to this Agreement shall be in writing and mailed by certified or registered mail, return receipt requested, or delivered by a national overnight express service to the addresses set forth in the first paragraph of this Agreement.

16.2.    Either party may change the address to which notice or payment is to be sent by written notice to the other party pursuant to the provisions of this paragraph.

**17.**    **ARBITRATION OF DISPUTES**

17.1.    This Agreement is subject to Norwegian law.

17.2.    The Parties accept Asker and Baerum District Court as non-exclusive jurisdiction in first instance.

17.3.    This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents that may be in conflict therewith.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

P.R. Stephansen, AS        Nordetek Environmental Inc.

By: _____    By: _____

Date: _____    Date: _Oct. 14, 2009_____

Title: _____    Title: _Managing Director_____

**EXHIBIT B**

**Paul Christy**

| | |
|---|---|
| **From:** | Paul Christy [PChristy@RDPTech.com] |
| **Sent:** | Friday, September 18, 2009 3:17 PM |
| **To:** | 'Dick Christy' |
| **Cc:** | Steve Benz (Steve Benz); Dave Kraut (Dave Kraut) |
| **Subject:** | Letter |
| **Attachments:** | Resignation letter 9-18-09.pdf |

Dick,

Please see attached letter

Paul Christy
RDP Technologies, Inc.

1

Paul Christy
1395 Wisteria Drive
Malvern, PA 19355

September 18, 2009

Richard Christy
President
RDP Technologies, Inc.
2495 Blvd of the Generals
Norristown, PA 19403

Re:    Resignation

It has been almost 3 years since your e-mail dated September 26, 2006, instructing Mark Harris to prepare the agreement we reached to split the Company by products. In your own words,

"This decision is final so is no need to discuss alternative arrangements."

Since that agreement you have continued to refuse to reach any reasonable compromise in splitting the Company. It is now clear to me, that there is no hope in ever getting you to finalize any agreements you make with me.

Your actions this week combined with your past actions leave me with no choice but to resign from RDP Technologies.

This week, I learned that someone in RDP's office forged my signature on the 2007 Corporate Tax return. This became obvious upon reviewing the documents you produced in regards to our pending case. Document D2788 has my name as signatory, dated September 10, 2008. However, the signature is not mine and not even the name I use when signing documents. This may be criminal conduct, and is another case of my identity being stolen that involves you. The person who signed my name stole my identity, lied to the federal government and (most likely) the state taxing boards, and did so on behalf of RDP.

Also this week, I just discovered that you now are excluding me from the review of the year-end financial information, including a meeting scheduled for September 16 to which I was invited earlier this week. I then later learned the meeting date was changed and I am being excluded at your instructions. The review, conducted in RDP's office, is an integral part of the Independent Accountants Report contained in the Company's year-end statements. In an e-mail from our CPA, Steve Benz;

"I spoke to Richard concerning our annual visit. We are scheduled for September 29, 2009. He made it clear to me that you will not be in attendance. We are to work with Richard and Dave."

For the first time in 30 years, you have directed our accountant to conduct a year-end review of our books, without me, the Secretary-Treasurer of the Corporation, present. In spite of this, I still look forward to speaking with RDP's valuation consultant, as proposed by you at the August 5, 2009 Board meeting.

Finally, this week I discovered that, for the second time in six months, and after I raised this issue in our case based on your April 14, 2009 actions, that you directed the Company to

make another tax payment for your personal taxes or distribution of funds (dividend) without notifying me, or making any corresponding payment on my behalf. You have once again posted $82,500 in Federal taxes, plus $10,000 in PA tax estimates as an expense to RDP and directed RDP to make a payment direct to both agencies, but only for you. This is another inappropriate and perhaps illegal distribution of Company funds

These events, which have occurred in just the three days of this week, are on top of the outrageous conduct in which you have engaged in the past.

I continue to be shocked that you have not even tried to explain stealing my name and social security number in order to illegally obtain a drivers license in North Carolina

I am also shocked by your continuing refusal to tell Mr. Stephansen the truth, and your bullying demand that I "help" when I have not been involved in the problem and told you not to take the steps you took.

Back in 1997, we paid a license fee of $2,000 per slaker plus an additional royalty of 2% of the gross sale amount. The amounts, agreed and paid, were based on the License and Distribution Agreement signed August 15, 1997. I negotiated the agreement with Mr. Stephansen and you approved the agreement prior to signing. The 1997 Agreement was for 5 years.

Prior to expiration of the 1997 Agreement, I began discussions with Mr. Stephansen to extend the Agreement out to and beyond the life of the patent. This resulted in a new agreement signed on January 25, 2001 approximately 3.5 years after the original agreement. The new agreement increased the per slaker license fee. There was no change in the 2% royalty on gross sales.

For all projects booked prior to about January 2007, RDP posted and paid the 2% royalty on the gross sale. There were a few projects wherein RDP provided installation services, at a significantly reduced margin of approximately 20% compared to 45 or 50% margin on the equipment, which was not included in the 2% calculation. The 2% royalty on the gross sale included slurry loop pumps, silos, grit removal equipment... etc.

You and I discussed the payment and calculation of the 2% royalty on at least one occasion prior to September 2008. You wanted to reduce the amount as you felt we should not be paying the 2% royalty on some of the items included in the gross sales price. I disagreed and took the position that this was not in accordance with the license agreement and was contrary to the almost 10 year history of paying a 2% royalty on the gross sale. As seems to be the case, the discussion ended up in an argument.

At some point in time, you secretly and without telling me, instructed Robert VanBramer to exclude certain components, and to remove the gross sales value of those components, from the royalty calculations. You did this in spite of the fact that Mike Quici was still preparing estimates with a 2% royalty on the gross sales price on jobs being bid. Furthermore, I was then using Mike's estimates to prepare "order entry estimates", that are sent to Robert VanBramer for our order entry procedure on the projects I sold. I believe Rob Christy and Mike Quici were also following the same procedure.

I have also learned, upon receipt of the Order Entry forms from Mike Quici as part of our year-end financial statement preparation, that you have unfairly taken the purchase orders from ADM, split RDP's proposal price in two, in such a manner as to reduce the amount of royalty to

2

be paid to P.R. Stephansen. You even gone so far, as to post or pay no royalty on the lime silo, even though it was included in RDP's proposal as part of the gross sales price. You have posted the lime slaking system at a gross sales price using a 34% margin, for which you have included the 2% royalty. Meanwhile the lime silo is posted at 57% margin, resulting in a higher sales value, for which you have failed to include any royalty fee whatsoever.

On July 8, 2009, you received a demand for payment for the unpaid amounts from Mr. Stephansen. On July 9, 2009, you asked for a copy of the License Agreement, and you stated "...I will look into the situation" in an e-mail to Mr. Stephansen and me. That is the last I heard from you on his issue. I did receive a request from Mike Quici, August 18, 2009, for a copy of the License Fee report, that I previously provided to Mr. Stephansen, and forwarded a copy to Mike the next day.

You secretly changed the amount of money that was to be paid to P.R. Stephansen, after 10 years of ongoing payments and consistent payment of license and royalty fees. Upon receipt of the July 8 e-mail, you dealt directly with Mr. Stephansen and kept all communications or discussions secret from me. You could have admitted to an error, paid what was owed, and we wouldn't be in the situation we are today where RDP's credibility is questioned, any trust is gone and the License and Distribution Agreement has been terminated.

RDP's actions under your leadership affects my credibility in our chosen work. You are engaging in criminal acts under the RDP name. You have now repeatedly stolen my identity without my knowledge, until recently, but I cannot let you steal my good name and word. RDP, in my view, is acting unethically , and I will not be forced to explain your conduct any longer. Particularly, when I am not aware of your actions as you continue to hide your actions from me.

You have denied me the ability to work with the Company's CPA to finalize the Company's annual financial statements and obtained an Independent Accountants Report. You have directed disbursement be made, which are inappropriate, and have hid those instructions from me on more than one occasion. I cannot be the Secretary-Treasurer with these actions, and staying with RDP in light of these facts would only be interpreted by the business community as approving of such actions. I cannot continue to work at RDP with this type of conduct.

As such, I resign as an employee and director of RDP immediately. Please remove my name from all materials, and do not use my name in connection with RDP in any regard. I have left my computer and company credit cards with my attorney, Mark Kearney. My company car, which was purchased, registered and remains in California, is in storage in San Diego at AAAA Auto Storage & Park 1304 38th Street, San Diego, Ca. 92105 (619) 266 - 7290. If you wish, my attorney can arrange with the Company for my purchase of this company car.

Paul Christy

Copy:  David Kraut    - Kraut Harris
        Stephen Benz - Quinn/Benz

**EXHIBIT C**

A

# License and Distribution Agreement

THIS LICENSE AGREEMENT is entered into as of _15 Aus._, 199̲7̲ (the "Agreement Date"), by and between:

TEKKEM P.R. Stephansen AS, a corporation organized under the laws of Norway ("Supplier") and having a usual place of business at Borgentoppen 71, 1374 Borgen, Norway, and

RDP Technologies, Inc., a corporation organized under the laws of _Pennsylvania_ ("Licensee") and having a usual place of business at 2495 Blvd of the Generals, Norristown, PA 19403-5236, USA

## 1.   Introduction

Supplier has developed the Product defined below and is the owner of various patents, know-how, and other intellectual property rights relating thereto. Licensee conducts, or will conduct, business within the Field and desires to obtain rights to manufacture, market, and distribute the Product. Accordingly, in consideration of the mutual promises contained herein, the parties agree to the terms and conditions set forth in this Agreement.

## 2.   Definitions

As used in this Agreement:

(a)   "Affiliated Parties" of either party to this Agreement means entities that are owned or controlled by or which own or control such party or which are owned or controlled by a person or entity that owns or controls the party. An entity shall be deemed to be "owned or controlled" by the person or entity having a direct or indirect right to vote a sufficient portion of the subject entity's equity securities (or other voting interests) to control management's policies and directives.

(b)   "Base Technology" means the inventions, discoveries, methods, techniques, know-how, data and other information known to Supplier on the Agreement Data that is necessary or useful in the design, development, or manufacture of the Product and that Supplier has the right to make available to Licensee as provided herein.

(c)   "Deliverables" means the items set forth in Exhibit A.

(d)   "Field" means the market area described in Exhibit A.

