IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NORDETEK ENVIRONMENTAL, INC.,     :          CIVIL ACTION
et al.                            :
                                  :
          v.                      :
                                  :
RDP TECHNOLOGIES, INC.            :          NO. 09-4714

MEMORANDUM

Dalzell, J.                                  January 8, 2010

         This litigation involves a complex business dispute

arising from a simple and ancient cause, enmity between brothers.

As the accounts from Biblical times through films like The

Godfather have rehearsed, fraternal venom is a potent poison, as

will shortly be on display here.

         On December 17 and 18, 2009, we convened on an

expedited basis a hearing on cross-motions for preliminary

injunction that the two brothers or their respective firms had

filed.  After considering the testimony from that hearing and the

voluminous documentary record adduced therein, together with the

parties' detailed pre- and post-hearing submissions, we offer the

following analysis of that record and the law, which will

constitute our findings of fact and conclusions of law within the

meaning of Fed. R. Civ. P. 52(a)(2).

I.  Factual Background

      A.   History and Business of RDP Technologies, Inc.

Defendant RDP Technologies, Inc. ("RDP") is a family business that is now jointly owned by plaintiff Paul Christy (43%) and his older brother, Dick Christy (57%). The brothers' father and Dick founded the business in 1978, and they named it after the three Christy brothers, R[obert] (who at one time owned 10%), D[ick] and P[aul].[1] Dick has been the President and majority shareholder of RDP from its inception, and Paul served as its Secretary and Treasurer until at least June of 2008.[2] Stip. Facts, Pl. Supp. Br. Ex. D ("Stip. Facts"), at ¶¶ 3-4, 13-16. The brothers' father initially owned 49% of RDP, but in 1982 he decided to give his shares to Rob and Paul.[3]

According to Paul, RDP "sells components that go into water and waste water treatment plants," and its target market is

--------

[1] The sons are listed in the order of their birth.

[2] Paul began to oversee RDP's accounting some time in the 1990s. Paul Christy Dep., Def. Supp. Br. Ex. A, at 9. Paul officially resigned from RDP on September 18, 2009, but the parties dispute the extent of his involvement with the company between June of 2008 and his resignation. Stip. Facts at ¶ 33.

[3] Paul claimed in his deposition that his father owned all of the shares initially and sold them to the sons in 1982. Paul Christy Dep. at 5. But the parties stipulated that Dick has always owned at least 51% of RDP's stock. Stip. Facts at ¶ 3.

"[w]ater and sewer authorities throughout the United States."

Paul Christy Dep. at 296. The parties also stipulated to the fact

that "RDP sells water and wastewater treatment equipment, and

provides the engineering services necessary to design and install

this equipment." Stip. Facts at ¶ 2. The Tekkem lime slakers at

the center of this dispute are used primarily for water

treatment, rather than <u>waste</u>water treatment, but they could be

used in either setting. Paul Christy Dep. at 295.

    B.   <u>1995 Shareholder Agreement</u>

On July 1, 1982, the three brothers and RDP entered

into a Corporate Stock Redemption Agreement that was superseded

on November 1, 1995 by an amended agreement among them. Amended

and Restated Shareholder Agreement, Ex. D-1[4] ("1995 Agreement").

This document allocated 4,100 shares, or 51%, of RDP's common

stock to Dick, 3,145 shares, or 39%, to Paul, and 800 shares, or

10%, to Robert.

───────────────

[4] We will refer to the exhibits by the parties' labels.
They stipulated to the admission of 104 exhibits at the
preliminary injunction hearing. The first seventy-one stipulated
exhibits were labeled "D-1" through "D-71." The remaining
stipulated exhibits were labeled "Stip. 72" through "Stip. 104."
We also admitted thirteen additional exhibits that the plaintiffs
introduced at the hearing, and these were labeled "P-1" through
"P-14." We did not admit Exhibit P-10.

The 1995 Agreement had at § 9 an extensive "Restrictive Covenant and Trade Secret/Confidential Information" provision. In essence, § 9 provided that if any shareholder's employment at RDP terminated "for any reason" then "that Shareholder shall not engage either directly or indirectly in any manner or capacity whatsoever (including principal, agent, partner, officer, director, shareholder, employee, consultant or otherwise) in any business competitive with the business" of RDP "in the United States, Canada or anywhere in the world that the Corporation is currently doing business." Id. § 9(b). The Agreement imposed this non-competition covenant ("NCC") on a terminated shareholder "[f]or a period of two years after the date on which" the terminated shareholder has left RDP's employ. Id. The 1995 Agreement also restricted the shareholders from using or disclosing RDP's confidential information. Id. at § 9(c). The brothers acknowledged that any violation of the non-compete or confidentiality provisions "would result in irreparable injury" to RDP. Id. at § 9(d). And § 10 of that Agreement explicitly provided that the signatories "agree that the subject matter of this Agreement is unique and that the remedy at law for any breach of any of the terms of this Agreement would be inadequate." Id. at § 10. Lastly, the Agreement provided at §

4

15(b) that it could only be amended if "made in writing and signed by all Parties hereto," _i.e._, by the three shareholders and RDP. Id. at § 15(b).

Paul testified that the 1995 Agreement did not change his job responsibilities or number of shares and that he did not receive additional compensation in exchange for signing it. But the 1995 Agreement barred RDP from terminating the employment of Rob and Paul except for cause, death, or disability. Dick could only be terminated for death or disability. Id. at § 5(d). Dick testified that Paul wanted to revise the shareholder agreement to limit RDP's ability to fire him and that this provision was not in the 1982 agreement. The 1995 Agreement also obligated RDP to repurchase the shares of a shareholder whose employment terminated. Stip. Facts at ¶ 34 (stating that Paul "is entitled to have his shares of RDP stock repurchased" pursuant to the 1995 Agreement "[a]s a result of his resignation from RDP").[5] Indeed, on November 12, 2009 RDP sent Paul a Judgment Note for $574,371.35, which it believes is the value of Paul's shares. Ex. D-17. Paul has, so far as we can tell, not done anything with

---

[5] Paul initially argued that the 1995 Agreement only gave RDP the option to purchase his stock and did not obligate RDP to do so, but the parties' stipulation resolves this issue.

the Note or accompanying documents. <u>See</u> Paul Christy Dep. at 161-63. The mutual NCC, the limitations on RDP's ability to terminate a shareholder's employment, and RDP's repurchase obligations were apparently not in place until the 1995 Agreement. There is no evidence in the record to the contrary.[6] Paul agrees that all three brothers were bound by the 1995 Agreement, including the NCC in ¶ 9. Paul Christy Dep. at 129, 137.

On May 5, 1997, Robert Christy decided to sell his ten percent interest, or 800 shares, back to RDP. <u>See</u> Ex. D-70. Notably, but unsurprisingly, this document was only signed by its parties, Robert W. Christy, Jr. and RDP; Paul signed the document not as a party but to attest his brother Dick's signature as President of RDP. Because all parties to the 1995 Agreement did not sign the 1997 document, it did <u>not</u> constitute an amendment of the 1995 Agreement[7] though, to be sure, the net result was that RDP's ownership became the current 57% - 43% split between Dick and Paul.

---

[6] At his deposition, Paul said that he did not know if Dick could have fired him without cause or "on a whim" before the 1995 Agreement. Paul Christy Dep. at 123-26. But Paul did not point to any other agreement that gave him such protection, and Dick has always been RDP's President and majority shareholder.

[7] We addressed this issue at length in our Order of December 11, 2009.