(e)   "Gross Margin" means the Net Sales Price of the Product minus the Cost of Sales.  The "Cost of Sales" means the sum of Licensee's direct costs of

B

materials, labor, and manufacturing overhead for the Product computed in accordance with generally accepted accounting principles consistently applied, provided that the cost of any material, labor, or component of manufacturing overhead obtained from an Affiliated Party shall be deemed to be the lesser of (i) Licensee's actual cost for such item or (ii) the cost charged for such item (in like kind and quality) by a bona fide unaffiliated supplier.

(f)  "Net Sales Price" means the gross selling price invoiced to purchasers of the Product from Licensee and its Affiliated Parties minus:

    (i)        trade discounts actually taken;

    (ii)       sales, use, excise, and similar taxes;

    (iii)      import and export taxes and customs duties;

    (iv)      packaging, crating, insurance, and transportation charges; and

    (v)      refunds, credits, allowances, and adjustments actually allowed or made.

(g)  "New Developments" means inventions, discoveries, methods, know-how, data, or other information useful to the design, development, or manufacture of the Product that is developed after the date of this Agreement.

(h)  "Patents" means the patents, if any, set forth in Exhibit C.

(i)  "Product" means the product within the Field, as defined in Exhibit A.

(j)  "Territory" means the geographical area set forth in Exhibit A.

(k)  "Trademarks" means the trademarks or service marks set forth in Exhibit D, as it may be amended by Supplier from time to time.

## 3.  License and Appointment

(a)  Supplier hereby appoints Licensee as its sole distributor of the Product in the Territory and hereby grants Licensee a non-transferable, exclusive license to utilize the Base Technology, know-how and Patents solely to improve, manufacture, market, sell, and distribute the Product in the Territory. These rights may be sublicensed by Licensee only to its Affiliated Parties located in the Territory which agree in writing to be bound by the provisions of this Agreement as if such Affiliated Parties were the Licensee.

---

PVC                                                                    

C

(b)     Supplier hereby grants Licensee a non-transferable, license to use the
        Trademarks in connection with Licensee's marketing, sales, and distribution
        of the Product in the Territory. Licensee shall take whatever action is
        reasonably requested by Supplier (at Supplier's expense) to protect Supplier's
        rights to these Trademarks in the Territory, including without limitation using
        appropriate notices and applying to become a registered user.

(c)     If Licensee fails to pay the minimum royalties set forth in Section 5(b) of this
        Agreement, but is not in default of any other provision of this Agreement,
        Supplier shall not have a right to terminate the Agreement pursuant to
        Section 12(e) below, but the license granted in Section 3(a) above shall
        become nonexclusive and Supplier and any agents or licensees it designates
        shall be entitled to manufacture, market, distribute, sell, and service the
        Product in the Territory and to use the Trademarks in connection therewith.

(d)     This agreement shall be binding on both parties, regardless of whether or not
        any of Supplier's patent- or trademark applications/registrations goes
        abandoned.

## 4.    Modifications

(a)     If Supplier creates a New Development, it will not offer to sell or license the
        New Development to any third party in the Territory, unless Supplier shall
        have first offered to sell or license the New Development to Licensee. If
        Supplier's offer consists of a license with respect to such New Development,
        the license shall be on an exclusive basis in the Territory, subject to
        negotiated provisions regarding termination and loss of exclusivity. Once
        Supplier has offered to sell or license the New Development to Licensee,
        Licensee shall have 14 calendar days to accept or reject the offer. If Licensee
        has not accepted the offer in writing within that period, the offer shall be
        deemed to have been rejected as of the expiration of the period. If Licensee
        rejects Supplier's offer, Supplier may offer to sell or license the New
        Development to any third party without limitation. However, Supplier may not
        offer to grant a license to any third party on terms that are materially more
        favorable to the third party than the terms of the license offered to Licensee
        without first giving Licensee 14 calendar days to accept or reject an offer
        comparable to the one made to the third party.

(b)     If Licensee develops a New Development, Licensee shall provide information
        regarding this New Development to Supplier sufficient to enable Supplier to
        understand the New Development. Licensee hereby grants Supplier a
        nonexclusive, royalty-free perpetual license to use such information in its

---

P6C

14/08 '97  20:37   ☎55 990906        ACTIO LASSEN A/S                           ☒004

D

research, development, design, manufacture, and marketing activities relating to the Product and related items.

## 5.  License Fees and Royalties

(a)  Licensee shall pay Supplier a non-refundable license fee, in the amount set forth in  Exhibit A, within 30 days after the Agreement Date.

(b)  In addition to the license fee set forth above, Licensee shall pay  Supplier minimum royalties in accordance with the schedule set forth in Exhibit A.

(c)  In addition to the license fee set forth in Section 5(a) above, Licensee  shall pay Supplier royalties with respect to a number of actual commercial sales of the Product by Licensee or any of Licensee's Affiliated Parties in accordance with the schedule set forth in Exhibit A. Royalties computed pursuant to this Section 5(c) shall be payable within 30 days following the end of each quarter of Licensee's fiscal year. All amounts paid pursuant to this Section 5(c) in any year shall reduce pro  rata the amounts payable pursuant to Section 5(b) for that year.

(d)  All payments shall be made in U.S. dollars. The exchange rate shall be the average of the buying and selling rates for U.S. dollars as quoted by the Bank of Boston, Boston, Massachusetts, at the close of business on the business day preceding the payment due date.

(e)  Licensee shall pay, or reimburse Supplier for any taxes or similar charges imposed by any governmental entity within the Territory and arising out of this Agreement, the licenses granted hereunder, or the licensee's use of the Base Technology, know-how, New Developments, Patents or Trademarks or its sale of Products, excluding any income or corporate excise tax assessed against Supplier.  Supplier will be responsible for any Norwegian taxes or similar charges.

## 6.  Technical Assistance

(a)  Within 30 days following the Agreement Date, Supplier shall deliver to Licensee the all recorded technical  information in its possession with respect to the Base Technology.  Supplier shall provide Licensee with such technical assistance as may be reasonably necessary to inform Licensee fully about the Base Technology.   For the first three years of the agreement period, if requested by Licensee from time to time and subject to the availability  of appropriate Supplier personnel, Supplier will provide Licensee with engineering assistance for the purpose of improving or modifying the Product at Supplier's then-effective billing rates for such services plus out-of-pocket expenses. (1)

---

v-4387                                                                14.08.97

(1) Supplier will be reimbursed for travel and travel expenses, plus $500 USD per day for technical assistance provided to licensee in licensees facility or territories. No cost or fees will be provided to Supplier for assistance

P6c

14/08 '97 20:38 ☎55 990908    ACTIO LASSEN A/S    ✆005

E

(b)   Licensee shall provide purchasers of the Product with whatever information, technical assistance, service, and repairs is reasonable or appropriate in light of the cost and use of the Product and the sophistication of the average purchaser [**OPTION**: as may be customary in the Territory for such products].

### 7.   Intellectual Property Rights

(a)   The Base Technology and Patents are and shall continue to be the property of Supplier exclusively and may be used by Licensee only as provided in this Agreement.

(b)   Any inventions or improvements (whether or not patentable), know-how, or other information developed by either party with respect to the Product shall belong solely to the developing party, subject (i) in the case of New Developments developed by Supplier, to Licensee's rights pursuant to Section 4(a) above, and (ii) in the case of New Developments developed by Licensee, to Supplier's rights pursuant to Section 4(b) above.

(c)   All Products manufactured by or for Licensee pursuant to this Agreement shall be labelled with patent and other notices in form and content sufficient to protect fully Supplier's intellectual property rights. Licensee agrees to use any reasonable form of notice, and manner of affixing such notice, specifically requested in writing by Supplier.

### 8.   Commercialization and Marketing

(a)   Licensee shall undertake all expenses of commercializing the Product in the Territory, such as funding capital equipment requirements, packaging, and production start-up expenses.

(b)   Licensee, at its own expense, shall take all steps that must be taken to satisfy all requirements applicable within the Territory with respect to declaring, recording, filing, notifying, authenticating, or otherwise rendering this Agreement valid. Licensee, at its own expense, also shall apply for and secure within 90 days after the Agreement Date all governmental and regulatory approvals necessary to sell the Product in the Territory.

(c)   Licensee shall use commercially reasonable efforts to optimize sales of the Product in the Territory.

(d)   (intentionally left blank)

(e)   Licensee agrees to refrain, outside the Territory, from seeking customers, establishing any branch, or maintaining any distribution center with respect to the Product.



PGC

F

(f)    All print advertising and other promotional materials for the Product shall
include a reasonably prominent notice that the Product was developed by
Supplier. Licensee shall obtain Supplier's prior approval of each use of
Supplier's name or Trademarks and, to such end, shall submit a prototype of
each such use to Supplier for review. Supplier shall be deemed to have
approved a proposed use of its name or Trademarks if it has not objected in
writing within 14 calendar days following its receipt of the prototype.

(g)    Once every three months, Licensee will provide Supplier with written reports
on bookings and sales detailing the actions taken since the prior report (or, in
the case of the first such report, since the Agreement Date) to promote sales of
the Product. Licensee will provide a list (naming the client, address, Territory
and value) of projects in which a contract or purchase covering the Products
has been received by Licensee. Licensee shall provide Supplier with a report,
at least annually, detailing the actions planned to promote sales of the Product
during the ensuing year. Such reports shall be accompanied by samples,
prototypes, sketches, or other illustrations, if available, of marketing and
promotional materials to be used during such period.

The sales report will provide a list of projects and number of Slakers in which
a sale has occurred within the quarter. The license fee will be calculated from
the amount of sales, by project, and shown as calculated on the sales report. A
sale is defined as a planned or performed shipment of Products, which gives
Licensee the right to issue an invoice towards the customer. The percentage
royalty fee will be paid on a pro rata basis, based on the amount invoiced
generated during each quarter. The reports and payments are due from
Licensee to Supplier within 30 days after the quarter's end.

(h)    If requested by Supplier, and at its expense, Licensee shall submit an
English-language translation of any marketing or promotional materials
required to be delivered to Supplier under Section 8(f) or (g).

## 9.    Books and Records

(a)    Each payment of royalties with respect to actual sales pursuant to Section 5(c)
of this Agreement shall be accompanied by a report detailing the number of
units of the Product sold or given away as complimentary merchandise during
the quarter to which such royalty payment applies, the Net Sales Price of these
Products, ~~the Cost of Sales of these Products~~, the rates at which royalties were
computed, the amount of royalties due, and any additional details necessary to
show how these amounts were determined.