C.   RDP's Business and Its
     Relationship with Stephansen

RDP has been, and remains, in the business of selling
and servicing water treatment and wastewater treatment equipment
throughout much of the United States.  Although RDP usually deals
with general contractors in the course of its business, the
ultimate consumers of its products are ordinarily municipalities
like the City of Ann Arbor, Michigan, which intervened in support
of RDP in this litigation.[8]

The purification of water and the treatment of
wastewater to assure environmental protection are complicated
tasks. Lime slakers, which are at the center of this dispute,
prepare powdered lime to make it usable for water purification.
Lime changes the pH of the water and removes minerals, which
makes the water softer. There are a number of technologies --
slakers and other techniques -- available to accomplish such
treatment, but one such technology is produced by an entity known
as TEKKEM P.R. Stephansen A.S., a Norwegian corporation based in
Borgen, Norway, whose principal is one Poju R. Stephansen.  We
refer to this bundle of technology as "Tekkem."  It is undisputed

---

[8] RDP is also currently attempting to sell a Tekkem
slaker to Oklahoma City, Oklahoma; Dallas, Texas; and Wichita
Falls, Texas. Stip. Facts at ¶ 40-55.

that Tekkem, though by far the most expensive technology for this purpose, is also quite effective in water treatment, which is its primary use in the United States.[9] Indeed, as much as a third of the projects RDP enters into uses Tekkem. RDP has never used non-Tekkem slakers, but Dick testified that other companies make slakers and that RDP could use them. See also Paul Christy Dep. at 305 (other companies besides Tekkem make slakers in the United States). RDP also has other lines of business (for example, in wastewater treatment) that do not use Tekkem.

Pertinent to the current controversy, since August 15, 1997 RDP has been a party to License Agreements for Tekkem, most recently in the iteration dated January 25, 2001. License and Distribution Agreement, Ex. D-18 ("2001 License Agreement"). That agreement provides for a royalty beginning at $3,000 per slaker with a five percent annual increase on that part of the fee after the year 2000. Id. at Exhibit A. It also provides for an additional royalty of "2 per cent of gross value" of RDP's contracts involving Tekkem technology (the "Two Percent

---

[9] According to a Senior Utilities Engineer for the City of Ann Arbor, Michigan, the Tekkem lime slaker is more efficient than others because it determines how much water and lime to mix together on the basis of weight and temperature, rather than volume and temperature. Second Brian Steglitz Aff., Ann Arbor Ex. 2, at ¶ 26. This process is more efficient and produces less waste than other systems. Id. at ¶¶ 26-27.

Calculation"). Id. Stephansen required RDP to sell a minimum number of slakers per year, and if RDP did not do so its license could become non-exclusive. Id. at § 3(c). But if RDP failed to make other payments to Stephansen, such as the fees from the Two Percent Calculation, Stephansen could terminate the license after notice and a thirty-day period to cure the default. Id. at § 12(c).

The 2001 License Agreement required RDP to submit quarterly reports and pay royalties within thirty days of the end of each quarter. Id. at §§ 5(c), 9. But, in practice, Paul -- who always prepared these reports for Stephansen and approved royalty payments -- sent the reports about once a year. RDP would usually wait for direction from Stephansen regarding when and where to send the royalty payments. RDP wired the money to accounts in Norway and the Canary or Cayman Islands, paid Stephansen's airplane repair bills in the United States, and even gave Stephansen a royalty check to cash in the United States. Paul Christy Dep. at 207-10. On at least one occasion, Paul requested -- and Stephansen granted -- a thirty-to-sixty day extension for RDP's royalty payments. Paul testified that the exact timing of the reports and payments was not "a big deal." Emails between Paul and Stephansen or his employees show that Stephansen was

often flexible about the timing of RDP's reports and payments.

See Ex. D-33. See also Paul Christy Dep. at 205-06, 214

(confirming that Stephansen was "pretty flexible" about the

timing of payments and that Paul knew this).

RDP developed some of its own technology to deal with

its customers' concerns with the Tekkem slakers, for example,

with the buildup of grit in the system. By August 26, 2008, RDP

had secured U.S. Patent No. 7,416,673 (the "'673 patent"), which

Paul and RDP employee Michael Quici filed on March 31, 2006 and

assigned to RDP. The '673 patent is for "[a] method and

apparatus . . . for conveying lime slurry, removing and

controlling the amount of grit" that accumulates in the water

purification process. See Ex. P-9 at 1. Because RDP had

developed the grit removal technology underlying the '673 patent,

Dick decided that grit removal should be excluded from the Two

Percent Calculation. When Dick told Paul about this idea, Dick

explained that RDP should not pay royalties on the "grit

classifier" because "[i]t was something that we [RDP] had

developed." Paul Christy Dep. at 218-19. Paul disagreed and

thought this would conflict with the 2001 License Agreement

because in his mind the grit classifier was part of the slaking

system.[10] Id. at 218-21. See also Dick Christy Dep., Pl. Supp. Br. Ex. A, at 62 (stating that Paul "questioned" this judgment). Dick nonetheless implemented this decision by at least 2008, although it is not clear in the record when, precisely, this happened. RDP may have omitted other items from the Two Percent Calculation as well, such as the "platforms" and installation. But the '673 patent was the primary issue that the parties discussed at the hearing with respect to the Two Percent Calculation.[11] Quici, a current Director of RDP who has been with the company for about twenty-five years, testified that the dosing system and fine grit classifier were usually excluded from the Two Percent Calculation.

Paul claims that he did not know until early 2009 that RDP changed the Two Percent Calculation because the total royalties for the first projects on which this change was made did not appear in RDP's accounting system until that time. Paul did not talk to Dick about this issue when it came to his

---

[10] Paul nonetheless agreed that the grit removal system and slaker are "two different things" and that RDP had sold them separately to some clients. Paul Christy Dep. at 222-23.

[11] Paul summarized his view of the discrepancy in the Two Percent Calculation in a document titled "Gross Sale Comparison," which is Ex. P-6. According to Paul's calculations, RDP underreported the gross sales amount for the Two Percent Calculation by an average of 22%.

attention again in early 2009. Moreover, Paul himself instructed

others at RDP not to include installation or the soda ash system

in the Two Percent Calculation. See Ex. D-32, D-61; Paul Christy

Dep. at 187-197. He testified that the soda ash system was

separate from the slaker system and that Stephansen should not

get royalties on the soda ash system because it did not use

Tekkem. According to Paul, Stephansen occasionally -- but not

usually -- received a royalty on the installation costs because

the contractor typically installed the equipment.

On behalf of RDP, Paul negotiated the 1997 and 2001

licensing agreements with Stephansen, and it seems undisputed

that until Paul's departure he was the shareholder primarily

entrusted with maintaining RDP's relationship with Stephansen.

Indeed, it was quite evident from the testimony that by 2009 Paul

had achieved a very close relationship with Stephansen, so much

so that he often had conversations and dealings with the

Norwegian principal about which his brother Dick knew nothing.

According to Paul, Stephansen spent Thanksgiving with Paul's

family one year, and Paul also stayed at Stephansen's home during

his visit to Norway in August of 2009, which we describe more fully below.[12] Paul Christy Dep. at 175-76.

D.    Enmity Between Brothers
      and Conflict With Stephansen

In recent years, the relationship between younger and older brother became so strained that they were barely on speaking terms.  Paul moved to California in September of 2008, in effect to set up a West Coast office of RDP, and operated as much as possible independently of Dick. See Paul Christy Dep. at 20. Dick declared that this plan was "abandoned" in his email to Paul on January 16, 2009, and Paul says that he started going back and forth more between Pennsylvania and California at that time. Ex. D-50; Paul Christy Dep. at 63. According to Paul, he "officially" returned to Pennsylvania to work in June of 2009. Paul Christy Dep. at 63.

It is evident that in 2009 the brothers' relationship deteriorated from frigid to belligerent. By this time, an opportunity presented itself for Paul to administer what he regarded as a coup de grâce against RDP and Dick by exploiting his relationship with Stephansen. Without informing anyone at

_____

[12] Paul testified that the home was under construction and that Stephansen did not stay there while he did.