(b) .   Licensee shall keep true and accurate records and books of account containing
all the data reasonably required for the full computation and verification of
royalty payments due under this Agreement for each quarter of each of
Licensee's fiscal years. Such materials shall be retained for a period of at least



14/08 '97  20:39  ☎55 990906        ACTIO LASSEN A/S                          ☒007

G

five years following the end of the fiscal year to which they relate. Licensee's books of account shall be maintained in accordance with generally accepted accounting principles consistently applied. Licensee shall permit the reasonable inspection and copying of such records and books of account by Supplier or its representatives during regular business hours at Licensee's regular place of business set forth above or, if Licensee moves during the term hereof, at a location acceptable to Supplier that is no less convenient for Supplier than the prior place of business. Supplier shall give Licensee at least 48 hours prior written notice of its election to inspect Licensee's records and books of account. Fees and expenses incurred in connection with such inspections (such as professional fees paid to accountants retained by Supplier and the cost of copying records) shall be borne by Supplier, unless such inspection shall reveal that an error of five percent (5%) or more in any royalty payment was made, in which case the fees and expenses incurred in connection with the inspection during which such error was discovered shall be borne by Licensee.

## 10.  Confidentiality

All proprietary information disclosed by one party to the other and marked as confidential or proprietary shall be treated as confidential and not disclosed or transferred by the recipient to third parties, other than the recipient's agents and employees who need to know this information to serve the recipient and who are obligated to treat this information as confidential. In addition, Licensee acknowledges that the Base Technology and New Developments of Supplier constitute trade secrets and proprietary properties of Supplier and agrees not to disclose or transfer such information or materials (or any copy or counterpart) to any third person, nor use these in any manner except pursuant to this Agreement; and Licensee shall take the more stringent of reasonable measures, and the measures it uses to protect its own comparable information and material, to prevent this transfer and use, including without limitation restricting access to its employees who require access to serve Licensee and who are obligated to treat such information as confidential. The foregoing non-disclosure provisions shall not apply to any information that is or becomes part of the public domain without breach of any obligation to the party owning or controlling such information.

## 11.  Representations and Warranties

(a)    Supplier hereby represents and warrants to Licensee that:

(i)    it owns all Patents, free and clear of liens or encumbrances, and has no actual knowledge of any conflicting patents or patent applications;

---

v-4387                                                                        14.08.97



D/aL

H

    (ii)        it has the full authority to enter into this Agreement without the prior consent or authorization of any court, agency, or other third party;

    (iii)      the undersigned officer has the full authority and approval of the Board of Directors of Supplier to enter into this Agreement; and

    (iv)      this Agreement does not violate the terms of any agreement, order, or other arrangement to which Supplier is subject or by which it is bound.

SUPPLIER MAKES, AND LICENSEE RECEIVES, NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, EXCEPT AS SPECIFICALLY STATED IN THIS AGREEMENT.

(b)    Licensee hereby represents and warrants to Supplier that:

    (i)        it has the full authority to enter into this Agreement without the prior consent or other authorization of any court, agency, or other third party;

    (ii)        the undersigned officer has the full authority and approval of the Board of Directors of Licensee to enter into this Agreement; and

    (iii)      this Agreement does not violate the terms of any agreement, order, or other arrangement to which Licensee is subject or by which it is bound.

## 12. Term and Termination

(a)    This Agreement shall remain in effect for an initial term of 5 years, and shall be renewed for successive additional terms of 5 years unless at least 120 days prior to commencement of any additional term either party, acting in its sole discretion, notifies the other of its intent not to renew, or unless the Agreement is otherwise terminated as permitted in this Section 12.

(b)    Supplier may terminate this Agreement immediately by written notice to Licensee if Licensee fails to pay the license fee required pursuant to Section 5(a), or if Licensee or any Affiliated Party of Licensee begins marketing a product that competes with the Product or that renders the Product obsolete, or upon the occurrence of any of the following events:

    (i)        the institution of proceedings by Licensee in bankruptcy, reorganization, receivership, or dissolution;

I

    (ii)          the institution of proceedings against Licensee in bankruptcy, reorganization, receivership, or dissolution, unless such proceedings have been dismissed or otherwise terminated within 60 days following the date they were initiated; or

    (iii)         the making of an assignment for the benefit of creditors by Licensee.

(c)    Either party may terminate this Agreement at any time for a default by the other party, effective on the date specified in a notice of termination, provided that at least 30 days prior to giving such notice of termination the terminating party shall have notified the defaulting party of the default and the defaulting party shall have failed to remedy the default within such 30-day period or, if the default is not susceptible of being remedied within such period, shall have failed to initiate action within such period that is reasonably calculated to remedy the default as promptly as practicable or shall have failed to pursue such action diligently to completion.

(d)    Upon expiration or termination of this Agreement for any reason, the licenses and appointment set forth in Section 3 above shall terminate. Within 30 days following the effective date of termination, Licensee shall give Supplier written notice of the number of units of the Product then in its inventory (including model numbers if there is more than one such number) and the Cost of Sales with respect to such Products (determined in accordance with Section 2(e) above). Supplier shall then have 14 calendar days to notify Licensee whether or not it wishes to purchase all or part of the inventory at Licensee's cost. If Supplier elects to purchase the inventory, the parties shall cooperate to complete the transaction within 30 days following Supplier's notice of election. Licensee shall be entitled to sell to any third parties any Product remaining in its inventory that Supplier does not elect to purchase for a period of 180 days following the date of termination.

(e)    Upon termination of this Agreement, Licensee shall return to Supplier, or destroy, all materials in its possession that constitute or describe, in whole or in part, any confidential or trade secret information of Supplier, including without limitation confidential information concerning the Base Technology and New Developments of Supplier. However, Licensee may retain one copy of any materials reasonably necessary for it to exercise its sell-off rights under Section 12(d) above or to comply with any maintenance or support obligations to its customers which it reasonably assumed. Within 10 business days after termination Licensee shall notify Supplier of any materials it intends to retain pursuant to the preceding sentence; shall certify in writing, by an officer, that it has returned or destroyed all other such materials; and shall agree in writing to hold all such materials, and the information they contain, in confidence in accordance with Section 10.

P/₆ C



J

(f)  If this Agreement is terminated, then the terminating party shall not be liable to the other for any damages, indemnification, expenditures or loss of profits or prospective profits of any kind sustained or arising out of such termination, both parties hereby irrevocably waiving any such rights to the fullest extent permitted under the laws of their respective countries and of any other jurisdiction. Neither party shall bring any action or proceeding of any nature whatsoever in any court, before any tribunal, or under any arbitration proceeding provided for herein, seeking or claiming any such damage or loss. Each party recognizes and acknowledges that the other party is entering into this Agreement in reliance upon and in consideration of the agreements and covenants contained in this paragraph (h).

(g)  Sections 4(b), 5(c), 5(d), 7, 9, 10, 12(d), 12(e), 12(f), 13, 14, 17, and 22 shall survive termination of this Agreement.

## 13.  Indemnification

(a)  Supplier shall indemnify and hold harmless Licensee and its officers, directors, employees, licensees, and agents from and against any liabilities, costs, or other damages (including reasonable attorneys' fees and litigation costs) arising out of a breach of any of Supplier's representations or warranties expressed in Section 11 above, provided Licensee took reasonable actions to minimize such damages.

(b)  Licensee shall indemnify and hold harmless Supplier and its officers, directors, employees, licensees, and agents harmless from and against any liabilities, costs, or other damages (including reasonable attorneys' fees and litigation costs) arising out of Licensee's or its Affiliated Parties' manufacture, use, or sale of the Product or their improvements or alterations thereto or from a breach of any one or more of Licensee's representations or warranties expressed in Section 11 of this Agreement, provided Supplier took reasonable actions to minimize such damages.

## 14.  Infringements

(a)  Although Supplier believes that Licensee's contemplated use of the Base Technology and Patents pursuant to the license granted by Section 3(a) will not infringe any valid patent, trade secret, or other intellectual property right of a third party in the Territory, it cannot warrant this as a fact. Accordingly, Supplier's sole responsibility, and Licensee's exclusive remedy, in connection with any claim of such infringement shall be to defend any suit or proceeding brought against Licensee so far as it is based on a claim that the use of the Base Technology or Patents by Licensee or its customers constitutes an infringement or misappropriation of the rights of a third party, provided Supplier is notified within ten (10) calendar days after the commencement of



PGL

K

such suit or proceeding and receives Licensee's full and complete authority, information, and assistance (at Supplier's expense) for its defense; and Supplier shall pay all damages and costs awarded in the action against Licensee, but shall not be responsible for any compromise made without its consent. If such use of the Base Technology or Patents is claimed or held to constitute such an infringement, or if Supplier determines that such claim or holding is likely to be made, Supplier, at its option and expense, may either procure for Licensee the right to continue using the allegedly infringing item; modify the item so that it becomes non-infringing; replace the item with a non-infringing counterpart; or terminate the associated license rights, require the return of the applicable material, and, if appropriate, adjust or refund the payments made or to be made by Licensee. The foregoing indemnity shall not apply to the extent that the claim of infringement either is based upon Licensee's use of the allegedly infringing item with an article or process developed by Licensee or obtained from a third party, or arises from Licensee's activities outside the scope of the Section 3(a) license, or arises from uses of the Product by Licensee's customers in ways that were not intended.

(b)    If either party learns of any possible infringement or misappropriation of Supplier's rights in the Base Technology, Patents or Product, it shall give notice thereof to the other party. Licensee agrees to cooperate with the Supplier's reasonable efforts to seek legal remedies for such infringements and misappropriations.

(c)    Supplier makes no warranty and undertakes no liability or responsibility with respect to Licensee's use of the Trademarks in the Territory. Licensee shall research the availability of the Trademarks for use and registration in the Territory before actually using them; notify Supplier if it has reason to believe that the Trademarks are not available and cooperate with Supplier in determining an appropriate course of action; and indemnify Supplier and hold it harmless from any infringement claims that arise in connection with Licensee's use of the Trademarks unless, despite Licensee's notice of unavailability, Supplier requires their use and agrees to assume responsibility therefor.