RDP, including Dick, in May or June of 2009 Paul sent to Stephansen a list of eleven Tekkem-involved projects where Stephansen was paid less than the full two percent on the total gross project price.[13] Paul testified that he disagreed with Dick's decision to change the Two Percent Calculation but thought that Dick created the problem and should fix it. He also said that he did not want to submit "false" numbers to Stephansen. This gratuitous information resulted in a telephone conversation that Stephansen had with Paul in early July of 2009, during which Paul reported that Stephansen was "rather upset." Paul told Stephansen that Dick had changed the method of the Two Percent Calculation but did not explain why. Paul never disclosed this conversation to Dick.[14]

Paul's report to Stephansen also led to Stephansen's July 7, 2009 email to Paul whose text stated, in full:

---

[13] Paul included these eleven projects in the License Fee Schedule that he sent to Stephansen about once a year; this report accounted for RDP's use of Tekkem and the corresponding license fees. Paul added a column to that report that made it clear on which projects he thought RDP had underpaid Stephansen regarding the Two Percent Calculation. See Ex. D-21.

[14] Paul said that he thought he was acting in the best interests of RDP when he had this phone conversation with Stephansen but failed to report it to Dick. At his deposition, Paul claimed that he did not tell Dick about the conversation because he thought it would be "inflammatory." Paul Christy Dep. at 235.

> Tekkem Slaker Fee Schedule and our Licence
> Distribution Agreement
>
> The plus 5 per cent increase in slaker fee
> per year to compensate for assumed Inflation,
> based on the value of US $ 3000 for the year
> 2000, has never been fulfilled.  This must be
> corrected now and calculated from year 2000.
> To compensate for lost Interest over time we
> want now instead of 5 per cent, 7 per cent.
>
> Also when checking your Tekkem Slaker Fee
> Schedule we find several incorrect values
> from the 2 per cent system royalty from the
> following projects[.]

Ex. D-19.

Thereupon, Stephansen listed projects pursuant to which he

claimed there was a total shortfall of $39,225 in addition to the

discrepancy regarding the per slaker royalty. Paul said that both

he and Stephansen neglected to calculate the five percent

increase, and he thought that RDP would pay Stephansen for that

discrepancy as well as the supposedly low fee for the Two Percent

Calculation. Given the tone of Paul's undisclosed phone

conversation with Stephansen, he was not surprised to receive

Stephansen's email.

Paul never responded to the July 7 email, but

transmitted it to his older brother the next day. See id. The

complete text of that email stated:

> Dick,
>
> I am forwarding an e-mail I received from
> Stephansen yesterday.
>
> Paul Christy
> RDPTech.com

Id. Paul did not tell Dick that he thought RDP should pay the

disputed amount of the Two Percent Calculation, but at some point

he left Dick a voicemail informing him that he should take care

of the issue.

On July 24, 2009, Dick sent an email to Stephansen,

which began with the following paragraph:

> Stephansen,
>
> Paul sent me your email and asked me to
> resolve this question. I am not sure why
> Paul asked me to do this because he has
> managed the accounting and book keeping for
> the past 30 years. Nonetheless a mistake has
> been made and I want to this [sic] corrected
> in a timely manner.

Ex. D-20.

Dick told Stephansen that after reading the 2001 License

Agreement, he saw Stephansen's "point," and he explained that it

would take "some time" to do the underlying calculations. Id. He

also offered to meet with Stephansen at an upcoming industry

conference or visit him in Norway.

Six days later, someone sent an email back to Dick

Christy, which said, in full:

> Dear Sir,
>
> Mr Stephansen is on vacation and will be back
> 15th August.
>
> Best regards,
> Annika Hjelle

Id.

Unbeknownst to Dick, Paul had during the first week of

August flown to Norway to meet with Stephansen while the

Norwegian was said to be "on vacation". Stephansen had invited

Paul to visit earlier in the year, supposedly to see slaker

improvements. In his testimony, Paul would have us believe that

the only thing that happened during the six hours he was with

Stephansen is that he looked at slakers. At his deposition, Paul

described his vacation in Norway as a "personal trip." Paul

Christy Dep. at 181. See also id. at 330 (explaining that he saw

a sewage plant in Hawaii during his honeymoon). But at the

hearing Paul said that he was acting on behalf of RDP during his

visit with Stephansen. Stephansen asked Paul about the Two

Percent Calculation issue, and Paul says that he replied that he

had no authority on that issue and that they did not discuss it

further. While Paul's testimony about this trip was incredible on

its face, most notable for our purposes now[15] is that Paul never disclosed the existence of the meeting to his brother Dick.

Michael Quici, a current RDP Director who has worked for the company for about twenty-five years, spoke with Stephansen on August 18, 2009 after Stephansen returned from "vacation." Quici described that conversation as "pleasant" and said that Stephansen did not use the word "default." Quici did not get the impression that there was any urgency in resolving the fee dispute. See Michael Quici Dep. at 72-74. At that point, Quici thought there had been an "accounting error" and did not know that Stephansen's concerns were rooted in Dick's change to the Two Percent Calculation. Id. at 75-76. When Quici asked Stephansen for the basis of the numbers in his July 7 email, Stephansen told Quici that he got the information about the disputed royalty amounts from Paul. Quici therefore asked Paul to send him that report, and Paul did so the next day. See Ex. D-21. In Stephansen's phone conversation with Quici, he did not mention Paul's visit to Norway just two weeks earlier.

---

[15] There remain significant disputes about Paul's alleged breaches of fiduciary duty to RDP occasioned by, e.g., this never-disclosed visit to Stephansen, or their never-disclosed pre-July 7 telephone conversation. While these matters are most serious, we leave their resolution for another day.

On August 27, 2009, Stephansen sent Dick and Paul a
letter by fax and mail that for the first time referred to the
July 7 email as "a notice of default."  <u>See</u> Ex. D-22 at 1.  This
triggered, in Stephansen's view, "article 12(c) of the [2001
License] Agreement, that the Agreement is terminated with effect
from 1 September 2009."  <u>Id.</u> at 2.[16]

---

[16] The resolution of the question regarding the legal
consequences of Stephansen's July 7, 2009 email regarding "Tekkem
Slaker fee" (Ex. D-19) is by no means free from doubt.  While it
is certainly true that Stephansen in the August 27, 2009 fax and
letter referred to the July 7 document as a "notice of default"
that triggered a thirty-day period under § 12(c) of the License
Agreement with RDP, nowhere in the July 7 email did he use the
word "default" or any locution that could be fairly regarded as a
cognate of "default."

When Dick Christy on July 24, 2009 responded to
Stephansen's email in order to clarify "this question," he was
informed six days later by a person said to be from Stephansen's
office that Stephansen was "on vacation and will be back 15th
august" [<u>sic</u>].  <u>See</u> Ex. D-20. July 24 was <u>within</u> thirty days of
the July 7 email and before Paul's visit with Stephansen, and
Stephansen's purported return to the office on August 15 was
after the hypothesized cure period was to expire. Of course, it
is undisputed that Paul Christy spent at least six hours visiting
Stephansen in Norway the first week of August of 2009, in which
he claimed never to have substantively discussed the matter
raised by the July 7 email, testimony that (to say the least) we
find incredible.

RDP's August 28, 2009 response, Ex. D-23, and the wire
transfer of the total amount in dispute ($106,091) was, to be
sure, more than thirty days after July 7, but the validity of
Stephansen's supposed "termination," or any other "controversy or
claim arising out of or relating to" the 2001 License Agreement,
are matters both parties entrusted to "binding arbitration under
the rules and auspices of the London Court of International
Arbitration, in London, England," which, to be sure, "shall apply
(continued...)