(d)    Supplier does not hereby assume any liability or obligation in connection with infringement claims relating to its New Developments. Rather, any such liability or obligation shall be subject to good faith negotiation between the parties at the time Licensee seeks rights to such New Development pursuant to Section 4(a) above.

## 15.  Assignment and Sublicensing

(a)    Licensee may not sublicense any third party to manufacture, market, distribute, sell, or service the Product or any component thereof without

PGC



L.

obtaining the prior written consent of Supplier. All proposed sublicense agreements shall contain provisions pursuant to which the sublicensee agrees: (i) to maintain the secrecy of confidential information and to sign a Confidentiality Agreement substantially in the form of Section 10; (ii) to maintain records and books of account containing all data reasonably required for the full computation of the Cost of Sales of Products produced by such third party or the royalties due with respect to sales by such party, as appropriate, and to permit the inspection of such records and books of account in accordance with the procedures set forth in Section 9(b) of this Agreement, at a location that is no less convenient for Supplier than the place of inspection specified in said Section 9(b); and (iii) to comply with and perform the obligations delegated to it by Licensee under this Agreement as if this Agreement were binding on it.

(b)    Licensee may not assign this Agreement, or any rights or obligations under it, to any third party without obtaining the prior written consent of Supplier.

(c)    The execution of any assignment or sublicense by Licensee without Supplier's prior written consent shall constitute a default of this Agreement and shall be ineffective as against Supplier.

## 16.   Independent Contractor Status.

Supplier and Licensee are independent contractors, and this Agreement shall not be deemed to constitute either party a partner, joint venturer, franchisee, servant, agent, or employee of the other.

## 17.   USA Export Controls

Licensee agrees not to export, re-export, or permit the re-exportation of any Product to any country now or hereafter included in the U.S. Department of Commerce's list of countries to which exportation of products of such type is or may be restricted or prohibited, unless that exportation or re-exportation is authorized specifically by a special license issued by the Office of Export Administration of the United States of America. This provision shall not be interpreted to expand the definition of "Territory" set forth above.

## 18.   Force Majeure

Neither party shall be deemed to be in default under this Agreement as long as its failure to perform any of its obligations hereunder is occasioned solely by fire, labor disturbance, acts of civil or military authorities, acts of God, or any similar cause beyond such party's reasonable control. [However, if a party is so rendered incapable of performing for a continuous period of 45 days or more, the other party may terminate this Agreement immediately upon notice to the non- performing party, subject to the provisions of Section 12(d)-(g).]

*PGC*

M

### 19.   Further Assurances

Each party shall cooperate fully with the other party, execute such further instruments, documents, and agreements, and give such further written assurances, as may be reasonably requested by the other party to carry into effect the intents and purposes of this Agreement.

### 20.   Counterparts

This Agreement may be executed in separate counterparts, each of which shall be deemed an original and, even if executed separately by each party, shall constitute a single original instrument, effective as if the parties had executed one and the same instrument.

### 21.   Waiver

No waiver of any term or condition of this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be a further or continuing waiver of that term or condition or a waiver of any other term or condition.

### 22.   Notices

All notices and other communications called for hereunder shall be in writing, shall specifically refer to this Agreement, and shall be delivered in person or sent by international carrier or overnight mail, by telex or telecopy, or by other means providing proof of delivery, to the parties at their respective addresses set forth above, or to any other address of which a party notifies the other. All notices shall be deemed to be effective on the date of actual receipt or five days after transmission as provided above, whichever is sooner.

### 23.   Entire Agreement; Amendment and Modification

This Agreement constitutes the entire agreement between the parties with respect to its subject matter and may be amended only by a writing executed by each of the parties.

### 24.   Binding Effect; Successors and Assigns; Language

This Agreement, as set forth in English, shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. The parties have specifically requested that English be the official language for the Agreement, that all related documents be drawn up in English, and that all communications and dispute resolution take place in English.

---

v-4387                                                                     14.08.97

N

### 25.  Severability; Enforceability

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions. If any law or rule within the Territory should prohibit, make impossible, or limit any obligation of Licensee under this Agreement, Supplier shall have the right, at its option, to suspend or terminate this Agreement or modify it as may be reasonably necessary to obtain the benefits contemplated herein.

### 26.  Headings

The section headings contained in this Agreement are for informational purposes only and are not to be construed to affect the meaning or application of any provision.

### 27.  Governing Law

This Agreement shall be governed by and construed in accordance with the laws Commonwealth of Pennsylvania [(excluding, if otherwise applicable, The United Nations Convention for the International Sale of Goods).] London, GB shall be the venue for any action arising with respect to this Agreement or the relationship between the parties, and each party hereby expressly consents to the jurisdiction of the courts of London, GB for this purpose, see art. 28 below.

### 28.  Arbitration of Disputes

Any controversy or claim arising out of or relating to this Agreement or its breach, which the parties fail to resolve by agreement within thirty (30) days of notice of such controversy or claim, shall be settled by binding arbitration under the rules and auspices of the London Court of International Arbitration, in London, England, by a single arbitrator with experience in commercial arbitration selected by the President of the LCIA, who shall apply the laws of the Commonwealth of Pennsylvania or, if the application of such laws shall be prohibited by the country in which the Licensee is domiciled, applying the laws of England. If the application of the laws of England in arbitration proceedings is prohibited by the country in which Licensee is domiciled, then any disputes arising hereunder shall be submitted to the courts of the Commonwealth of Pennsylvania, to whose jurisdiction the parties hereby consent, for settlement under the laws of the Commonwealth of Pennsylvania .

The arbitrators shall have no authority to award punitive damages. The costs of the arbitration shall be borne equally by the parties and each party shall bear its own associated costs, except that if the arbitrator in its discretion determines that there is good cause for doing so (such as willful misconduct or bad faith) it may award the prevailing party its reasonable attorneys' fees and costs incurred in connection with the arbitration.

Pd.

O

Notwithstanding the foregoing, the parties reserve the right to seek and obtain injunctive relief, whether in the form of a temporary restraining order, preliminary injunction, injunction to enforce an arbitration award, or other order of similar import, from any court of competent jurisdiction prior to, during, or after commencement or prosecution of arbitration proceedings or the final decision and award of the arbitrators.

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed as an instrument under seal as of the date first written above.

TEKKEM P.R. STEPHANSEN                      RDP TECHNOLOGIES, INC.

By: _____              By: _____
(signature)                                                    (signature)

Name: Poju R. Stephansen                    Name: Paul G. Christy

Title: V D                                  Title: Vice President

P

EXHIBIT A

Product, Territory and Miscellaneous

## I.    Definitions

A.    Deliverables: Lime slaking plants

B.    Field: Lime slaking

C.    Product: Batch Lime Slakers and associated spares/accessories

D.    Territories: 1) USA
2) Canada, Mexico
3) Australia, New Zealand

With respect to territories 2 and 3 above, these are also included in the agreement. Supplier may terminate the agreement for each of the ~~three~~ territories if Licensee fails to meet the respective minimum targets of            two

| Year | Territory no. | Number of Slakers w/parts packages | Fixed license fee per Slaker sold minimum nos. Or above | Additional Royalty percentage from all sales |
|------|---------------|-----------------------------------|----------------------------------------------------------|---------------------------------------------|
| 1997 | 1 | 1 | | |
| | 2 | 0 | | |
| | 3 | 0 | | |
| 1998 | 1 | 1 | | |
| | 2 | 1 | | |
| | 3 | 0 | | |
| 1999 | 1 | 1 | US $ 2,000 | 2 per cent of gross value |
| | 2 | 1 | | |
| | 3 | 1 | | |
| 2000 | 1 | 1 | | |
| | 2 | 1 | | |
| | 3 | 1 | | |
| 2001 | 1 | 1 | | |
| | 2 | 1 | | |
| | 3 | 1 | | |

v-4387                                                              14.08.97

14/08 '97  20:45  ☎55 990906         ACTIO LASSEN A/S                    ☒017

Q

......... Lime Slakers per year in territory no. 2, and ....... Lime Slakers in territory no. 3.

## II.    Payments:

A.    Non-Refundable License Fee ({5(a)}: US $ 50,000,-, payable by Licensee in five installments, each US $ 10,000, the first US $ 10,000 to be paid upon *by 9-30-97* signature of this Agreement, thereafter each of the four remaining installments to be paid every year on ~~January~~ 2, commencing on ~~January 2, 1998,~~ ending *September 30 1997.* on January 2, 2001. Licensee will sign a promissory note for the unpaid amount when signing this Agreement, said promissory note to be assigned by Supplier to Supplier's bankers for collection on the note's due dates.

*September 30*

B.    Minimum Royalty Schedule ({5(b)}: US $ ...... per Lime Slaker

C.    Additional Royalty Schedule ({5(c)}: US $ ...... per Lime Slaker

---

TEKKEM P.R. STEPHANSEN                        RDP ~~COMPANY~~
                                              *Technologies, Inc.*

By: _(signature)_                             By: _(signature)_
(signature)                                        (signature)

Name: Poju R. Stephansen                      Name: Paul G. Christy

Title: V D                                    Title: Vice President

---

v-4387                                                            14.08.97

A

## License and Distribution Agreement

THIS LICENSE AGREEMENT is entered into as of January 25, 2001 (the "Agreement Date"), substituting a prior agreement including also a license agreement dated 15 August, 1997, by and between:

TEKKEM P.R. Stephansen AS, a corporation organized under the laws of Norway ("Supplier") and having a usual place of business at Borgentoppen 71, 1374 Borgen, Norway, and

RDP Technologies, Inc., a corporation organized under the laws of Pennsylvania ("Licensee") and having a usual place of business at 2495 Blvd of the Generals, Norristown, PA 19403-5236, USA

1.    **Introduction**

Supplier has developed the Product defined below and is the owner of various patents, know-how, and other intellectual property rights relating thereto. Licensee conducts, or will conduct, business within the Field and desires to obtain rights to manufacture, market, and distribute the Product. Accordingly, in consideration of the mutual promises contained herein, the parties agree to the terms and conditions set forth in this Agreement.

2.    **Definitions**

As used in this Agreement:

(a)    "Affiliated Parties" of either party to this Agreement means entities that are owned or controlled by or which own or control such party or which are owned or controlled by a person or entity that owns or controls the party. An entity shall be deemed to be "owned or controlled" by the person or entity having a direct or indirect right to vote a sufficient portion of the subject entity's equity securities (or other voting interests) to control management's policies and directives.