19

When RDP received the August 27 letter, its corporate attorney asked Paul to call Stephansen right away regarding the situation. Paul again displayed his studied disinterest in resolving the fee dispute by declining to call Stephansen.[17] He told us that he simply did not know what to say to Stephansen about the issue, and Paul also takes the preposterous position that it was in RDP's best interests for him -- RDP's primary contact with Stephansen -- to refuse to make the call to this important supplier at this facially crucial time.

As one might expect, Dick took a different approach and responded immediately to Stephansen's August 27 letter. In Dick's August 28 letter to Stephansen, he stated that he "was very surprised" because he "had thought, based on our conversations and emails, that we were working towards resolving the questions you had raised about the royalty payments you have received under the agreement." Ex. D-23. But as "a show of good faith," Dick

---

[16] (...continued)
the laws of the Commonwealth of Pennsylvania," 2001 License Agreement at § 28. We therefore leave these weighty issues to that Tribunal.

[17] At the hearing, Paul insisted that he did not "refuse" to call Stephansen, but in his email to Dick of September 2, 2009, he stated that he "simply refused to call Mr. Stephansen, because [he] was uninformed of the situation." Stip. Ex. 86.

wrote to Stephansen that though, in Dick's view, the "amount is clearly an overpayment," he nevertheless was ready to wire "$106,091.00[18] to your bank account in accordance with your prior instructions on making royalty payments." Id. Dick also asked Stephansen to confirm where to wire the payment and offered to meet with Stephansen to discuss the issue. Id. On August 31, Dick, Quici, and their attorney had a phone conversation with Stephansen, and Quici said that Stephansen told them he "would consider reinstating the agreement." Michael Quici Dep. at 99-100. On September 1, Stephansen emailed Dick with instructions regarding where to wire the $106,091 and told him that Stephansen would "use our best endeavours to come to an equitable solution." Ex. D-24. RDP wired the funds shortly thereafter.

E.    Paul's Resignation and Founding of Nordetek

It is undisputed that on September 18, 2009 Paul resigned as an employee, officer, and director of RDP.[19]

_____

[18] On August 28 Quici and his daughter, who also works at RDP, calculated that $106,091 was the maximum amount that RDP could owe Stephansen for the disputed Two Percent Calculation, as well as for the mutually missed accelerator percentage. Quici calculated the latter portion of the disputed fees at Stephansen's demanded seven percent, rather than the five percent that the 2001 License Agreement provided.

[19] In his resignation letter, Paul listed many personal
(continued...)

Notwithstanding his receipt of RDP's wired funds, Stephansen wrote to Dick on October 2, 2009 and reiterated that the agreement had been terminated. Ex. D-27. He demanded that RDP stop using the Tekkem trademark and cease advertising Tekkem slakers. Id. RDP's attorney responded on October 5 and explained RDP's view that Stephansen had not terminated the license. Ex. D-28.

Just three weeks after resigning from RDP, Paul on October 9, 2009 incorporated Nordetek Environmental, Inc. in Delaware. Nordetek purportedly has its principal place of business in California, and Paul is its only owner and employee.[20] Paul Christy Dep. at 237-38. It is also undisputed that four days later Nordetek signed a putatively exclusive

---

[19] (...continued)
and professional reasons for resigning. See Ex. D-16. But why Paul resigned from RDP is immaterial at this time. If RDP may enforce the NCC, it applies to termination of Paul's employment "for any reason."

After Paul resigned, Dick wrote to Stephansen and told him about this change at the firm. Ex. D-25. Dick reminded Stephansen about his long history with the company and his vision for the future and also shared some ideas for issues to be resolved in the next license agreement between them. Dick again offered to visit Stephansen in Norway. Id.

[20] Paul has sometimes hesitated to characterize himself as an "employee" of Nordetek, but the parties stipulated that he is currently Nordetek's only employee. Stip. Facts at ¶ 75.

License Agreement with Stephansen. <u>See</u> Ex. D-46. This litigation
ensued the next day.[21]

At the preliminary injunction hearing, Paul claimed
that he did not speak to Stephansen regarding Nordetek getting
the Tekkem license until early October. But in the plaintiffs'
responses to RDP's interrogatories, they swear that Paul and
Stephansen first discussed having a company created by Paul serve
as the Stephansen licensee "no earlier than September 26, 2009."
Ex. D-71 at 4. Even before Paul resigned, Stephansen asked him if
he could help find a new licensee, but Paul allegedly responded
that he could not work on that issue while he was still an RDP
employee. <u>Id.</u>

Paul claims that Nordetek has everything it needs to
sell Tekkem slakers by virtue of its licensing agreement. He told
us that once Nordetek got this license, it was "instantly" in
that business.

But Dick credibly testified that Nordetek would need
additional technology and know-how to sell the slakers and
provide the engineering expertise to support their installation.

---

[21] We have jurisdiction because plaintiff Nordetek and
Paul Christy have invoked our federal question jurisdiction
regarding patent and/or trademark numbers 5,746,983 and
2,607,699.

Dick cited as one example RDP's development of technology to address the grit issue. He also said that RDP has improved on the computer software that Stephansen provided with the Tekkem license. Paul responded that Nordetek will be able to complete its first potential contract in Dallas with assistance from Stephansen and without using RDP's proprietary information. Tekkem slakers are in use in many locations outside of the United States, so in Paul's view it is plausible that Nordetek could install the Dallas slaker with Stephansen's help without using RDP's patent or other technology.

Paul also testified that Nordetek's only business is Tekkem lime slakers. He does not believe that Nordetek competes with RDP because from his perspective RDP no longer has a Tekkem license, and Tekkem slakers are Nordetek's only line of business.[22] At this time, however, RDP is proceeding as though it still has a Tekkem license because it believes that Stephansen never properly terminated the 2001 License Agreement. According to Dick, RDP has six pending or potential projects that would use Tekkem, and RDP would have to lay off most of its fifteen

---

[22] Paul testified that he is _personally_ an agent for another Norwegian company called Cambi, which is involved in wastewater treatment. But he denied that Nordetek has a relationship with Cambi.

employees if it could not complete those projects. But RDP may be able to survive, despite such a catastrophic blow.

In mid-October of 2009, all of the characters in this family drama attended WEFTEC, the Water Environment Federation's Annual Technical Exhibition Conference. Ex. D-68 at ¶¶ 113, 120-21. WEFTEC is "the largest conference of its kind in North America and offers water quality professionals from around the world with the best water quality education and training available today." Stip. Facts at ¶ 79. RDP had an exhibit at WEFTEC that included references to Tekkem.

    F.   <u>Clients Caught in the Middle</u>

Since Stephansen purportedly terminated the 2001 License Agreement and Nordetek signed its own licensing agreement with Stephansen, both Nordetek and RDP have held themselves out as the only Tekkem licensees in the United States. They have also sought the same contracts from the same clients.

Nordetek's first potential order is for the Tekkem slaker in Dallas, but in May of 2009 Paul tried to get this same contract <u>for RDP</u>. Paul Christy Dep. at 149, 307-08. Nordetek has received a letter of intent for the Dallas project, which is worth $4.4 million, but has not yet signed a contract. <u>See</u> Ex. D-

67. Both companies have also sought the Ann Arbor job, and Dick credibly testified that RDP customers all over the country are questioning whether they should work with RDP or Nordetek. <u>See also, e.g.</u>, Stip. Ex. 101 (regarding the system in Wichita Falls). Stephansen stepped into the fray and told people connected to the Ann Arbor and Dallas projects that they should contract with Nordetek because he thinks that Nordetek is the current exclusive licensee in the United States. <u>See</u> Stip. Ex. 93 (regarding Dallas) and 95 (regarding Ann Arbor).