(b)    "Base Technology" means the inventions, discoveries, methods, techniques, know-how, data and other information known to Supplier on the Agreement Data that is necessary or useful in the design, development, or manufacture of the Product and that Supplier has the right to make available to Licensee as provided herein.

(c)    "Deliverables" means the items set forth in Exhibit A.

(d)    "Field" means the market area described in Exhibit A.

(e)    "Gross Margin" means the Net Sales Price of the Product minus the Cost of Sales. The "Cost of Sales" means the sum of Licensee's direct costs of

B

materials, labor, and manufacturing overhead for the Product computed in accordance with generally accepted accounting principles consistently applied, provided that the cost of any material, labor, or component of manufacturing overhead obtained from an Affiliated Party shall be deemed to be the lesser of (i) Licensee's actual cost for such item or (ii) the cost charged for such item (in like kind and quality) by a bona fide unaffiliated supplier.

(f)     "Net Sales Price" means the gross selling price invoiced to purchasers of the Product from Licensee and its Affiliated Parties minus:

    (i)     trade discounts actually taken;

    (ii)     sales, use, excise, and similar taxes;

    (iii)     import and export taxes and customs duties;

    (iv)     packaging, crating, insurance, and transportation charges; and

    (v)     refunds, credits, allowances, and adjustments actually allowed or made.

(g)     "New Developments" means inventions, discoveries, methods, know-how, data, or other information useful to the design, development, or manufacture of the Product that is developed after the date of this Agreement.

(h)     "Patents" means the patents, if any, set forth in Exhibit C.

(i)     "Product" means the product within the Field, as defined in Exhibit A.

(j)     "Territory" means the geographical area set forth in Exhibit A.

(k)     "Trademarks" means the trademarks or service marks set forth in Exhibit D, as it may be amended by Supplier from time to time.

**3.     License and Appointment**

(a)     Supplier hereby appoints Licensee as its sole distributor of the Product in the Territory and hereby grants Licensee a non-transferable, exclusive license to utilize the Base Technology, know-how and Patents solely to improve, manufacture, market, sell, and distribute the Product in the Territory. These rights may be sublicensed by Licensee only to its Affiliated Parties located in the Territory which agree in writing to be bound by the provisions of this Agreement as if such Affiliated Parties were the Licensee.

(b)     Supplier hereby grants Licensee a non-transferable, license to use the Trademarks in connection with Licensee's marketing, sales, and distribution

c

of the Product in the Territory. Licensee shall take whatever action is reasonably requested by Supplier (at Supplier's expense) to protect Supplier's rights to these Trademarks in the Territory, including without limitation using appropriate notices and applying to become a registered user.

(c)    If Licensee fails to pay the minimum royalties set forth in Section 5(b) of this Agreement, but is not in default of any other provision of this Agreement, Supplier shall not have a right to terminate the Agreement pursuant to Section 12(e) below, but the license granted in Section 3(a) above shall become nonexclusive and Supplier and any agents or licensees it designates shall be entitled to manufacture, market, distribute, sell, and service the Product in the Territory and to use the Trademarks in connection therewith.

(d)    This agreement shall be binding on both parties, regardless of whether or not any of Supplier's patent- or trademark applications/registrations goes abandoned.

## 4.    Modifications

(a)    If Supplier creates a New Development, it will not offer to sell or license the New Development to any third party in the Territory, unless Supplier shall have first offered to sell or license the New Development to Licensee. If Supplier's offer consists of a license with respect to such New Development, the license shall be on an exclusive basis in the Territory, subject to negotiated provisions regarding termination and loss of exclusivity. Once Supplier has offered to sell or license the New Development to Licensee, Licensee shall have 14 calendar days to accept or reject the offer. If Licensee has not accepted the offer in writing within that period, the offer shall be deemed to have been rejected as of the expiration of the period. If Licensee rejects Supplier's offer, Supplier may offer to sell or license the New Development to any third party without limitation. However, Supplier may not offer to grant a license to any third party on terms that are materially more favorable to the third party than the terms of the license offered to Licensee without first giving Licensee 14 calendar days to accept or reject an offer comparable to the one made to the third party.

(b)    If Licensee develops a New Development, Licensee shall provide information regarding this New Development to Supplier sufficient to enable Supplier to understand the New Development. Licensee hereby grants Supplier a nonexclusive, royalty-free perpetual license to use such information in its research, development, design, manufacture, and marketing activities relating to the Product and related items.

## 5.    License Fees and Royalties, Taxes.

D

(a)    Licensee shall pay Supplier a non-refundable license fee, in the amount set forth in Exhibit A, within 30 days after the Agreement Date.

(b)    In addition to the license fee set forth above, Licensee shall pay Supplier minimum royalties in accordance with the schedule set forth in Exhibit A.

(c)    In addition to the license fee set forth in Section 5(a) above, Licensee shall pay Supplier royalties with respect to a number of actual commercial sales of the Product by Licensee or any of Licensee's Affiliated Parties in accordance with the schedule set forth in Exhibit A. Royalties computed pursuant to this Section 5(c) shall be payable within 30 days following the end of each quarter of Licensee's fiscal year. All amounts paid pursuant to this Section 5(c) in any year shall reduce pro rata the amounts payable pursuant to Section 5(b) for that year.

(d)    All payments shall be made in U.S. dollars. The exchange rate shall be the average of the buying and selling rates for U.S. dollars as quoted by the Bank of Boston, Boston, Massachusetts, at the close of business on the business day preceding the payment due date.

(e)    Licensee shall pay, or reimburse Supplier for any taxes or similar charges imposed by any governmental entity within the Territory and arising out of this Agreement, the licenses granted hereunder, or the licensee's use of the Base Technology, know-how, New Developments, Patents or Trademarks or its sale of Products, excluding any income or corporate excise tax assessed against Supplier. Supplier will be responsible for any Norwegian taxes or similar charges.

(f)    Licensee will be responsible for payment of all taxes imposed by Government or agencies within the territory. Supplier will be responsible for any taxes from Norway.

## 6.    Technical Assistance

(a)    Within 30 days following the Agreement Date, Supplier shall deliver to Licensee the all recorded technical information in its possession with respect to the Base Technology. Supplier shall provide Licensee with such technical assistance as may be reasonably necessary to inform Licensee fully about the Base Technology. For the first three years of the agreement period, if requested by Licensee from time to time and subject to the availability of appropriate Supplier personnel, Supplier will provide Licensee with engineering assistance for the purpose of improving or modifying the Product at Supplier's then-effective billing rates for such services plus out-of-pocket expenses. Supplier will be reimbursed for living and travel expenses, plus US $500 per day for technical assistance provided by Supplier to Licensee in

E

Licensee's facility or territories. No cost or fees will be paid to Supplier for assistance by Supplier which occurs in Norway.

(b)    Licensee shall provide purchasers of the Product with whatever information, technical assistance, service, and repairs is reasonable or appropriate in light of the cost and use of the Product and the sophistication of the average purchaser

(c)    (Licensee will use supplier's manager, Mr. Poju R. Stephansen as Licensee's quality assurance and development (QAD) advisor to Licensee's business; as governed in a service contract as previously agreed between Licensee and Mr. Poju R. Stephansen, see the original agreement part 6, Technical Assistance.

Licensee will employ Mr. Stephansen in order to enhance future profitability of the Licensee's use of the licensed technology from Supplier, and for promoting safety and quality standards within the organization in so far as the licensed technology is concerned.

Licensee will consult Mr. Stephansen concerning any design changes to design, function and operation procedures affecting a licensed technology, and send copies of memos, drawings, specifications and other relevant technical documents to Mr.Stephansen. Recommendations from the Licensee affecting the slaking equipment process shall be reviewed for safety and quality by Mr. Stephansen, to ensure original design standards. Recommendation of improvements, upgrades and/or system changes to enhance performance and/or profit from these slaking systems will be considered being within the scope of the advisor's role and authority.

Mr. Stephansen's role is to recommend and offer advice based on his personal experience and industry knowledge; but without assuming any liability; as Licensee shall indemnify and hold harmless Suppliers and its officers, directors, employees, licensees and agents as specified in article 13 (b).

## 7.    Intellectual Property Rights

(a)    The Base Technology and Patents are and shall continue to be the property of Supplier exclusively and may be used by Licensee only as provided in this Agreement.

(b)    Any inventions or improvements (whether or not patentable), know-how, or other information developed by either party with respect to the Product shall belong solely to the developing party, subject (i) in the case of New Developments developed by Supplier, to Licensee's rights pursuant to Section 4(a) above, and (ii) in the case of New Developments developed by Licensee, to Supplier's rights pursuant to Section 4(b) above.

F

(c)    All Products manufactured by or for Licensee pursuant to this Agreement shall be labelled with patent and other notices in form and content sufficient to protect fully Supplier's intellectual property rights. Licensee agrees to use any reasonable form of notice, and manner of affixing such notice, specifically requested in writing by Supplier.

## 8.    Commercialization and Marketing

(a)    Licensee shall undertake all expenses of commercializing the Product in the Territory, such as funding capital equipment requirements, packaging, and production start-up expenses.

(b)    Licensee, at its own expense, shall take all steps that must be taken to satisfy all requirements applicable within the Territory with respect to declaring, recording, filing, notifying, authenticating, or otherwise rendering this Agreement valid. Licensee, at its own expense, also shall apply for and secure within 90 days after the Agreement Date all governmental and regulatory approvals necessary to sell the Product in the Territory.

(c)    Licensee shall use commercially reasonable efforts to optimize sales of the Product in the Territory.

(d)    (intentionally left blank)

(e)    Licensee agrees to refrain, outside the Territory, from seeking customers, establishing any branch, or maintaining any distribution center with respect to the Product.

(f)    All print advertising and other promotional materials for the Product shall include a reasonably prominent notice that the Product was developed by Supplier. Licensee shall obtain Supplier's prior approval of each use of Supplier's name or Trademarks and, to such end, shall submit a prototype of each such use to Supplier for review. Supplier shall be deemed to have approved a proposed use of its name or Trademarks if it has not objected in writing within 14 calendar days following its receipt of the prototype.