According to Brian Steglitz, Ann Arbor's Senior Utilities Engineer and Project Manager for its water treatment project, Ann Arbor's existing lime slaking system has reached the end of its serviceable life. First Brian Steglitz Aff., Ann Arbor Ex. 1, at ¶ 4. For nineteen months, the City has worked on the design of the new system. <u>Id.</u> at ¶ 10. It anticipates receiving $1.4 million in federal stimulus funding, assuming that it can continue to meet rigorous deadlines for starting and completing the project. <u>See id.</u> at ¶ 7, 9. Ann Arbor met the first deadline by awarding the contract for the project on November 16, 2009, and RDP is slated to be a subcontractor for the Tekkem lime

slaker and other components.[23] But for Ann Arbor to remain
eligible for the funding, it must "issue the start work order"
and have a contractor on the job site by February 17, 2010.
Second Brian Steglitz Aff., Ann Arbor Ex. 2, at ¶ 5. Steglitz
estimates that the lime slaking system would need to be delivered
in June of 2010. Id. at ¶ 22. According to Steglitz, Paul was the
"primary [RDP] representative" who sold the system to the City,
and Paul continued to work with Ann Arbor on behalf of RDP as
late as August 20, 2009. First Steglitz Aff. at ¶ 12.

Nordetek is also interested in the Ann Arbor job, but
the city "does not believe that Paul Christy or Nordetek has the
personnel or facilities to prepare the shop drawings or to
manufacture the complete system components that are required for
the project." Id. at ¶ 20. Paul testified that Nordetek could
meet Ann Arbor's deadlines and that Nordetek could get a
performance bond for the project because he would put up a 100%
cash deposit with the bonding company.[24] For this job only,

_____

[23] The budget for the whole project is just over $4.2
million, and RDP's portion of the contract is about $1.15
million. First Steglitz Aff. at ¶ 8.

[24] Nordetek has not yet put up a bond for the Dallas
project, and Paul does not know if the surety company would
require him to again pay a 100% deposit. But the Dallas project
is worth more than $4 million, and Paul testified that he could

(continued...)

Nordetek has also offered to permit Ann Arbor to use its Tekkem license and contract with RDP to build the equipment. Ex. P-5. The City has apparently rebuffed this offer.

Tekkem is a critical component of Ann Arbor's water treatment plan design. Without it the City would incur significant delays in implementing this project, which would likely result in a loss of the federal stimulus funding. First Steglitz Aff. at ¶¶ 21-23; Second Steglitz Aff. at ¶ 23. If Ann Arbor could not proceed with RDP providing the Tekkem slaker system, it would have to find a new Tekkem provider and would possibly experience construction delays resulting in the loss of the stimulus funding. RDP has agreed to indemnify Ann Arbor regarding the Stephansen licensing issues. First Steglitz Aff. at ¶ 25.

Ann Arbor's concerns cannot be firmly put to rest until this case concludes and, more importantly, Stephansen and RDP resolve their dispute regarding whether RDP is still a Tekkem licensee. But RDP's surety company is awaiting the outcome of the parties' motions for preliminary injunction before deciding whether to provide bonds to RDP for the project. Second Steglitz

---

[24] (...continued)
not come up with even a 50% cash security -- or $2 million -- for that bond.

Aff. at ¶ 12. This is currently a major stumbling block in meeting the upcoming deadlines for the project. Ann Arbor's attorney informed us at the hearing that denying the plaintiffs' motion for preliminary injunction might have a positive effect on the City's continued eligibility for the federal stimulus funding and its efforts to ensure that its residents have safe drinking water. In other words, if we do not affirmatively <u>prevent</u> RDP from providing the Tekkem slaker to the City at this early stage in the litigation, Ann Arbor believes it will make timely progress on the project and remain eligible for the stimulus funding.

### G.    <u>RDP's Confidential Proprietary Information</u>

Paul admitted that RDP has confidential proprietary information and that he had unfettered access to it while he worked at RDP. RDP is concerned that Paul will use this sensitive information to do projects in the future, but Dick does not believe that Paul has used it yet. At the preliminary injunction hearing, Dick explained that Paul had access, <u>inter alia</u>, to electronic files containing preliminary engineering drawings, which are completed before RDP signs a contract. Having the electronic version -- as opposed to a paper copy -- of those

drawings potentially saves hundreds of hours of work in creating the drawings that are done at later stages of the project because they incorporate RDP's resolution of its past mistakes and embody thirty years of the company's work experience.

II.  <u>Legal Analysis</u>

As noted, the parties have filed cross-motions for preliminary injunction.[25] In its motion, RDP asked for injunctive relief on several grounds, but it produced evidence that suffices only to support its request that we enjoin Paul and Nordetek from competing with RDP. The plaintiffs seek relief pursuant to their Lanham Act claims and ask us to enjoin RDP from (1) claiming that it has a Tekkem license, (2) stating that Nordetek does not have that license, (3) saying that Paul is subject to a two-year NCC with RDP, and (4) "disparaging and misrepresenting Plaintiffs and their products and/or services." Pl. Mot. at 1. We will thus limit our discussion to the NCC and plaintiffs' Lanham Act claims.

---

[25] We denied an earlier plaintiffs' motion for a temporary restraining order on November 12, 2009, and the same day granted the City of Ann Arbor's motion to intervene.

Based on the following analysis, we will grant RDP's motion against Paul and Nordetek, and deny Paul and Nordetek's motion against RDP.

A. <u>Preliminary Injunction Standard</u>

In ruling on a motion for preliminary injunction, we must consider[26] whether the movant has shown "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." <u>Child Evangelism Fellowship v. Stafford Tp. School Dist.</u>, 386 F.3d 514, 524 (3d Cir. 2004) (internal quotations omitted). The moving party must show that it will suffer irreparable harm that is beyond monetary damages, and we must consider the extent, if any, to which it will suffer that harm. <u>Liberty Lincoln-Mercury, Inc.</u>

---

[26] In <u>McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC</u>, 511 F.3d 350 (3d Cir. 2007), our Court of Appeals stated that the movant "must demonstrate that <u>each</u> of [these] factors favors the requested relief." <u>Id.</u> at 356 (emphasis added). But later jurisprudence, which in turn cites <u>McNeil</u>, simply states that we "must consider" these factors and does not indicate a shift away from the traditional balancing approach that courts take regarding these concerns when ruling on a motion for a preliminary injunction. <u>See Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.</u>, 562 F.3d 553, 556 (3d Cir. 2009). <u>See also McTernan v. City of York</u>, 577 F.3d 521, 526 (3d Cir. 2009) (same).

v. Ford Motor Co., 562 F.3d 553, 557 (3d Cir. 2009). It is not

sufficient for the movant to show that irreparable harm "will

occur only in the indefinite future." Campbell Soup Co. v.

Conagra, Inc., 977 F.2d 86, 91 (3d Cir. 1992). Rather, it "must

make a clear showing of immediate irreparable harm." Id.

(internal quotations omitted, emphasis in original).

　　　　We will first address RDP's motion for preliminary

injunction.

　　　　B.　　RDP's Motion for Preliminary Injunction

　　　　In its motion, RDP asks us to enforce the NCC and to

preliminarily enjoin and restrain Paul for two years from

competing with RDP and working for, owning, controlling,

operating, or affiliating with Nordetek. The parties have

presented extensive evidence and arguments on this point, and, as

noted, we will grant RDP's motion on it. But RDP also asks us to

issue an injunction regarding, generally speaking, Paul's use and

possession of RDP's property, confidential information, and trade

secrets. It also requests that we order Paul and Nordetek to

account to RDP for any income received as a result of Paul's work

with Nordetek. At this juncture, RDP has not provided us with

evidence or arguments that are sufficient to support an

injunction on either of <u>these</u> issues,[27] and we will deny its

motion as it relates to them.