(g)    Once every three months, Licensee will provide Supplier with written reports on bookings and sales detailing the actions taken since the prior report (or, in the case of the first such report, since the Agreement Date) to promote sales of the Product. Licensee will provide a list (naming the client, address, Territory and value) of projects in which a contract or purchase covering the Products has been received by Licensee. Licensee shall provide Supplier with a report, at least annually, detailing the actions planned to promote sales of the Product during the ensuing year. Such reports shall be accompanied by samples, prototypes, sketches, or other illustrations, if available, of marketing and promotional materials to be used during such period.

G

The sales report will provide a list of projects and number of Slakers in which a sale has occurred within the quarter. The license fee will be calculated from the amount of sales, by project, and shown as calculated on the sales report. A sale is defined as a planned or performed shipment of Products, which gives Licensee the right to issue an invoice towards the customer. The percentage royalty fee will be paid on a pro rata basis, based on the amount invoiced generated during each quarter. The reports and payments are due from Licensee to Supplier within 30 days after the quarter's end.

(h)    If requested by Supplier, and at its expense, Licensee shall submit an English-language translation of any marketing or promotional materials required to be delivered to Supplier under Section 8(f) or (g).

## 9.    Books and Records

Licensee shall procure a Bookings report and a Sales report every 3 months to the Supplier. The bookings report will provide a list of projects in which a contract or purchase has been received by the Licensee for the products covered by the agreement. The report will contain the name of the project, and the sales price for the project. In addition, the following particulars apply:

(a)    Each payment of royalties with respect to actual sales pursuant to Section 5(c) of this Agreement shall be accompanied by a report detailing the number of units of the Product sold or given away as complimentary merchandise during the quarter to which such royalty payment applies, the Net Sales Price of these Products, the rates at which royalties were computed, the amount of royalties due, and any additional details necessary to show how these amounts were determined.

(b)    Licensee shall keep true and accurate records and books of account containing all the data reasonably required for the full computation and verification of royalty payments due under this Agreement for each quarter of each of Licensee's fiscal years. Such materials shall be retained for a period of at least five years following the end of the fiscal year to which they relate. Licensee's books of account shall be maintained in accordance with generally accepted accounting principles consistently applied. Licensee shall permit the reasonable inspection and copying of such records and books of account by Supplier or its representatives during regular business hours at Licensee's regular place of business set forth above or, if Licensee moves during the term hereof, at a location acceptable to Supplier that is no less convenient for Supplier than the prior place of business. Supplier shall give Licensee at least 48 hours prior written notice of its election to inspect Licensee's records and books of account. Fees and expenses incurred in connection with such inspections (such as professional fees paid to accountants retained by Supplier and the cost of copying records) shall be borne by Supplier, unless such inspection shall reveal that an error of five percent (5%) or more in any royalty payment was made, in which case the fees and expenses incurred in

H

connection with the inspection during which such error was discovered shall be borne by Licensee.

## 10.   Confidentiality

All proprietary information disclosed by one party to the other and marked as confidential or proprietary shall be treated as confidential and not disclosed or transferred by the recipient to third parties, other than the recipient's agents and employees who need to know this information to serve the recipient and who are obligated to treat this information as confidential. In addition, Licensee acknowledges that the Base Technology and New Developments of Supplier constitute trade secrets and proprietary properties of Supplier and agrees not to disclose or transfer such information or materials (or any copy or counterpart) to any third person, nor use these in any manner except pursuant to this Agreement; and Licensee shall take the more stringent of reasonable measures, and the measures it uses to protect its own comparable information and material, to prevent this transfer and use, including without limitation restricting access to its employees who require access to serve Licensee and who are obligated to treat such information as confidential. The foregoing non-disclosure provisions shall not apply to any information that is or becomes part of the public domain without breach of any obligation to the party owning or controlling such information.

## 11.   Representations and Warranties

(a)    Supplier hereby represents and warrants to Licensee that:

    (i)    it owns all Patents, free and clear of liens or encumbrances, and has no actual knowledge of any conflicting patents or patent applications;

    (ii)    it has the full authority to enter into this Agreement without the prior consent or authorization of any court, agency, or other third party;

    (iii)    the undersigned officer has the full authority and approval of the Board of Directors of Supplier to enter into this Agreement; and

    (iv)    this Agreement does not violate the terms of any agreement, order, or other arrangement to which Supplier is subject or by which it is bound.

SUPPLIER MAKES, AND LICENSEE RECEIVES, NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, EXCEPT AS SPECIFICALLY STATED IN THIS AGREEMENT.

(b)    Licensee hereby represents and warrants to Supplier that:

I

(i)        it has the full authority to enter into this Agreement without the prior consent or other authorization of any court, agency, or other third party;

(ii)       the undersigned officer has the full authority and approval of the Board of Directors of Licensee to enter into this Agreement; and

(iii)     this Agreement does not violate the terms of any agreement, order, or other arrangement to which Licensee is subject or by which it is bound.

## 12.   Term and Termination

(a)    This Agreement shall remain in effect for the full anticipated term of US patent no. 5746983, expiring August 31, 2013, regardless of whether or not the parties choose to keep the patent in force.  Thereafter, the agreement is automatically renewed for additional terms, each of five years, on the basis of Supplier's trademarks rights, and technical/commercial know-how within the particular Field.

(b)    Supplier may terminate this Agreement immediately by written notice to Licensee if Licensee fails to pay the license fee required pursuant to Section 5(a), or if Licensee or any Affiliated Party of Licensee begins marketing a product that competes with the Product or that renders the Product obsolete, or upon the occurrence of any of the following events:

(i)        the institution of proceedings by Licensee in bankruptcy, reorganization, receivership, or dissolution;

(ii)       the institution of proceedings against Licensee in bankruptcy, reorganization, receivership, or dissolution, unless such proceedings have been dismissed or otherwise terminated within 60 days following the date they were initiated; or

(iii)     the making of an assignment for the benefit of creditors by Licensee.

(c)    Either party may terminate this Agreement at any time for a default by the other party, effective on the date specified in a notice of termination, provided that at least 30 days prior to giving such notice of termination the terminating party shall have notified the defaulting party of the default and the defaulting party shall have failed to remedy the default within such 30-day period or, if the default is not susceptible of being remedied within such period, shall have failed to initiate action within such period that is reasonably calculated to

J

remedy the default as promptly as practicable or shall have failed to pursue such action diligently to completion.

(d)    Upon expiration or termination of this Agreement for any reason, the licenses and appointment set forth in Section 3 above shall terminate. Within 30 days following the effective date of termination, Licensee shall give Supplier written notice of the number of units of the Product then in its inventory (including model numbers if there is more than one such number) and the Cost of Sales with respect to such Products (determined in accordance with Section 2(e) above). Supplier shall then have 14 calendar days to notify Licensee whether or not it wishes to purchase all or part of the inventory at Licensee's cost. If Supplier elects to purchase the inventory, the parties shall cooperate to complete the transaction within 30 days following Supplier's notice of election. Licensee shall be entitled to sell to any third parties any Product remaining in its inventory that Supplier does not elect to purchase for a period of 180 days following the date of termination.

(e)    Upon termination of this Agreement, Licensee shall return to Supplier, or destroy, all materials in its possession that constitute or describe, in whole or in part, any confidential or trade secret information of Supplier, including without limitation confidential information concerning the Base Technology and New Developments of Supplier. However, Licensee may retain one copy of any materials reasonably necessary for it to exercise its sell-off rights under Section 12(d) above or to comply with any maintenance or support obligations to its customers which it reasonably assumed. Within 10 business days after termination Licensee shall notify Supplier of any materials it intends to retain pursuant to the preceding sentence; shall certify in writing, by an officer, that it has returned or destroyed all other such materials; and shall agree in writing to hold all such materials, and the information they contain, in confidence in accordance with Section 10.

(f)    If this Agreement is terminated, then the terminating party shall not be liable to the other for any damages, indemnification, expenditures or loss of profits or prospective profits of any kind sustained or arising out of such termination, both parties hereby irrevocably waiving any such rights to the fullest extent permitted under the laws of their respective countries and of any other jurisdiction. Neither party shall bring any action or proceeding of any nature whatsoever in any court, before any tribunal, or under any arbitration proceeding provided for herein, seeking or claiming any such damage or loss. Each party recognizes and acknowledges that the other party is entering into this Agreement in reliance upon and in consideration of the agreements and covenants contained in this paragraph (h).

(g)    Sections 4(b), 5(c), 5(d), 7, 9, 10, 12(d), 12(e), 12(f), 13, 14, 17, and 22 shall survive termination of this Agreement.

## 13.    Indemnification

K

(a)     Supplier shall indemnify and hold harmless Licensee and its officers, directors, employees, licensees, and agents from and against any liabilities, costs, or other damages (including reasonable attorneys' fees and litigation costs) arising out of a breach of any of Supplier's representations or warranties expressed in Section 11 above, provided Licensee took reasonable actions to minimize such damages.

(b)     Licensee shall indemnify and hold harmless Supplier and its officers, directors, employees, licensees, and agents harmless from and against any liabilities, costs, or other damages (including reasonable attorneys' fees and litigation costs) arising out of Licensee's or its Affiliated Parties' manufacture, use, or sale of the Product or their improvements or alterations thereto or from a breach of any one or more of Licensee's representations or warranties expressed in Section 11 of this Agreement, provided Supplier took reasonable actions to minimize such damages.

**14.    Infringements**

(a)     Although Supplier believes that Licensee's contemplated use of the Base Technology and Patents pursuant to the license granted by Section 3(a) will not infringe any valid patent, trade secret, or other intellectual property right of a third party in the Territory, it cannot warrant this as a fact. Accordingly, Supplier's sole responsibility, and Licensee's exclusive remedy, in connection with any claim of such infringement shall be to defend any suit or proceeding brought against Licensee so far as it is based on a claim that the use of the Base Technology or Patents by Licensee or its customers constitutes an infringement or misappropriation of the rights of a third party, provided Supplier is notified within ten (10) calendar days after the commencement of such suit or proceeding and receives Licensee's full and complete authority, information, and assistance (at Supplier's expense) for its defense; and Supplier shall pay all damages and costs awarded in the action against Licensee, but shall not be responsible for any compromise made without its consent. If such use of the Base Technology or Patents is claimed or held to constitute such an infringement, or if Supplier determines that such claim or holding is likely to be made, Supplier, at its option and expense, may either procure for Licensee the right to continue using the allegedly infringing item; modify the item so that it becomes non-infringing; replace the item with a non-infringing counterpart; or terminate the associated license rights, require the return of the applicable material, and, if appropriate, adjust or refund the payments made or to be made by Licensee. The foregoing indemnity shall not apply to the extent that the claim of infringement either is based upon Licensee's use of the allegedly infringing item with an article or process developed by Licensee or obtained from a third party, or arises from Licensee's activities outside the scope of the Section 3(a) license, or arises from uses of the Product by Licensee's customers in ways that were not intended.