##### 1. Likelihood of Success on
##### <u>the Merits Regarding the NCC</u>

"In Pennsylvania,[28] restrictive covenants are

enforceable if [1] they are incident to an employment

relationship between the parties; [2] the restrictions imposed by

the covenant are reasonably necessary for the protection of the

employer; and [3] the restrictions imposed are reasonably limited

in duration and geographic extent." <u>Hess v. Gebhard & Co., Inc.</u>,

808 A.2d 912, 917 (Pa. 2002). A restrictive covenant will also be

enforced when it is "attached to a contract for the sale of a

business" and meets the second and third requirements in <u>Hess</u>.

---

[27] The parties submitted evidence regarding Paul's RDP laptop and his use of software to delete all of the files from its hard drive before he returned it to RDP. But RDP has not shown that this evidence has any bearing on its claims regarding misuse of trade secrets or confidential information. There is no evidence that Paul or Nordetek currently has any property of RDP. And since we will enjoin Paul from competing with RDP and continuing to work on Nordetek's behalf, there is no reason to be concerned that Paul will use RDP's protected information in the immediate future.

On the accounting issue, there is no indication in the record that Nordetek or Paul have yet received <u>any</u> income or generated accounts receivable from Paul's work at Nordetek.

[28] The 1995 Agreement is to be construed according to Pennsylvania law. 1995 Agreement at § 15(c).

<u>Piercing Pagoda, Inc. v. Hoffner</u>, 351 A.2d 207, 210 (Pa. 1976).

The plaintiffs do not argue that the NCC was unreasonable in duration or geographic extent, so we will not address these matters. The parties executed the 1995 Agreement well after Paul's relationship with RDP as a shareholder and employee began, so the NCC will not be enforced unless Paul received a "corresponding benefit or change in status." <u>Wainwright's Travel Service, Inc v. Schmolk</u>, 500 A.2d 476, 478 (Pa. Super. 1985).

> a. Incident to an Employment Relationship
>    <u>or Contract for the Sale of a Business</u>

Plaintiffs argue that the NCC does not meet the first <u>Hess</u> requirement because it was in a shareholder agreement and not an employment contract, but that fact is not fatal to the enforcement of the NCC. In <u>Wainwright's Travel Service</u>, the Superior Court of Pennsylvania held that a restrictive covenant in a shareholder agreement was enforceable because the employee had the opportunity to purchase stock in the company <u>because</u> she was a key employee. <u>Id.</u> The court concluded that the shareholder agreement was therefore "sufficiently related to the employment relationship." <u>Id.</u> Here, Paul's relationship to RDP as an employee and shareholder are intertwined, and it appears that Paul's father made him a shareholder not because he was a key

employee but because Paul was his son. But even though the 1995 Agreement was labeled as a "Shareholder Agreement," it addressed issues that the brothers faced in their roles as shareholders <u>and</u> employees. For example, it protected Paul from termination as an employee except for cause, death, or disability. The brothers could only trigger the NCC and the share repurchase provisions by termination of their employment with RDP. For these reasons, RDP is likely to succeed in showing that the 1995 Agreement was "sufficiently related to [Paul's] employment relationship" so that the NCC was ancillary to it.

RDP also contends that the NCC was ancillary to a contract to sell Paul's ownership interest in RDP pursuant to the 1995 Agreement's repurchase provisions. The plaintiffs respond that the 1995 Agreement only discussed the <u>future</u> sale of Paul's interest and that the NCC was therefore not ancillary to a buy-sell agreement. Because we find that RDP is likely to succeed in showing that the NCC was ancillary to Paul's employment relationship with RDP, we need not resolve this dispute.

b.  Reasonably Necessary
<u>for RDP's Protection</u>

RDP argues that Paul's work with Nordetek threatens its relationships with existing customers and its ability to attract

new business in the future. The evidence in the record at this time shows that RDP and Nordetek are competing not only in the same market -- selling equipment for water treatment facilities and providing services to support their installation -- <u>but for the very same clients and projects</u>. Paul himself attempted to get contracts for RDP in Dallas and Ann Arbor while he worked at RDP and then later sought the same work for Nordetek shortly after leaving RDP. Within weeks of resigning from RDP, Paul also signed Nordetek's license agreement to use Tekkem -- clearly a key item of technology for RDP and its business. RDP claims that during Paul's long tenure as a shareholder, executive, and employee at RDP, he built up his technical expertise, industry contacts, and had a reputation in this field. RDP credibly through Dick reports that Paul's actions at Nordetek have already caused it harm and could seriously -- perhaps fatally -- damage the company unless we enjoin Paul from continuing on this path.

Plaintiffs respond that RDP has no legitimate business reason for enforcing the NCC because they believe that RDP and Nordetek are not competitors. They contend that Nordetek's only business is Tekkem slakers and that because RDP no longer has a license from Stephansen, RDP is barred from that business. According to Paul and Nordetek, even if RDP could show that

Stephansen wrongfully terminated RDP's Tekkem license, RDP's remedy is not specific performance -- to wit, getting the license back -- but only damages. Again, the dispute between RDP and Stephansen is not before us because it must be submitted to arbitration in London, but we will discuss this argument to dispel the plaintiffs' extravagant claims on this point.

Despite plaintiffs' protests to the contrary, whether RDP is still a licensee, and whether Nordetek's purported license is exclusive, are unquestionably in dispute. Cf. Pl. Post-Hearing Brief at 5 ("The evidence is indisputable that Nordetek -- and not RDP -- has the exclusive license to TEKKEM slaker plants, and any finding otherwise would be without jurisdiction[29] and contrary to all of the evidence and RDP's December 18, 2009 testimonial admission."). It is by no means clear that Stephansen has properly terminated RDP's license, and it seems entirely possible that the arbitration panel could conclude that RDP is still a licensee. Furthermore, none of the cases that plaintiffs

---

[29] Again, we agree with Nordetek's assessment that we do not have the power to determine the status of Stephansen's license(s), but Nordetek incorrectly believes that the outcome of that dispute is clear. Moreover, even if RDP is not a licensee, we conclude that RDP is likely to succeed in showing that the appropriate field of competition for this analysis is broader than just Tekkem slakers and that Paul has acted, and is acting, in competition with RDP.

cite supports their contention that, assuming that RDP is no

longer a licensee, it cannot get the license back through the

remedy of specific performance.[30]

---

[30] In Travelodge Hotels, Inc. v. Coutoules, No.
98-4307, 1999 WL 314166, *4 (D.N.J. 1999), Judge Wolin stated
that "[a] franchisee's remedy for wrongful termination is an
action for money damages, and not the continued unauthorized use
of its franchisor's trademarks" (internal quotations omitted).
But unlike this case, in Travelodge the court found that the
plaintiff licensor could "substantiate its claim that the license
was properly terminated," and the licensee never argued to the
court that it had not breached the license agreement and failed
to cure the defaults. Id. at *4-*5.
        The plaintiffs also cite S & R Corp. v. Jiffy Lube
Intern., Inc., 968 F.2d 371, 375 (3d Cir. 1992), in which our
Court of Appeals held that an ongoing dispute over whether a
franchise agreement was properly terminated did not preclude the
entry of an injunction against the franchisee's continued use of
the franchisor's trademarks. But in that case -- again unlike
this one -- the court found that the franchisee had stopped
paying royalties and the franchisor had properly terminated the
agreement on that basis.
        Plaintiffs' reliance on Crane Co. v. Aeroquip Corp.,
356 F.Supp. 733, 740 (D.C. Ill. 1973), is also unpersuasive. In
that case, the defendant licensee moved for a preliminary
injunction to stop the licensor from licensing its patent to a
third party. That court's discussion of the motion was
perfunctory -- just three short paragraphs -- and only observed
that the licensee had failed to show that monetary damages were
inadequate, its likelihood of success on the merits, or
irreparable harm.
        These cases simply do not support plaintiffs'
contention that RDP has no hope of getting specific performance
of the 2001 License Agreement. One relevant treatise explains
that this remedy is sometimes "directly awarded to the licensee
[but] in very few cases." Raymond T. Nimmer & Jeff Dodd, Modern
Licensing Law § 11:34 (2009), available at MODLICENLAW § 11:34 on
Westlaw (database version updated Oct. 2009).