L

(b)     If either party learns of any possible infringement or misappropriation of Supplier's rights in the Base Technology, Patents or Product, it shall give notice thereof to the other party. Licensee agrees to cooperate with the Supplier's reasonable efforts to seek legal remedies for such infringements and misappropriations.

(c)     Licensee will affix Supplier's trademark TEKKEM to the Product as sold, and will also use the mark in promotional and advertising material. Supplier makes no warranty and undertakes no liability or responsibility with respect to Licensee's use of the Trademarks in the Territory. Licensee shall research the availability of the Trademarks for use and registration in the Territory before actually using them; notify Supplier if it has reason to believe that the Trademarks are not available and cooperate with Supplier in determining an appropriate course of action; and indemnify Supplier and hold it harmless from any infringement claims that arise in connection with Licensee's use of the Trademarks unless, despite Licensee's notice of unavailability, Supplier requires their use and agrees to assume responsibility therefor.

(d)     Supplier does not hereby assume any liability or obligation in connection with infringement claims relating to its New Developments. Rather, any such liability or obligation shall be subject to good faith negotiation between the parties at the time Licensee seeks rights to such New Development pursuant to Section 4(a) above.

(e)     Licensee will refrain from manufacturing, selling, representing or otherwise engage in activities that involve doing business with goods and services that are in competition with Supplier's Product.

## 15.     Assignment and Sublicensing

(a)     Licensee may not sublicense any third party to manufacture, market, distribute, sell, or service the Product or any component thereof without obtaining the prior written consent of Supplier. All proposed sublicense agreements shall contain provisions pursuant to which the sublicensee agrees: (i) to maintain the secrecy of confidential information and to sign a Confidentiality Agreement substantially in the form of Section 10; (ii) to maintain records and books of account containing all data reasonably required for the full computation of the Cost of Sales of Products produced by such third party or the royalties due with respect to sales by such party, as appropriate, and to permit the inspection of such records and books of account in accordance with the procedures set forth in Section 9(b) of this Agreement, at a location that is no less convenient for Supplier than the place of inspection specified in said Section 9(b); and (iii) to comply with and perform the obligations delegated to it by Licensee under this Agreement as if this Agreement were binding on it.

M

(b)    Licensee may not assign this Agreement, or any rights or obligations under it, to any third party without obtaining the prior written consent of Supplier.

(c)    The execution of any assignment or sublicense by Licensee without Supplier's prior written consent shall constitute a default of this Agreement and shall be ineffective as against Supplier.

16.    **Independent Contractor Status.**

Supplier and Licensee are independent contractors, and this Agreement shall not be deemed to constitute either party a partner, joint venturer, franchisee, servant, agent, or employee of the other.

17.    **USA Export Controls**

Licensee agrees not to export, re-export, or permit the re-exportation of any Product to any country now or hereafter included in the U.S. Department of Commerce's list of countries to which exportation of products of such type is or may be restricted or prohibited, unless that exportation or re-exportation is authorized specifically by a special license issued by the Office of Export Administration of the United States of America. This provision shall not be interpreted to expand the definition of "Territory" set forth above.

18.    **Force Majeure**

Neither party shall be deemed to be in default under this Agreement as long as its failure to perform any of its obligations hereunder is occasioned solely by fire, labor disturbance, acts of civil or military authorities, acts of God, or any similar cause beyond such party's reasonable control. [However, if a party is so rendered incapable of performing for a continuous period of 45 days or more, the other party may terminate this Agreement immediately upon notice to the non- performing party, subject to the provisions of Section 12(d)-(g).]

19.    **Further Assurances**

Each party shall cooperate fully with the other party, execute such further instruments, documents, and agreements, and give such further written assurances, as may be reasonably requested by the other party to carry into effect the intents and purposes of this Agreement.

20.    **Counterparts**

This Agreement may be executed in separate counterparts, each of which shall be deemed an original and, even if executed separately by each party, shall constitute a

N

single original instrument, effective as if the parties had executed one and the same instrument.

21. **Waiver**

No waiver of any term or condition of this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be a further or continuing waiver of that term or condition or a waiver of any other term or condition.

22. **Notices**

All notices and other communications called for hereunder shall be in writing, shall specifically refer to this Agreement, and shall be delivered in person or sent by international carrier or overnight mail, by telex or telecopy, or by other means providing proof of delivery, to the parties at their respective addresses set forth above, or to any other address of which a party notifies the other. All notices shall be deemed to be effective on the date of actual receipt or five days after transmission as provided above, whichever is sooner.

23. **Entire Agreement; Amendment and Modification**

This Agreement constitutes the entire agreement between the parties with respect to its subject matter and may be amended only by a writing executed by each of the parties.

24. **Binding Effect; Successors and Assigns; Language**

This Agreement, as set forth in English, shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. The parties have specifically requested that English be the official language for the Agreement, that all related documents be drawn up in English, and that all communications and dispute resolution take place in English.

25. **Severability; Enforceability**

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions. If any law or rule within the Territory should prohibit, make impossible, or limit any obligation of Licensee under this Agreement, Supplier shall have the right, at its option, to suspend or terminate this Agreement or modify it as may be reasonably necessary to obtain the benefits contemplated herein.

26. **Headings**

The section headings contained in this Agreement are for informational purposes only and are not to be construed to affect the meaning or application of any provision.

O

### 27.    Governing Law

This Agreement shall be governed by and construed in accordance with the laws Commonwealth of Pennsylvania [(excluding, if otherwise applicable, The United Nations Convention for the International Sale of Goods).] London, GB shall be the venue for any action arising with respect to this Agreement or the relationship between the parties, and each party hereby expressly consents to the jurisdiction of the courts of London, GB for this purpose, see art. 28 below.

### 28.    Arbitration of Disputes

Any controversy or claim arising out of or relating to this Agreement or its breach, which the parties fail to resolve by agreement within thirty (30) days of notice of such controversy or claim, shall be settled by binding arbitration under the rules and auspices of the London Court of International Arbitration, in London, England, by a single arbitrator with experience in commercial arbitration selected by the President of the LCIA, who shall apply the laws of the Commonwealth of Pennsylvania or, if the application of such laws shall be prohibited by the country in which the Licensee is domiciled, applying the laws of England. If the application of the laws of England in arbitration proceedings is prohibited by the country in which Licensee is domiciled, then any disputes arising hereunder shall be submitted to the courts of the Commonwealth of Pennsylvania, to whose jurisdiction the parties hereby consent, for settlement under the laws of the Commonwealth of Pennsylvania .

The arbitrators shall have no authority to award punitive damages. The costs of the arbitration shall be borne equally by the parties and each party shall bear its own associated costs, except that if the arbitrator in its discretion determines that there is good cause for doing so (such as willful misconduct or bad faith) it may award the prevailing party its reasonable attorneys' fees and costs incurred in connection with the arbitration.

Notwithstanding the foregoing, the parties reserve the right to seek and obtain injunctive relief, whether in the form of a temporary restraining order, preliminary injunction, injunction to enforce an arbitration award, or other order of similar import, from any court of competent jurisdiction prior to, during, or after commencement or prosecution of arbitration proceedings or the final decision and award of the arbitrators.

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed as an instrument under seal as of the date first written above.


\_\_\_\_\_ _____ _____                                    _____
TEKKEM P.R. STEPHANSEN                                    RDP TECHNOLOGIES, INC.

P

By:_____          By:_____
(signature)                                        (signature)

Name:_____          Name:_____

Title:__ _____ ____ ____ _____          Title:_____ _____

Q

EXHIBIT A

Product, Territory and Miscellaneous

I.     **Definitions**

      A.     Deliverables: Lime slaking plants

      B.     Field: Lime slaking

      C.     Product: Batch Lime Slakers and associated spares/accessories

      D.     Territories: 1) USA
                          2) Canada, Mexico
                          3) Australia, New Zealand

With respect to territories 2 and 3 above, these are also included in the agreement.  Supplier may terminate the agreement for each of the three territories if Licensee fails to meet the respective minimum targets of

| Year | Territory no. | Number of Slakers w/parts packages | Fixed license fee per Slaker sold minimum nos. Or above | Additional Royalty percentage from all sales |
|------|---------------|-----------------------------------|---------------------------------------------------------|-----------------------------------------------|
| 2000 | 1 | 4 | | |
| | 2 | 0 | | |
| | 3 | 0 | | |
| 2001 | 1 | 4 | | |
| | 2 | 0 | | |
| | 3 | 0 | | |
| 2002 | 1 | 4 | US $ 3000 | 2 per cent of gross value |
| | 2 | 0 | | |
| | 3 | 0 | Plus 5 per cent | |
| 2003 | 1 | 4 | increase per year to compensate | |
| | 2 | 1 | for assumed | |
| | 3 | 1 | inflation, based | |
| 2004 | 1 | 4 | on the above value for the year | |
| | 2 | 1 | 2000. | |
| | 3 | 1 | | |
| 2005 | 1 | 5 | | |
| | 2 | 2 | | |

25.01.01

R

| | 3 | 1 | | |
|---|---|---|---|---|
| 2006 | 1 | 5 | | |
| | 2 | 2 | | |
| | 3 | 1 | | |
| 2007 | 1 | 6 | | |
| | 2 | 2 | | |
| | 3 | 2 | | |
| 2008 | 1 | 6 | | |
| | 2 | 3 | | |
| | 3 | 2 | | |
| 2009 | 1 | 6 | | |
| | 2 | 4 | | |
| | 3 | 2 | | |
| 2010 | 1 | 6 | | |
| | 2 | 4 | | |
| | 3 | 2 | | |
| 2011 | 1 | 6 | | |
| | 2 | 4 | | |
| | 3 | 2 | | |
| 2012 | 1 | 6 | | |
| | 2 | 4 | | |
| | 3 | 2 | | |
| 2013 | 1 | 6 | | |
| | 2 | 4 | | |
| | 3 | 2 | | |

**II.    Payments:**

A.    A non-refundable License Fee of US $ 50,000 is payable by the Licensee as per a previous contract between the parties; during the years 1997-2001, of which US $ 10,000 has been paid by Licensee.  The balance of US $ 40,000 will be settled by January 2, 2001.