But more importantly, although restrictive covenants "should be construed narrowly," All-Pak, Inc. v. Johnston, 694 A.2d 347, 351 (Pa. Super. 1997), the plaintiffs' view of this issue is not just narrow but myopic. In asking us to limit our review of this issue to only Tekkem slakers, Nordetek invites us to see the relevant market -- selling water treatment equipment and providing related services -- with a set of blinders and ignore the reality that Nordetek and RDP are currently pursuing the same jobs. Indeed, Nordetek's reasoning leads to the preposterous conclusion that any company with a proprietary product has no competitors.

We decline to take such a crabbed view, especially in light of the NCC's broad language. That portion of the 1995 Agreement provides that for a period of two years after leaving RDP Paul "shall not engage either directly or indirectly in any manner or capacity whatsoever . . . in any business competitive with the business of the Corporation." 1995 Agreement at § 9(b). It is true that the agreement does not define the phrase "competitive with." But The Oxford English Dictionary defines competitive as "Of, pertaining to, or characterized by competition." III The Oxford English Dictionary 605 (2d ed. 1989). In the realm of commerce, competition is "Rivalry in the

39

market, striving for custom between those who have the same commodities to dispose of." Id. at 604, def. 1(b).

The Pennsylvania Superior Court has defined competition similarly as the "effort or action of two or more commercial interests to obtain the same business from third parties." Omicron Systems, Inc. v. Weiner, 860 A.2d 554, 560 (Pa. Super. 2004) (internal quotations omitted). The court concluded in Omicron that two companies were competitors because they provided their clients with solutions to the same kinds of problems. Id. at 561. The plaintiffs here argue that RDP may no longer supply Tekkem slakers and does not currently market any products that compete with Tekkem. They contend that RDP and Nordetek are therefore not competitors under Omicron. But plaintiffs ignore the fact that RDP is currently marketing Tekkem slakers and may well be doing so lawfully. It is plain that RDP and Nordetek are offering the same solutions to their customers' water treatment problems and that under Omicron they are paradigmatic competitors.[31]

On the record before us, RDP is likely to succeed in showing that RDP and Nordetek (through Paul) are "striving for

---

[31] Under this approach, Paul violated the NCC by getting the Tekkem license for Nordetek in the first place.

[the same] custom" -- because that is, in fact, what they are doing -- and that it has a current legitimate business interest in enforcing Paul's broad covenant not to compete for two years against the family firm.

> ### c.    Corresponding Benefit
> ### or Change in Status

Plaintiffs also contend that Paul did not receive any consideration for the NCC because the 1995 Agreement did not change his job responsibilities, compensation, or increase his ownership of RDP. RDP responds that the 1995 Agreement benefitted Paul because it increased his job security by limiting RDP's ability to terminate him.

RDP also argues that its promise to purchase Paul's shares was valuable consideration that it believes is now worth more than $500,000. Paul characterizes the share repurchase provisions as a detriment because before the 1995 Agreement he could have resigned as an employee and remained a shareholder. But the parties stipulated that due to Paul's resignation, he "is entitled to have his shares of RDP stock repurchased" pursuant to the 1995 Agreement. Stip. Facts at ¶ 34.

There is no evidence that prior to the 1995 Agreement Paul and RDP were subject to these provisions. Moreover, Rob and

Dick also agreed to the NCC, and Paul benefitted from this mutual arrangement because he had the assurance that his interest in RDP was protected from his brothers leaving the company and taking its business with them. Plaintiffs contend that Dick's promise not to compete was illusory because he never planned to leave RDP. But Dick credibly testified that he considered resigning from RDP due to the hostility between him and Paul but decided not to do so precisely because of the NCC.

RDP is likely to succeed in showing that Paul's job protections, RDP's obligation to repurchase Paul's shares upon his resignation,[32] and the mutual NCC in the 1995 Agreement were new, and that these obligations and promises were corresponding benefits for Paul's agreement not to compete.[33]

---

[32] Again, notwithstanding plaintiffs' prior arguments to the contrary, the parties stipulated that the 1995 Agreement obligated RDP to take this action.

[33] In their pre-hearing supplemental brief, plaintiffs argue that Dick's misbehavior toward Paul, including freezing Paul out of decisions at RDP, renders the 1995 Agreement unenforceable because Dick has failed to perform his obligations under that agreement in good faith. Pl. Supp. Br. at 13-16. But Dick is not seeking to enforce the NCC -- RDP is. And plaintiffs have not made any arguments that would support piercing RDP's corporate veil on this issue. We will therefore not further address these inapposite contentions.

### d.  <u>Constructive Termination</u>

Plaintiffs assert that "equity commands" that we not enforce the NCC against Paul because his "value" to RDP at the time of his resignation was "nominal." Pl. Opp. Br. at 20. Their argument is apparently that RDP should not feel threatened by Paul because RDP (read Dick) held him in low esteem by the end of his tenure with the company. This reasoning may have some merit as applied to a low-level employee with little ability to pose a serious threat to the well-being of a former employer. But it has no place here because Paul was an officer, director, and shareholder at RDP who admits that he had unfettered access to its confidential information. And there is no question that Paul and Nordetek actually pose a serious threat to RDP. We will not belabor this meritless argument.

Based on all of the evidence and arguments that the parties have submitted thus far, we conclude that RDP is likely to succeed in showing that Paul's NCC is enforceable and that he is breaching that agreement.

### 2.  <u>Irreparable Harm and Balance of Harm</u>

We have already discussed the harm that RDP has suffered and continues to experience as a result of Paul's

actions with Nordetek. Paul claims that we cannot view Nordetek's acquisition of the Tekkem license as harmful to RDP because RDP lost the license before Nordetek acquired it. We find Paul's testimony that he did not discuss the possibility of his firm serving as the Tekkem licensee until he left RDP to be utterly incredible. But even if we treated this fiction as true, it appears that Paul's actions with Stephansen since he left RDP have further poisoned the relationship between Stephansen and RDP and made less likely the possibility of reconciliation and resolution of the issues surrounding the 2001 License Agreement.

But Paul and Nordetek have also harmed RDP more directly by competing for the very same business and causing RDP's current customers to question their ongoing relationship with the company. Under Pennsylvania law, Paul's disruption of RDP's established business relationships, the possibility that RDP will lose new business, which is "inherently unascertainable," and the damage that Paul and Nordetek are causing to RDP's market advantage constitute quintessential irreparable injuries. West Penn Specialty MSO, Inc. v. Nolan, 737 A.2d 295, 299 (Pa. Super. 1999). Unlike Nordetek, which only "employs" Paul, RDP has fifteen employees, and Dick credibly testified that RDP could have to lay off most of them if RDP

continues to lose business. On these bases, RDP has demonstrated that the actions of Paul and Nordetek are causing it irreparable injury now and will continue to do so in the immediate future unless we grant RDP's motion.