B.    Minimum Royalty Schedule ({5(b)): US $ 3,000 per Lime Slaker (see above, I)

C.    Additional Royalty Schedule ({5(c)): 2 per cent of value per Lime Slaker (see above, I)

TEKKEM P.R. STEPHANSEN                    RDP COMPANY

S

By: _____
(signature)

Name: P.R. Stephansen

Title: V.D


By: _____  1-25-01
(signature)

Name: Paul Christy

Title: Vice President

T

EXHIBIT B

Components of Manufacturing Overhead

U

EXHIBIT C

Patents and Patent Applications

For purposes of the Agreement the term "Patents" shall refer to the letters patent listed below and to the possible letters patent subsequently issued, if the applications are finally accepted by the Patent Offices in question with respect to the patent applications listed below.

**I. Patents:**

| Country | Number | Expiration Date |
|---------|--------|-----------------|
| US | 5746983 | |

II.    Patent Applications:

| Country | Serial Number | Filing Date |
|---------|---------------|-------------|
| US | 08/299,060 | August 31, 1994 |
| NO | P933084 | August 31, 1993 |

v

EXHIBIT D

Trademarks and Service Marks

For purposes of the Agreement the term "Trademarks" shall refer to the Marks listed below, whether registered or unregistered.

| Mark: | Registration/Application No.: | Country: | Date of Issuance/ Filing: |
|---|---|---|---|
| TEKKEM (device) | To be filed | USA | Before Dec. 31, 2000. |

The trademark and its inherent goodwill is owned solely by Supplier (see possible limitations in art 14 (c), and the trademark shall be used by Licensee in compliance with the trademark laws within the Territory for the duration of this Agreement.

**EXHIBIT D**

**/o=RDP/ou=first administrative group/cn=Recipients/cn=pchristy**

**From:**     Paul Christy [pchristy@rdptech.com]
**Sent:**     Wednesday, July 08, 2009 3:43 PM
**To:**       'Dick Christy'
**Subject:** FW: Tekkem slaker fee

Dick,

I am forwarding an e-mail I received from Stephansen yesterday.

Paul Christy
RDPTech.com

**From:** P.R. Stephansen AS [mailto:prs@tekkem.no]
**Sent:** Tuesday, July 07, 2009 12:40 PM
**To:** Paul Christy
**Subject:** Tekkem slaker fee

<u>Tekkem Slaker Fee Schedule and our Licence Distribution Agreement</u>

The plus 5 per cent increase in slaker fee per year to compensate for assumed inflation, based on the value of US $ 3000 for the year 2000, has never been fulfilled. This must be corrected now and calculated from year 2000. To compensate for lost interest over time we want now instead of 5 per cent, 7 per cent.
Also when checking your Tekkem Slaker Fee Schedule we find several incorrect values from the 2 per cent system royalty from the following projects:

|       |                            | Total Fee | Amount Paid |        | Amount Due |
|-------|----------------------------|-----------|-------------|--------|------------|
| 21001 | Avoca                      | 8 678     | 8 700       | -      | (22)       |
| 21030 | Tampa Water Plant          | 6 385     | 6 384       | -      | 1          |
| 22001 | DeKalb - Snapfinger        | 6 400     | 6 398       | -      | 2          |
| 22005 | Independence, MO           | 11 080    | 11 141      | -      | (61)       |
| 22034 | Calhoun, GA                | 6 388     | 8 562       | -      | (2 194)    |
| 22038 | S. San Joaquin, CA         | 12 000    | 11 998      | -      | 2          |
| 23008 | Murfreesboro, TN           | 24 144    |             | 20 418 | 3 726      |
| 23046 | Omaha, NE                  | 19 856    | 2 036       | 17 252 | 568        |
| 23050 | Jckson. MS - Fewell        | 9 460     | 8 930       | 528    | 2          |
| 24020 | UOSA, MD                   | 8 473     |             | 5 388  | 4 351      |
| 25002 | Louisville, KY - Crescent Hill | 25 378 |            | 18 878 | 6 500      |
| 25024 | Margate, FL                | 27 066    |             | 23 661 | 3 405      |
| 25034 | Trenon, NJ                 | 29 760    |             | 25 120 | 4 840      |
| 26010 | Johnson County, KS         | 43 350    |             | 33 528 | 9 822      |
| 26033 | Canton, IL                 | 9 199     |             | 7 718  | 1 481      |
| 26036 | Modesto, CA                | 14 320    |             | 11 689 | 2 631      |
| 26058 | Champaign, IL              | 27 379    |             | 23 413 | 3 966      |
| 27007 | El Paso II                 | 10 900    |             | 9 540  | 1 360      |

| | | | | | |
|---|---|---|---|---|---|
| 98014 | Bloomington, IN | 10 480 | 11 340 | - | (888) |
| 99029 | Denison, IA | 14 500 | 19 171 | - | (76) |
| 99040 | Iowa City, IA | 21 978 | 21 852 | - | 1 |
| 99042 | Aurora, IL | 16 976 | 16 439 | - | 11 |
| | Total | | | | $  39 225 |

Best Regards,

Poju R. Stephansen

**P.R. Stephansen AS**
Borgentoppen 71, NO-1388 Borgen, Norway
Phone: +47 66 90 30 00
Fax: +47 66 90 35 00
E-mail: prs@tekkem.no

## /o=RDP/ou=first administrative group/cn=Recipients/cn=pchristy

| | |
|---|---|
| **From:** | P.R. Stephansen AS [prs@tekkem.no] |
| **Sent:** | Friday, August 28, 2009 10:47 AM |
| **To:** | Dick Christy |
| **Cc:** | Paul Christy |
| **Subject:** | Notice of Termination of Agreement |
| **Attachments:** | RDP Tech 1.pdf; RDP Tech 2.pdf |

Dear Sir,

Attached is a copy of our Notice of Termination of Agreement. The original document is sent by mail today and also by fax no.: 0016 106509070 .

Best Regards,

Poju R. Stephansen

**P.R. Stephansen AS**
Borgentoppen 71, NO-1388 Borgen, Norway
Phone: +47 66 90 30 00
Fax: +47 66 90 35 00
E-mail: prs@tekkem.no

8/28/2009

# poju r. stephansen as

RDP Technologies, Inc.
2495 Blvd of the Generals,
Norristown
Pa 19403-5236,
USA



**poju r. stephansen as**

Attn: Dick Christy, President and CEO.

Sent by fax and mail

Asker, Norway, 27 August 2009

**Re: License and Distribution Agreement between TEKKEM P.R. Stephansen AS and RDP Technologies Inc, dated as of 25 January 2001 (the "Agreement")**

**Notice of Termination of Agreement.**

Dear Sir,

On 7 July this year the Supplier sent a notice of default by e. mail to the Licensee with the following wording:

*"Tekkem Slaker Fee Schedule and our Licence Distribution Agreement*

*The plus 5 per cent increase in slaker fee per year to compensate for assumed inflation, based on the value of US $ 3000 for the year 2000, has never been fulfilled. This must be corrected now and calculated from year 2000. To compensate for lost interest over time we want now instead of 5 per cent, 7 per cent.*

*Also when checking your Tekkem Slaker Fee Schedule we find several incorrect values from the 2 per cent system royalty from the following projects:*

| | | Total Fee | Amount Paid | | Amount Due |
|---|---|---|---|---|---|
| 21001 | Avoca | 8 678 | 8 700 | - | (22) |
| 21030 | Tampa Water Plant | 6 385 | 6 384 | - | 1 |
| 22001 | DeKalb - Snapfinger | 6 400 | 6 398 | - | 2 |
| 22005 | Independence, MO | 11 080 | 11 141 | - | (61) |
| 22034 | Calhoun, GA | 6 368 | 8 562 | - | (2 194) |
| 22038 | S. San Joaquin, CA | 12 000 | 11 998 | - | 2 |
| 23008 | Murfreesboro, TN | 24 144 | | 20 418 | 3 726 |
| 23046 | Omaha, NE | 19 856 | 2 036 | 17 252 | 568 |
| 23050 | Jckson, MS - Fewell | 9 460 | 8 930 | 528 | 2 |
| 24020 | UOSA, MD | 8 473 | | 5 388 | 4 351 |
| 25002 | Louisville, KY - Crescent Hill | 25 378 | | 18 878 | 6 500 |

# poju r. stephansen as

| 25024 | Margate, FL | 27 066 | | 23 661 | 3 405 |
|---|---|---|---|---|---|
| 25034 | Trenton, NJ | 29 760 | | 25 120 | 4 640 |
| 26010 | Johnson County, KS | 43 350 | | 33 528 | 9 822 |
| 26033 | Canton, IL | 9 199 | | 7 718 | 1 481 |
| 26036 | Modesto, CA | 14 320 | | 11 689 | 2 631 |
| 26058 | Champaign, IL | 27 379 | | 23 413 | 3 966 |
| 27007 | El Paso II | 10 900 | | 9 540 | 1 360 |
| 98014 | Bloomington, IN | 10 480 | 11 340 | - | (888) |
| 99029 | Denison, IA | 14 500 | 19 171 | - | (76) |
| 99040 | Iowa City, IA | 21 978 | 21 852 | - | 1 |
| 99042 | Aurora, IL | 16 976 | 16 439 | - | 11 |
| | Total | | | | $ 39 225 |

As per today's date this notification stands unanswered by the Licensee, and the outstanding amount of USD 39 225 plus accrued interest remains unsettled.

Since more than thirty days have elapsed since the Licensee received the above notice of default, and since this default has not been remedied during this thirty days' period, the Supplier hereby notifies the Licensee, pursuant to article 12 (c) of the Agreement, that the Agreement is terminated with effect from 1 September 2009.

In regard to Licensee's surviving obligations under the agreement, please remit payment in full for all past due and current royalties including interest forthwith.

The Supplier begs the Licensee to proceed without delay with the termination tasks set forth in Article 12 (d) and (e) of the Agreement.

Signed: _P R Stephansen_

Poju R. Stephansen, President and CEO

Tekkem P. R. Stephansen AS

CC: Paul Christy, Vice President