The plaintiffs argue that if we grant RDP's motion, Nordetek will be forced out of business and that Paul will not be able to work in the only field in which he has been employed since college. But the only real-world effect of Nordetek's potential demise would be harm to Paul as Nordetek's sole owner and employee. At the November 12, 2009 hearing on plaintiffs' motion for a temporary restraining order, we learned that Paul has significant personal wealth, and he told us that he is not personally suffering from any financial distress. Any harm that Paul would suffer from the injunction RDP seeks is, moreover, entirely of his own making. He signed the 1995 Agreement and then resigned from RDP, thereby triggering the application of the NCC. He then promptly founded a business that competes with RDP. Such "self-inflicted" injury will not be considered irreparable. See Caplan v. Fellheimer Eichen Braverman & Kaskey, 68 F.3d 828, 839 (3d Cir. 1995).

The harm for Nordetek and Paul of granting RDP's motion pales in comparison to the palpable harm that the plaintiffs'

behavior is causing, and will continue to cause, RDP. The balance of harms thus tips heavily in favor of granting RDP's motion.

### 3. Public Interest

Nordetek contends that the public interest will be harmed if we grant RDP's motion because no contractor in North America would then be able to provide Tekkem lime slakers. As discussed above, we think this outcome is by no means a foregone conclusion, as RDP may still be a Tekkem licensee. We also cannot predict what action Stephansen may take if we grant the motion, but it is possible that Stephansen may find an entity unrelated to Paul to sell Tekkem in the United States. The parties also make broad arguments regarding the public interest, e.g., that it is generally good to enforce non-compete agreements or that non-compete agreements are disfavored and individuals should be free to conduct business as they choose. There may be merit to these abstract arguments but -- on the issue of whether to enjoin Paul from competing with RDP -- the public interest does not weigh heavily in favor of either side.[34]

---

[34] The more central and palpable public interest concerns -- for Ann Arbor, Dallas, and other municipalities -- relate to local governments' ability to provide clean, safe drinking water and to move forward with projects to improve water treatment in those cities. But those important concerns do not
(continued...)

RDP is likely to succeed on the merits, and Paul's
conduct is causing, and will cause, irreparable harm in the
immediate future unless we grant RDP's motion. The balance of
harms weighs heavily in favor of RDP, and at this point the
public interest does not tip the scales for either side. Pursuant
to Fed. R. Civ. P. 65, we will therefore grant RDP's motion and
will enjoin Paul and anyone in active concert or participation
with him from competing with RDP. As things now stand, Paul is
the only owner and employee of Nordetek, and this injunction will
restrain Nordetek from competing with RDP as long as Paul has
anything to do with that firm.

C.   Plaintiffs' Motion for Preliminary Injunction

Plaintiffs' motion for preliminary injunction is
grounded in their Lanham Act claims relating to the Tekkem

---

[34] (...continued)
bear heavily on the defendant's motion to enjoin Paul from
competing with RDP. Ann Arbor, for example, simply wants a Tekkem
slaker and would like for RDP to provide it. But whether Paul and
Nordetek are also providing Tekkem slakers would have no impact
on Ann Arbor's situation.
   We know that Nordetek has received a letter of intent
for the Dallas project, and granting RDP's motion would
undoubtedly have an impact on Nordetek's ability to move forward
in Dallas. But the plaintiffs have provided no evidence regarding
the impact, if any, that an injunction would have on Dallas's
ability to proceed with its water treatment project. We therefore
cannot conclude that granting RDP's motion would have any impact
on the public's paramount interest in clean water.

license, Paul's NCC, and Nordetek's products and services, which plaintiffs have repeatedly contended <u>only</u> involve Tekkem slakers. They must show that if we do not grant their motion they will suffer irreparable and immediate harm. But we will enjoin Paul and everyone in active concert or participation with him -- currently including Nordetek -- from competing with RDP in the market of selling equipment for water treatment and providing services related to the installation of such equipment in the United States. The plaintiffs thus cannot show that they will suffer <u>immediate</u> irreparable harm from <u>anything</u> that RDP says about Tekkem, the non-compete, or Nordetek.

RDP argues that once we enjoin plaintiffs they lack standing to assert these claims because they cannot be suffering an injury to business they are barred from conducting. <u>See</u> <u>The Pitt News v. Fisher</u>, 215 F.3d 354, 359 (3d Cir. 2000) ("To demonstrate Article III standing, plaintiffs must demonstrate that they have suffered an injury-in-fact, that the injury is causally connected and traceable to an action of the defendant, and that it is redressable."). But the injunction against Paul and anyone acting in concert with him would last at most for two years -- the NCC's time limit. In view of this long breathing space, the plaintiffs cannot demonstrate that they will suffer

<u>immediate</u> and irreparable harm regarding RDP's relevant statements, and we will therefore not grant a preliminary injunction on this basis. But it is premature for us to declare that the plaintiffs will never suffer any injury from RDP's statements, given plaintiffs' at least theoretical possibilities after September of 2011 in selling Tekkem slakers.

We will deny plaintiffs' motion for preliminary injunction because they cannot show that they will in any way suffer immediate and irreparable injury.

## III.  <u>Security</u>

Having concluded that RDP is entitled to a preliminary injunction against Paul Christy and Nordetek for violation of § 9 of the Shareholders' Agreement, Fed. R. Civ. P. 65(c) obliges us to consider the issue of "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  As Wright and Miller note, this part of the Rule "is to enable a restrained or enjoined party to secure indemnification for the costs, usually not including attorney's fees, and pecuniary injury that may accrue during the period in which a wrongfully issued equitable order remains in effect."  11A Charles Alan

Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2954, at 287 (1995) (footnote omitted).

The problem in this case is determining what, if any, "pecuniary injury" Paul and Nordetek are at practical risk of incurring during the pendency of this preliminary injunction. We know from the hearing that Nordetek, which at the time of the hearing was clearly Paul's alter ego, not only had no employees, but also had no business. The record to date reveals, at its most concrete, a November 11, 2009 "Notice of Intent" with Oscar Renda Contracting, Inc. to Nordetek with respect to a possible $4.4 million water treatment plant expansion in Dallas, Texas. See Ex. D-67.

But we also know from the parties' experience with Ann Arbor that much can happen between an expression of "intent" and the execution of an actual contract. Indeed, for Nordetek and Paul perhaps the most inconvenient truth is that municipalities like Ann Arbor and Dallas oblige contractors to post performance bonds. As Paul readily admitted in his testimony, Nordetek's surety company would oblige him to post one hundred percent security for the Ann Arbor bond, over $1 million, and he could do so. But the Dallas job is worth $4.4 million, and Paul conceded

that there is no possible way that he could post even half of
that amount from the resources available to him.

      The record also confirms that municipalities prefer
dealing with firms that actually have employees, and not merely a
corporate charter and high hopes.  This hard reality is the
reason Ann Arbor expressed to us its desire to proceed with RDP
rather than with Nordetek.

      With such imponderables and contingencies, fashioning a
just amount to satisfy the purposes of Rule 65(c) is, in the end,
speculative on this record.  Taking what we know, which is the
<u>possibility</u> that Nordetek <u>may</u> participate in a $4.4 million
project with the City of Dallas, and generously assuming
(admittedly with no support in the record) a fifty percent profit
margin for Nordetek, the worst case scenario for the enjoined
parties would be a loss of $2.2 million for, say, a period of one
year before our Court of Appeals or this Court could come to the
conclusion that this preliminary injunction was improvidently
granted.  According to today's tables in <u>The Wall Street Journal</u>,
and taking the current yield on benchmark two-year government
bonds issued by the United States Treasury,[35] and applying this
risk-free 1.02% rate for one year, represents a maximal interest

---

    [35] To be sure, another generous assumption.

loss of $22,440.  We will therefore condition the preliminary injunction on the posting of security in the amount of $22,440.

IV.       Conclusion

We will grant RDP's motion for preliminary injunction as to the NCC, and we will deny the plaintiffs' motion for preliminary injunction. We will order RDP to post $22,440 security pursuant to Fed. R. Civ. P. 65(c).

                              BY THE COURT:

                              __\s\Stewart Dalzell