IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NORDETEK ENVIRONMENTAL,          :            CIVIL ACTION
INC., et al.                     :
                                 :
        v.                       :
                                 :
RDP TECHNOLOGIES, INC.           :            NO. 09-4714

MEMORANDUM

Dalzell, J.                                   May 16, 2012

As we noted in an earlier memorandum, see Nordetek

Envtl., Inc. v. RDP Tech., Inc., 677 F. Supp. 2d 825 (E.D. Pa.

2010), this case arises from the venom between two brothers, Paul

G. ("Paul") and Richard ("Dick") Christy.  Together for decades

they ran a successful company, RDP Technologies, Inc. ("RDP"),

before enmity between them led Paul to leave the company, start

his own firm, Nordetek Environmental, Inc. ("Nordetek"), and

attempt to compete against RDP -- all in alleged violation of his

fiduciary duties to his family's company and a non-competition

provision in a shareholder agreement.

Thus it was that plaintiffs and counterclaim defendants

Nordetek and Paul on October 14, 2009 filed suit against

defendant and counterclaim plaintiff RDP, asserting claims for

patent infringement, false designation of origin, false

advertising, and trade infringement.  They shortly thereafter

filed a motion for preliminary injunction, to which RDP responded

with its own preliminary injunction motion.  After a hearing, we denied Nordetek and Paul's motion for preliminary injunction and granted RDP's motion for one.  Id.  After further briefing, we granted RDP's motion for summary judgment with respect to all of Nordetek and Paul's claims against it.  Aug. 9, 2010 Order (docket entry # 110).  But by this time RDP had filed counterclaims against Nordetek and Paul -- including claims for breach of fiduciary duty and breach of contract -- which the counterclaim defendants unsuccessfully moved to dismiss. Moreover, several months after the entry of our preliminary injunction against Paul, RDP moved to hold Paul in contempt for violating the injunction -- a motion that we granted.  June 11, 2010 Order (docket entry # 100).

After those battles this case settled into relative quiet for a time, as the parties first attempted (unsuccessfully) to mediate their claims before Judge Jacob P. Hart, and then participated in arbitration proceedings before our former colleague, the Hon. Edward N. Cahn, aimed at fixing a value of RDP to determine how much Paul's shares in RDP were worth at the time he resigned.  Judge Cahn issued a decision in that arbitration about a year ago and offered to help the parties mediate the rest of their claims.  While the parties accepted

2

this gracious offer, Judge Cahn's efforts at mediation were unavailing, leading us to set a schedule for discovery and motion practice regarding the remaining counterclaims in this case.

RDP has now filed a motion for summary judgment with respect to its counterclaims for breach of fiduciary duty and breach of contract, a motion to hold Lisa Christy ("Lisa"), Paul's wife, in contempt and a motion to enjoin a second arbitration that Paul has initiated.  Paul and Nordetek have filed a motion for summary judgment regarding seven of RDP's ten counterclaims, as well as a motion to preclude the expert testimony of J. Mark Penny that RDP has proffered.

RDP restricts its motion for summary judgment to a subset of its counterclaims explaining that it "is willing to liquidate the entirety of its damages to $5,165,000, _i.e._, those resulting from Paul Christy's breaches of his fiduciary duty and contractual obligations."[1]  RDP's Mot. Summ. J. ("RDP's MSJ") at

---

[1]  As this quotation makes clear, RDP now seeks only compensatory damages resulting from Paul's alleged wrongdoing, though it notes that it has also asserted claims against Paul that would entitle it to recoup "punitive damages resulting from the willful, malicious and outrageous nature of Paul Christy's conduct."  RDP's MSJ at 3 n.2.  But RDP is not shy about the fist in this glove:  "In the event that RDP's motion for summary judgment [is] not granted in its entirety, RDP reserves the right to, and intends to, seek the maximum available damages on all of
(continued...)

3 n.2.  With respect to liability for Paul's alleged breach of fiduciary duty, RDP argues that "collateral estoppel applies to findings made in arbitration proceedings, as well as in litigation," id. at 5, and suggests that since Judge Cahn found that Paul "'devised a plan that was intended to harm RDP,'" id. at 8 (quoting Ex. 604 to RDP's MSJ ("Cahn Opinion") at 4), RDP is entitled to summary judgment on that claim.  Id. at 10.  RDP also points to evidence presented in the arbitration proceedings that it says demonstrates Paul's alleged breach.  Id. at 9-10.  With respect to liability for Paul's alleged breach of his noncompetition obligation, RDP notes that this Court has found that Paul competed with RDP, so that it is entitled to summary judgment on this claim as well.  Id. at 11,  Finally, with respect to damages, RDP argues that because (1) "Judge Cahn found that the value of RDP prior to a deduction for Paul Christy's bad acts was $6,490,000," id. at 14, (2) RDP's expert Edward Wilusz set "the value of RDP following Paul Christy's bad acts" at $1,325,000, id. at 15, and (3) "[a]fter hearing all of the evidence, Judge Cahn credited Wilusz's report, and rejected Paul

---

[1](...continued)
its claims at trial."  Id.

Christy's challenges to it," id., RDP is therefore "entitled to $5,165,000 -- the difference in RDP's value."   Id.

        As for Paul and Nordetek, they contend in their motion for summary judgment that "Judge Cahn found, and RDP is collaterally estopped from challenging, [that] RDP has not -- and cannot -- show any damages were caused to it by Paul Christy's conduct."   Nordetek's Mot. Summ. J. ("Nordetek's MSJ") at 1. Since causation and damages "are both elements of [RDP's] Counts I-IV and VI-VIII," Paul and Nordetek argue that "RDP cannot establish the existence of the elements of its claims and summary judgment is appropriate."   Id.   Paul and Nordetek further assert that "the only evidence of economic damages RDP has provided for any of its counterclaims rests entirely on Penny's unreliable and irrelevant expert opinion."   Id. at 9.   Since as counterclaim defendants they move for the preclusion of this testimony pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993), Paul and Nordetek suggest that they are entitled to summary judgment.

        As this canvass of these motions makes clear, the two pending motions for summary judgment and motion to preclude expert testimony involve related issues.  We will thus examine these motions together, considering each pertinent issue in turn,

before pivoting to resolve RDP's motions to hold Lisa in contempt and enjoin Paul's second arbitration.

## I.   __The Parties' Arguments Respecting Collateral Estoppel__

We first consider the parties' respective efforts to use Judge Cahn's Opinion and Award to collaterally estop their opponents and secure summary judgment.  We begin by reviewing the outlines of collateral estoppel doctrine in Pennsylvania.

As the Supreme Court of Pennsylvania explained in Safeguard Mut. Ins. Co. v. Williams, 345 A.2d 664, 668 (Pa. 1975),

> [A] plea of collateral estoppel is valid if, 1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merits, 3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, and 4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

While this language suggests that only four requirements need be met in order for the doctrine to apply, an array of case law makes clear that in addition "[t]he identical issue must have been necessary to final judgment on the merits."  Balent v. City of Wilkes-Barre, 669 A.2d 309, 313 (Pa. 1995).  See also, e.g.,

City of Pittsburgh v. Zoning Board of Adjustment of Pittsburgh, 559 A.2d 896, 901 (Pa. 1989) ("Collateral estoppel applies if . . . the determination in the prior proceeding was essential to the judgment."); Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 327 n.5 (1979) ("Under the doctrine of collateral estoppel . . . the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action."); Witkowski v. Welch, 173 F.3d 192, 203 n.15 (3d Cir. 1999) ("Some Pennsylvania courts state that there are actually five -- instead of four -- elements to the issue preclusion doctrine.  The fifth element requires that the determination of an issue in the prior case must have been 'essential' to the previous judgment. . . . In any event, the doctrine is essentially the same under either analysis."); Irizarry v. Office of General Counsel, 934 A.2d 143, 151 (Pa. Commw. Ct. 2007) ("If the parties to an action have had an opportunity to appear and be heard in a prior proceeding involving the same subject matter, all issues of fact which were actually adjudicated in the former action and essential to the judgment therein are concluded as between the parties.") (quoted in RDP's MSJ Reply at 2).

RDP attempts to apply the doctrine of collateral estoppel to bar Paul and Nordetek from challenging (1) Wilusz's $1,325,000 valuation of RDP and (2) the contention that Paul violated his fiduciary duty to RDP.  Given the requirements of the doctrine, there are at least two problems with RDP's first application of the collateral estoppel doctrine.

To begin, though RDP claims that "Judge Cahn rejected all challenges to Wilusz's $1,325,000 valuation," RDP's MSJ at 13 n.13 (citing Cahn Opinion at 7), and that "Judge Cahn credited Wilusz's report" as to "RDP's worth after Paul Christy began competing -- and after he convinced Stephansen to purport to cancel RDP's license," id. at 15 (citing Cahn Opinion generally without pin citation), this simply is not true.  RDP points to no language from Judge Cahn's Opinion and Award suggesting that he accepted Wilusz's $1,325,000 valuation of RDP, and our own parsing of the Opinion -- including the passages RDP cites -- reveals no language even hinting at such acceptance.  Indeed, as we note below, Judge Cahn rejected the suggestion that he determine RDP's value following Paul's alleged wrongful conduct, and instead explained that he would "evaluate RDP without any deduction for Paul's conduct and leave for determination in Judge

8

Dalzell's Court an assessment of the damages allegedly caused by

Paul both before and after his resignation." Cahn Opinion at 7.

We are, in truth, puzzled by how RDP's counsel can so

confidently assert a proposition that finds no support in the

record and appears to be false. More seriously, this flat-footed

stance brings into play Fed. R. Civ. P. 11(b), which states that

"[b]y presenting to the court a pleading, written motion, or

other paper -- whether by signing, filing, submitting, or later

advocating it -- an attorney or unrepresented party certifies

that to the best of the person's knowledge, information, and

belief, formed after an inquiry reasonable under the

circumstances: . . . (3) the factual contentions have evidentiary

support . . . ."[2]

In any case, even if Judge Cahn <u>had</u> credited Wilusz's

$1,325,000 valuation, Paul and Nordetek would still not be

estopped from challenging this valuation -- for any determination

respecting this valuation was not "necessary to [Judge Cahn's]

---

[2] We will accordingly order RDP's counsel to show cause
why they should not be sanctioned pursuant to Rule 11(c). To
avoid sanction, RDP's counsel must point to specific language
from Judge Cahn's March 29, 2011 Opinion and Award in which he
"reject[s] all challenges to Wilusz's $1,325,000 valuation" and
"credit[s] Wilusz's report" with respect to this valuation.
RDP's MSJ at 13 nn.13, 15.

final judgment." <u>Balent</u>, 669 A.2d at 313.  In fact, Judge Cahn

explicitly noted that he would <u>not</u> evaluate the effect of Paul's

acts on RDP's valuation and the passage warrants quoting at

length:

> My assignment is complicated by the fact that
> RDP has damage claims against Paul currently
> pending before Judge Dalzell. . . . I had
> originally intended, as confirmed by my
> remarks at Oral Argument, to include in my
> decision as to the value of RDP some
> consideration of Paul's acts to harm the
> company.  I was going to weave into my
> decision Paul's acts up to September 18,
> 2009, the date of his resignation.  That
> approach would leave for Judge Dalzell's
> determination an assessment of any damages
> caused by Paul after September 18, 2009.
> When I attempted to make decisions using that
> approach, I realized that it would be very
> difficult to segregate the impact of Paul's
> conduct before and after September 18, 2009.
> I also realized that Judge Dalzell, in his
> Order of August 9, 2010, ruled that Paul has
> waived any right to arbitrate RDP's claims.
> That is a compelling reason for me to abstain
> from an assessment of any of RDP's alleged
> damages.  Consequently, I have changed my
> approach and will evaluate RDP without any
> deduction for Paul's conduct and leave for
> determination in Judge Dalzell's Court an
> assessment of the damages allegedly caused by
> Paul both before and after his resignation.

Cahn Opinion at 6-7.  Judge Cahn then reiterated that

> Judge Dalzell and/or a jury will have the
> responsibility to assess any monetary damages
> in regard to RDP's claims against Paul.  Paul
> is entitled to receive 43% of $6,490,000 in

> installments calculated in accordance with
> the Agreement.  Judge Dalzell's Court will
> calculate the amount of damages Paul may owe
> to RDP for any harm he caused to RDP.

Id. at 8-9.  Judge Cahn thus reached the following conclusions:

> 1.    The Arbitrator has jurisdiction over
>       this dispute pursuant to paragraph 15j
>       of the Amended and Restated Shareholder
>       Agreement.
>
> 2.    The Arbitrator has in personam
>       jurisdiction over the parties who have
>       appeared personally and through counsel.
>
> 3.    The valuation of RDP Technologies, Inc.
>       as of September 17, 2009 is $6,490,000.

Id. at 9.

In sum, Judge Cahn's only conclusion on the merits
arising out of the arbitration was that RDP was worth $6,490,000
prior to Paul's alleged wrongful conduct.  We are at a loss to
understand how the value of RDP after Paul's alleged wrongful
conduct could possibly have been "necessary" to this conclusion.
To the extent RDP claims that Judge Cahn could not accept
Wilusz's ex ante valuation of RDP without relying upon Wilusz's
opinion as a whole -- including as to RDP's value after Paul's
alleged conduct -- such a contention neither finds support in
Judge Cahn's Opinion nor makes sense as a matter of logic, given
that Wilusz employed different methodologies and assumptions in

11

arriving at the two valuations.  <u>See</u> Cahn Opinion at 4 ("VMI
produced a report that valued RDP at $5,900,000 prior to Paul's
resignation and at $1,325,000 thereafter.  VMI's assumption in
support of the lower evaluation is that any prospective purchaser
would assume that Paul would compete with RDP and that RDP would
lose the Tekkem license.  Considering those assumptions, VMI's
lower evaluation was based on a liquidation approach.  VMI's
higher evaluation was based on an income approach.").  Thus, even
if Judge Cahn accepted Wilusz's $1,325,000 valuation  -- and his
Opinion betrays no hint that he did -- such acceptance was not
necessary to Judge Cahn's final judgment and thus cannot warrant
applying the doctrine of collateral estoppel.

    RDP's second attempt to apply the collateral estoppel
doctrine -- to foreclose Paul from claiming that he did not
violate his fiduciary duty to RDP -- also fails, though for only
one of the two reasons described above.  Judge Cahn did find that

> Evidence consisting of emails, memoranda to
> and from attorneys and other documents
> establishes that Paul, after his return to
> Pennsylvania, devised a plan that was
> intended to harm RDP.  The components of
> Paul's plan included fomenting a dispute
> between Tekkem and RDP by advising Tekkem
> that royalty payments were underreported and
> taking other actions calculated to disrupt
> the business of RDP.  As of August 13, 2009,
> Paul's lawyers confirm his "plan to start

12

> your own company, salvage your relationships
> with licensors so that they will do business
> with your new entity, and compete against
> RDP."

<u>Id.</u> at 2-3.  But if this matter had actually been decided in the

prior arbitration, it was no more necessary to Judge Cahn's

conclusions than the value of RDP following Paul's alleged

wrongful conduct.  RDP has not bothered to explain how Judge

Cahn's finding that Paul devised a plan to harm RDP was a

prerequisite to his conclusion that RDP was worth $6,490,000 as

of September 17, 2009, "without any deduction for Paul's

conduct."  <u>Id.</u> at 7.  Such a finding is thus nothing more than

dicta that does not bind Paul pursuant to the doctrine of

collateral estoppel.

As for Paul and Nordetek, they suggest that "Judge Cahn

noted, and RDP though [<u>sic</u>] its counsel confirmed, [that] RDP

wasn't damaged and has recovered from Paul's actions," and that

"Judge Cahn's findings are binding on RDP through collateral

estoppel."  Nordetek's MSJ at 5.  In support of <u>this</u> claim,

counterclaim defendants cite passages of the transcript of the

arbitration proceedings before Judge Cahn wherein he explained

that

> I also think what's going to be urged on
> Judge Dalzell is that the company was -- when

13

> Paul Christy did his acts following September
> 18th, he darn near ruined the company, and it
> was only through Richard Christy's Herculean
> efforts that the company was saved.  Of
> course, in basic damage law you can only
> recover for what you lost.  So even though
> Mr. Christy, Mr. Richard Christy, was lucky
> to salvage the company, it doesn't mean that
> Paul Christy gets short-changed.  I need you
> to address that.
>
> . . .
>
> What you're suggesting is that I put a
> liquidation value on the company because on
> November 12th it was at death's door, but
> fortunately for Richard Christy, you got
> Judge Dalzell to correct those things and
> somehow you got Stephansen back on track.
> Now the company's pretty good.

Nordetek's MSJ at 4-5 (quoting Arbitration Tr., Vol. V, 2055-57).

We can readily reject this supposed application of estoppel

doctrine.  Judge Cahn's musings on this point during a colloquy

with counsel in the course of the proceedings cannot mean that

this was an "issue <u>decided</u> in the prior adjudication." <u>Safeguard</u>

<u>Mut. Ins. Co.</u>, 345 A.2d at 668 (emphasis added).

But Paul and Nordetek also note that in Judge Cahn's

Opinion and Award he observed that

> [A]lthough it was necessary for Dick to
> obtain an injunction and contempt Order from
> Judge Dalzell in regard to Paul's competition
> and while it was necessary for Dick to engage
> in arbitration proceedings to confirm the
> Tekkem license, those events enabled RDP to

14

> survive and, according to the June 30, 2010
> Financial Statements, continue as a
> profitable enterprise.

Nordetek's MSJ at 5 (quoting Cahn Opinion at 8).  This observation comes closer to an actual determination respecting the health of RDP's ongoing operations.  Moreover, it appears that Judge Cahn made this finding to demonstrate the validity of his conclusion respecting RDP's September 17, 2009 value, noting that "subsequent events are germane" to "evaluat[ing] an earlier appraisal," and that "the higher VMI liquidation was based on the assumptions that Paul would not compete and the Tekkem license would be retained."  Cahn Opinion at 8.  Even if this issue was actually decided and necessary to Judge Cahn's judgment, however, it is far from a <u>finding</u> that RDP sustained no damages as a consequence of Paul's alleged wrongful conduct.  Nordetek and Paul thus cannot employ Judge Cahn's observation that RDP "continue[d] as a profitable enterprise," <u>id.</u>, to collaterally estop RDP from claiming that it has suffered damages.

We will accordingly reject RDP's and Paul and Nordetek's attempts to apply the doctrine of collateral estoppel to Judge Cahn's decision in order to secure summary judgment.

15

## II.  **Paul and Nordetek's Motion to Preclude Testimony**

Paul and Nordetek move "to preclude any and all evidence, whether testimonial or otherwise, proffered by Defendant RDP Technologies, Inc.'s expert, J. Mark Penny". They contend that Penny estimates RDP's financial losses resulting from Paul's alleged wrongful conduct by "completely disregard[ing] RDP's actual business operations before and after September 18, 2009, which contradict his assumptions and conclusions." Nordetek's Mot. Preclude at 1. RDP responds that (1) Paul cannot challenge these assumptions, inasmuch as he must "adher[e] to the allegations he made in his complaint (as judicial estoppel requires him to do)," RDP's Resp. to Nordetek's Mot. Preclude at 5; and (2) "<u>Paul Christy's</u> own expert admitted that Penny's methodology was correct, that Penny's assumptions, facts and calculations were correct, that Paul Christy damaged RDP, and that Richard Christy's efforts to repair the damage Paul Christy did cannot be used to reduce RDP's damages." <u>Id.</u> at 6-7 (emphasis in original). RDP thus concludes that "this case presents the classic 'battle of the experts' in which each expert argues that the (permissible) methodology he selected is superior," <u>id.</u> at 16, and that under these circumstances preclusion of expert testimony is inappropriate. <u>Id.</u> at 17.

16

Fed. R. Evid. 702 provides that

A witness who is qualified as an expert by
knowledge, skill, experience, training, or
education may testify in the form of an
opinion or otherwise if:

(a)  the expert's scientific, technical, or
     other specialized knowledge will help
     the trier of fact to understand the
     evidence or to determine a fact in
     issue;

(b)  the testimony is based on sufficient
     facts or data;

(c)  the testimony is the product of reliable
     principles and methods; and

(d)  the expert has reliably applied the
     principles and methods to the facts of
     the case.

Interpreting this Rule, the Supreme Court has explained that a
"trial judge must ensure that any and all scientific testimony or
evidence admitted is not only relevant, but reliable." Daubert,
509 U.S. at 589.  See also Kumho Tire Co., Ltd. v. Carmichael,
526 U.S. 137, 141 (1999) ("We conclude that Daubert's general
holding -- setting forth the trial judge's general 'gatekeeping'
obligation -- applies not only to testimony based on 'scientific'
knowledge, but also to testimony based on 'technical' and 'other
specialized' knowledge.").  The Supreme Court elaborated in
Daubert that the condition enshrined in Rule 702(a) "goes

17

primarily to relevance," quoting Chief Judge Becker for the
proposition that "'[a]n additional consideration under Rule 702
-- and another aspect of relevancy -- is whether expert testimony
proffered in the case is sufficiently tied to the facts of the
case that it will aid the jury in resolving a factual dispute.'"
Daubert, 509 U.S. at 591 (quoting United States v. Downing, 753
F.2d 1224, 1242 (3d Cir. 1985)).  Importantly, the Supreme Court
has emphasized that "nothing in either Daubert or the Federal
Rules of Evidence requires a district court to admit opinion
evidence that is connected to existing data only by the ipse
dixit of the expert.  A court may conclude that there is simply
too great an analytical gap between the data and the opinion
proffered."  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

> In Penny's expert report, he explains that
>
> > We have been asked to quantify the damages to
> > RDP as a result of alleged wrongful acts of
> > Paul Christy.  In measuring damages, we
> > considered three approaches: 1) cost to cure,
> > 2) measurement of lost profits and 3)
> > diminution in value.  The choice of approach
> > is pragmatic, based on availability of data.
> > In some instances, facts and circumstances
> > favor one model over other approaches.
> >
> > In this instance, for example, a cost to cure
> > approach would entail gathering data about
> > attorney's fees, time records of RDP
> > personnel spent on this matter, ascribing an
> > appropriate billing rate for RDP personnel

18

time, and measuring the opportunity cost of
time spent away from RDP's normal business.
This type of calculation becomes difficult,
in terms of reasonable certainty, however,
when coming up with measures of RDP time
spent (detailed time records were not kept),
billing rates and opportunity costs.
Therefore, we did not utilize this approach.

With regard to a lost profits analysis, we
note that RDP did not prepare projected
income or cash flow statements.
Consequently, it is difficult to map out
differential scenarios reflecting anticipated
income compared to scenarios reflecting
interruption of RDP's established
relationships and the loss of prospective new
customers.  For this reason, measurement of
lost profits is problematic.  Having ruled
out two of three approaches, it is evident
that the facts and circumstances of this
matter lend themselves more readily to a
diminution of value approach to damages
measurement.

Under a diminution of value approach, damages
are measured based upon comparison of the
value of RDP without any deduction for harm
arising from alleged wrongful acts to the
value of RDP after accounting for the impact
of the alleged damaging activity.

Ex. 25 to Nordetek's Mot. Preclude ("Penny Report") at 11.  As

Penny elaborates, a diminution of value approach requires the

measurement of fair market value, which

involves consideration of three broad
approaches to value, namely the market
approach, the income approach and the asset-
based approach.

19

Due to a lack of useful publicly-traded comparative companies and transaction data, Judge Cahn did not place reliance on expert valuations based on the market approach.  In the instant case, the market approach is rendered even less viable due to the need to identify pricing data from a reasonably comparative company that was also similarly harmed.  For this reason, we have not utilized a market-based approach in measuring the damaged value of RDP.

As previously noted, RDP's lack of projections makes lost profits analysis problematic.  The lack of projections also makes projections of damaged cash flow scenarios difficult if not impossible to ascertain. . . . We do not have a historical record of RDP earnings which reflects cash flow generation ability absent the Tekkem license and with direct competition from Nordetek and Paul.  Since the Slakers using Tekkem's intellectual property accounts for such a large portion of RDP sales, the profit making capability of RDP in a damaged scenario is not readily ascertainable.

Because both the market and income approaches do not provide a satisfactory means of estimating RDP's fair market value in a damaged scenario, we turn to the asset-based approach.

Id. at 12-13.

Based on Judge Cahn's Opinion, Penny "adopt[s] $6.49 million as a reasonable measure of the unharmed fair market value of the stockholders' equity of RDP."  Id. at 12.  Penny then notes that "RDP's book value of June 30, 2009 was approximately

20

$2.1 million," id. at 13, and that its "net tangible book value (excluding the book value of patents) [was] $1.32 million."  Id. at 14.  According to Penny, the differential between Judge Cahn's figure and this latter valuation represents "the unharmed value of intangible assets," namely "license agreements, customer relationships, backlog, experienced workforce, proprietary information and know-how, goodwill and the like."  Id.

Next comes the critical step in Penny's analysis:

Without the Tekkem license, it follows that indicated aggregate intangible asset value of $5.17 million for RDP would be significantly, if not totally, impaired.  Total impairment would result if RDP, stripped of its enabling asset, could not generate sufficient earnings from its remaining base of tangible and intangible assets to provide a fair return on its overhead or to operate at a scale necessary to employ the technical staff needed to participate in its business.

Without the Tekkem license and with competition from Paul, RDP faced the loss of its current and prospective bookings and the prospect of laying off its employees.  In this case, the value of RDP's remaining asset base was stripped of its earnings capability. Without prospective earning capability, a prospective buyer would view the value of RDP's remaining intangible assets to be highly speculative.  Consequently, a buyer would be unlikely to ascribe significant value to RDP's remaining intangible assets. Therefore, the fair market value of RDP equity interests would gravitate towards net

21

>       tangible asset value, or lower, in a
>       liquidation scenario.

Id. at 15.  Penny concludes that "for purposes of calculating

damages, the fair market value of RDP's aggregate equity

interests, in a damaged state, without the Tekkem license, with

competition from Paul and other harms caused by Paul's alleged

wrongful acts, is reasonably measured at an amount not greater

than net tangible asset value of $1.32 million."  Id. at 16-17.

     Nordetek and Paul argue that Penny's expert report must

be precluded for two reasons.  First, they contend that "[a]

diminution of value approach is deemed appropriate in two

senarios: (1) the immediate destruction of a business; and (2)

the 'slow death' of a business.  As RDP's ongoing business

operations demonstrate, neither scenario applies here."

Nordetek's Mot. Preclude at 4.  Second, they assert that

>       RDP's expert's analysis is based on two
>       flawed factual assumptions.  The first
>       assumption is that RDP permanently lost its
>       ability to sell and install Tekkem technology
>       under an exclusive licensing agreement as of
>       September 18, 2009.  The second assumption
>       was that Paul Christy would secure exclusive
>       rights to the Tekkem technology and engage in
>       direct competition, stripping away as much as
>       75% of RDP's business.  Neither assumption
>       came to fruition.

Id. at 2.

Taking up Nordetek and Paul's first set of arguments, we note that we, too, are dubious about the appropriateness of a diminution of value approach under the present circumstances -- at least as RDP seeks to employ it. As Kenneth M. Kolaski and Mark Kuga explain, such an approach is appropriate "if a business is destroyed completely, for example by fire or because a defendant's actions were so harmful that a plaintiff is forced out of business," or where "the alleged bad acts of a defendant cause a business to lose profits over a period of time but then ultimately destroy the business concern" -- a so-called "slow death" scenario. Measuring Commercial Damages Via Lost Profits or Loss of Business Value: Are These Measures Redundant or Distinguishable?, 18 J. L. & Comm. 1, 5, 16 (1998). See also James R. Hitchner, Financial Valuation: Applications and Models 1033-34 (2d ed. 2006) (noting that "[w]here an immediate destruction of the business occurs, diminution of value generally would be indicated as the most appropriate measure of damages," but that "[t]he measure of damages for a temporary impairment is considered lost profits," and "[t]he slow death of a business . . . might use a combination of the two measures"). The obvious distinguishing feature of these two scenarios is that the value of the damages incurred by the business-owner remains the same

23

from the time of the business's death until the time damages are
assessed by a court, since the business (presumably) remains dead
throughout this period.  There is thus no risk that a plaintiff
will recover a windfall by receiving damages that <u>exceed</u> his
actual loss.  Where a business has not been destroyed completely
or undergone a slow death, but instead sustained an injury from
which it ultimately recovered in part, we could nonetheless
imagine that the diminution in value approach <u>might</u> be
applicable[3] -- but only if the post-injury value of the business
is determined at the time damages are assessed so that the
diminution in value reflects the actual loss suffered.

        Notably, RDP seeks to apply the diminution in business
value approach to estimate its post-injury value -- not at the
time damages are assessed, but in the immediate aftermath of
Paul's allegedly wrongful conduct -- that is, at RDP's absolute
nadir as a company, even though RDP concedes that Dick's "efforts
to save RDP" were "ultimately successful."  RDP's Resp. to
Nordetek's Mot. Preclude at 17; <u>see also</u> RDP's MSJ at 18 ("There
is no dispute that, as a result of the efforts of Richard

---

        [3] We make this observation not to suggest that such an
approach would be appropriate, but only to emphasize that we do
not <u>foreclose</u> such an application of this methodology.

Christy, and the injunction entered by this Court, RDP was able to retain most of the large contracts it was seeking."). Such an approach ignores, however, that compensatory damages "have as their purpose the desire to make the plaintiff whole," <u>Feingold v. Se. Pa. Transp. Auth.</u>, 517 A.2d 1270, 1276 (Pa. 1986), and that punitive damages "are a windfall to the recipients over and above compensatory damages to which they are entitled." <u>In re Collins</u>, 233 F.3d 809, 812 (3d Cir. 2000). Insofar as RDP attempts to employ a diminution in business value methodology to estimate its losses by valuating its post-injury worth at the time of its maximum infirmity -- though it has since recovered some (if not all) of its financial health[4] -- we do not believe that such a methodology is "relevant" to the facts of this case.

RDP's main argument in defense of this methodology is that attacks upon it "ignore[] <u>Paul Christy's</u> own expert's admission that Richard Christy's acts to repair Paul Christy's damage cannot reduce RDP's damages claim." RDP's Resp. to Nordetek's Mot. Preclude at 17 (emphasis in original). Of

---

[4] We note that a logical consequence of RDP's approach is that if Paul's actions had robbed RDP of its value only for a split second, after which its value rebounded of its own accord to previous levels, RDP would nonetheless be entitled to its entire value in damages -- though it would have incurred no real world loss.

course, whether mitigation efforts can generally reduce damages awards is a question of law upon which experts are not qualified to opine.  More troubling, the principle that RDP enunciates -- that a defendant is responsible for any damages avoided or repaired through a plaintiff's mitigation efforts -- is simply wrong.

It is true that efforts to mitigate injury cannot reduce damages, but not for the reason that RDP contends. Mitigation efforts do not reduce damages because any damages calculus <u>assumes</u> that reasonable efforts to mitigate have been made.  Thus, final damages are <u>net</u> of mitigation.  Where plaintiffs fail to make such efforts, they cannot recover the quantum of damages that they might otherwise have averted.  Thus, under Pennsylvania law "'one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort.'"  <u>Yost v. Union R. Co.</u>, 551 A.2d 317, 322 (Pa. Super. 1988) (quoting Restatement (Second) of Torts § 918(1) (1979)).  To be sure, where a plaintiff <u>has</u> made reasonable efforts to mitigate damages, he may recover "mitigation damages" for any costs incurred in the course of

these efforts[5] plus the amount of any remaining loss.  See, e.g.,

All Seasons Services, Inc. v. Newnam, 2006 WL 2052407, at *9 (Pa.

Com. Pl. 2006); Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149-50

(3d Cir. 1990) (discussing analogous proposition in context of

New Jersey law).  But awarding such a mitigating plaintiff

damages for injury that was avoided or repaired through his

efforts would do more than make him whole or return him to "'a

position as nearly as possible equivalent to his position prior

to the tort,'" Trotsky v. Civil Serv. Comm'n, 652 A.2d 813, 817

(Pa. 1995) -- it would, in short, award him a windfall.

Compensatory damages are not designed to function as such a

lottery.[6]

---

[5] In this case, such damages might include the costs of
(1) pursuing litigation designed to negate Paul's allegedly
wrongful conduct, (2) negotiating a new license with Stephansen
after his purported revocation of RDP's prior license as a result
of Paul's alleged fiduciary breach, and (3) recovering customers
lost as a result of Paul's alleged efforts to harm RDP.

[6] RDP argues that "Paul Christy's position is that, if
he had literally shot his brother in the back of the head, and
through good luck, the efforts of a fine surgeon, and a lot of
hard work in rehab his brother survived and even thrived, his
brother would not be entitled to recover damages unless he could
prove he lost income during the period of his recovery."  RDP's
MSJ at 16 n.15.  Of course, under these hypothetical
circumstances, Dick might well be entitled to recover damages for
the costs of mitigation -- e.g., medical and rehabilitation bills
-- as well as damages for emotional distress and pain and
                                          (continued...)

27

Aside from inappropriate methodology, Penny's report is also infirm because it applies this methodology incorrectly. <u>Even if</u> we accept that RDP's post-injury value should be determined at the time of its maximum depression -- at best a dubious proposition -- Penny does not appear to have actually calculated this value. Instead, Penny opines that "the fair market value of RDP's aggregate equity interests, in a damaged state, <u>without the Tekkem license</u>, with competition from Paul and other harms caused by Paul's alleged wrongful acts, is reasonably measured at an amount not greater that net tangible asset value of $1.32 million," Penny Report at 16-17 (emphasis added). His valuation is thus based on the assumption that RDP lost the Tekkem license.

But RDP has presented no evidence that it ever <u>lost</u> this license, and its representations to this Court suggest that Paul's actions, at worst, placed a cloud upon the validity of this license that ultimately lifted. As we explained in our January 8, 2010 Opinion in this matter,

---

[6](...continued)
suffering. The important point is that Dick would <u>not</u> be entitled to recover the value of his future earning stream in the form of compensatory damages under the counterfactual assumption that he had <u>not</u> recovered from his injury, when in fact he had.

> Notwithstanding his receipt of RDP's wired
> funds, Stephansen [the owner of the Tekkem
> technology] wrote to Dick on October 2, 2009
> and reiterated that the agreement had been
> terminated.  He demanded that RDP stop using
> the Tekkem trademark and cease advertising
> Tekkem slakers.  RDP's attorney responded on
> October 5 and explained RDP's view that
> Stephansen had not terminated the license. .
> . . It is also undisputed that [on October
> 13, 2009] Nordetek signed a putatively
> exclusive License Agreement with Stephansen.

Nordetek Envtl., 677 F. Supp. 2d at 835 (citations omitted).  We

noted at that time that "RDP is proceeding as though it still has

a Tekkem license because it believes that Stephansen never

properly terminated the 2001 License Agreement," id. at 836, and

observed that "RDP is currently marketing Tekkem slakers and may

well be doing so lawfully."  Id. at 842 (emphasis omitted).  See

also Prelim. Inj. Hrg. Tr. at 93, Dec. 18, 2009 (Dick: "We have

the TEKKEM License. . . . And our attorney says the determination

was not valid and if we -- have a worst case scenario, it is that

the license goes nonexclusive.").  In any event, the parties

agree that on "February 11, 2010 . . . RDP executed a new license

agreement with Tekkem."  Penny Report at 17; see also Nordetek's

Mot. Preclude at 3 ("A February 11, 2010 agreement . . .

retroactively reinstated RDP's exclusive licensing agreement for

the Tekkem technology.").

The core problem with Penny's analysis is that it equates RDP's <u>disputed</u> license to the Tekkem technology with having <u>no</u> license at all, thus failing to recognize that disputed title is <u>not</u> valueless.  To the contrary, disputed title can be quite valuable.  In patent litigation, for example, holders of disputed interests in intellectual property commonly sell those interests for prodigious sums to other parties who then litigate their entitlement to the patents in question.  In fact, elementary statistical principles suggest that the expected value $(E(V))$ of a disputed license is not zero, but $E(V) = P_1V_1 + P_2V_2$, where $V_1$ equals the value of the license, $V_2$ equals the value of not having the license (presumably, zero), $P_1$ equals the probability that the claimant will retain the license, and $P_2$ equals the probability that the claimant will lose the license (presumably, $1 - P_1$).[7]  Penny's analysis assumes that following Paul's wrongful conduct $P_1$ equaled zero from RDP's perspective,

---

[7] To be sure, this formulation of the expected value oversimplifies matters to some extent since in reality we can envision more than two outcomes to a dispute over a license. Another plausible outcome, for example, might involve two claimants sharing a non-exclusive license.  In the interests of clarity, we confine our analysis to the two-outcome case.

but he presents no explanation as to why this would be true.[8]
Notably, RDP represented to us at the time of the preliminary
injunction hearing that this probability was <u>not</u> zero, and RDP's
resolution of a licensing agreement with Stephansen a few months
later demonstrates that this probability was in business reality
non-zero.  Even if we assume that RDP's compensatory damages can
properly be calculated by taking its pre-injury value and
subtracting the amount it was worth at its post-injury bottom --
an approach that, as we have explained, appears here unjustified

---

[8] RDP notes that its other expert, Wilusz, "was very
firm in testifying that, in light of Stephansen's purported
termination of the Tekkem license, and given that Paul Christy
was the main point of contact with Stephansen, after Paul
Christy's resignation any potential buyer would assume that the
Tekkem license had been cancelled no matter what RDP or Richard
Christy might say."  RDP's MSJ at 12 n.10 (citations omitted).
This insistence that a would-be buyer would ignore the strength
of RDP's legal claim to the license and instead consider only who
"was the main point of contact with Stephansen," flies in the
face of economic logic.  Moreover, given that this assertion is
unsupported by any evidence that Wilusz or Penny ever consulted
any actual potential buyer for RDP, it comes close to the "<u>ipse
dixit</u>" that <u>Joiner</u>, 522 U.S. at 146, warns courts against
crediting.  Wilusz and Penny's opinions as to the valuelessness
of RDP's disputed license is further belied by the evidence --
that Paul and Nordetek introduced and that RDP does not challenge
-- demonstrating that during the time this license was disputed
(between September 18, 2009 and February 12, 2010) RDP booked no
less than six projects with a total value exceeding $3.5 million
-- four of which involved use of Tekkem lime slakers.  <u>See</u>
Nordetek's Mot. Preclude at 28 (citing Exs. 9G, 9I, 9J, 9K, 9L,
and 9P to Nordetek's Mot. Preclude).

-- Penny did not look to the right facts in calculating the latter value.

RDP's main retort in defense of Penny's application of his methodology is that "Penny can base his opinion on Paul Christy's allegations that RDP did not have the Tekkem license, that Nordetek did, and that Paul Christy was permitted to compete," RDP's Resp. to Nordetek's Mot. Preclude at 6, arguing that "[a]lthough Paul Christy may wish to disavow his prior allegations, he is estopped from doing so." Id. at 6 n.8.  There are at least two problems with this argument.  To begin, our Court of Appeals has made it clear that "in our Circuit judicial estoppel is generally not appropriate where the defending party did not convince the District Court to accept its earlier position." G-I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d 247, 262 (3d Cir. 2009).  RDP appears to concede as much, noting that "'a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.'"  RDP's Resp. to Nordetek's Mot. Preclude at 6 n.8 (quoting Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., 337 F.3d 314, 319 (3d Cir. 2003)).  But RDP nowhere explains how Paul and Nordetek "gain[ed]

an advantage" in this litigation by making the allegations that RDP now claims they are estopped from denying.

Second, if the doctrine of judicial estoppel were to apply to bar Paul and Nordetek from denying allegations made in their complaint, it would appear equally well to estop RDP from denying averments made in its own pleadings.  In RDP's amended answer to Nordetek and Paul's complaint, it "denie[s] that the termination of the Stephansen license agreement has occurred." RDP's Am. Ans. to Nordetek's Am. Compl. ¶ 37 (docket entry # 109).  If we were to accept RDP's distorted view of judicial estoppel, we would thus be left in the nonsensical position of obliging RDP to claim that it <u>had</u> the Tekkem license at the same time we required Nordetek and Paul to claim that RDP did <u>not</u> have this license.  Damages determinations do not take us through such a looking-glass.

In the final analysis, RDP suggests that even if we do not credit Penny's expert report, we should nonetheless not resort to the "drastic remedy" of precluding his opinion.  RDP's Resp. to Nordetek's Mot. Preclude at 15.  RDP contends that (1) it "does not have to prove the amount of damages it suffered with mathematical certainty," RDP's Resp. to Nordetek's MSJ at 4; (2) "[a]s the plaintiff on its counterclaims, RDP is entitled to

33

select the method used to quantify its damages," RDP's MSJ at 13;
and (3) a motion to preclude expert testimony "cannot be granted
absent a hearing during which the expert can be questioned
regarding the bases of his opinions."  RDP's Resp. to Nordetek's
Mot. Preclude at 15.

However true RDP's first two contentions may be, this
Court cannot abdicate its gatekeeping function under the Federal
Rules of Evidence.  See Kumho Tire Co., Ltd., 526 U.S. at 158-59
("I join the opinion of the Court, which makes clear that the
discretion it endorses -- trial-court discretion in choosing the
manner of testing expert reliability -- is not discretion to
abandon the gatekeeping function.") (Scalia, J., concurring).  As
our reasoning above demonstrates, Penny's report is not simply
more uncertain than we would like.  We also do not simply suggest
that another methodology would be preferable to the one he used.
Rather, our close reading of Penny's report reveals that his
methodology is not appropriate to the particulars of this case.
Perhaps more importantly, Penny's application of this methodology
rested on unfounded and incorrect, but highly consequential,
assumptions.  We thus cannot conclude that expert testimony as
defective as Penny's could "help the trier of fact to understand

34

the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

As for RDP's third point, it is true that "when the ruling on admissibility turns on factual issues . . . at least in the summary judgment context, failure to hold such a hearing may be an abuse of discretion." Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999). But our Court of Appeals has also stressed that "[a]n in limine hearing will obviously not be required whenever a Daubert objection is raised to a proffer of expert evidence. Whether to hold one rests in the sound discretion of the district court." Id. Here, we do not need further development of the factual record to determine that Penny's expert report is inadmissible. RDP concedes that Penny's report would result in its windfall recovery of compensatory damages for injury that RDP averted or repaired, and Penny unambiguously states that his analysis is predicated on an assumption -- i.e., that RDP no longer had the Tekkem license -- that simply was not true. Under these circumstances, Penny's report does not "fit" the facts of this case. We will thus grant Paul and Nordetek's motion to preclude Penny's expert testimony.

III. **The Parties' Remaining Arguments for Summary Judgment**

As we have noted, the parties assert grounds in support of their motions for summary judgment that do not rest exclusively on the doctrine of collateral estoppel. Nordetek and Paul suggest that the preclusion of Penny's expert report means that RDP has not pointed to evidence supporting damages so that Nordetek and Paul are entitled to summary judgment on seven of RDP's counterclaims. RDP points to evidence in the record to claim that there is no genuine issue of fact in dispute regarding Paul's liability for breach of fiduciary duty and contract breach.

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," where "[a] party asserting that there is a genuine dispute as to a material fact must support that assertion with specific citations to the record." Bello v. Romeo, 424 Fed. Appx. 130, 133 (3d Cir. 2011). On a motion for summary judgment, "[t]he moving party first must show that no genuine issue of material fact exists," Adderly v. Ferrier, 419 Fed. Appx. 135, 136 (3d Cir. 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)), whereupon "[t]he burden then

36

shifts to the non-moving party to set forth specific facts demonstrating a genuine issue for trial." Id. "'A disputed fact is "material" if it would affect the outcome of the suit as determined by the substantive law,'" J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 925 (3d Cir. 2011) (quoting Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992)), while a factual dispute is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Bialko v. Quaker Oats Co., 434 Fed. Appx. 139, 141 n.4 (3d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)) (brackets omitted). We "draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence." Eisenberry v. Shaw Bros., 421 Fed. Appx. 239, 241 (3d Cir. 2011) (quotation marks omitted).

Nordetek and Paul argue that "the only evidence of economic damages RDP has provided for any of its counterclaims rests entirely on Penny's unreliable and irrelevant expert opinion," and that "because RDP has failed to provide any evidence of actual financial damages, Paul Christy's motion for summary judgment as to RDP's claims for Counts I-IV and VI-VIII should be granted." Nordetek's MSJ at 9. While we will grant

37

Nordetek and Paul's motion to preclude Penny's report, we cannot agree, drawing all reasonable inferences in RDP's favor, that RDP has failed to provide evidence that counterclaim defendants' alleged wrongful conduct caused it to sustain damages.

As we noted above, RDP may seek as damages costs that it incurred in mitigating injury Paul and Nordetek caused -- which may include litigation costs, the costs of negotiating a new license with Stephansen, and the costs of recovering customers lost due to Paul's alleged malfeasance.  Even if RDP lost no profits as a result of counterclaim defendants' alleged conduct, RDP may <u>still</u> prove damages by demonstrating that it incurred the above costs because of this alleged conduct.  RDP expended obvious efforts in litigation and licensing as a consequence of Paul's allegedly wrongful conduct, and we thus draw the inference that these efforts were not cost-free.  RDP has pointed to evidence in the record suggesting that its employees went to great lengths to keep customers nearly lost due to Paul's activities, <u>see</u> RDP's MSJ at 18, and we will similarly infer that these efforts carried a cost.

We therefore cannot conclude, as a matter of law, that there is no genuine dispute of material fact as to whether counterclaim defendants' alleged conduct caused damages to RDP.

38

We will accordingly deny Paul and Nordetek's motion for summary judgment.

Turning to RDP's motion for summary judgment, it argues that evidence in the record demonstrates that Paul breached his fiduciary duty to RDP as well as a non-competition obligation. As Judge DuBois has explained, "[t]o allege a breach of fiduciary duty [under Pennsylvania law], a plaintiff must establish that a fiduciary or confidential relationship existed between her and the defendants," and must also allege three elements:

> (1) That the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed;
>
> (2) That the plaintiff suffered injury; and
>
> (3) The defendant's failure to act solely for the plaintiff's benefit was a real factor bringing about plaintiff's injuries.

Baker v. Family Credit Counseling Corp., 440 F.Supp.2d 392, 414 (E.D. Pa. 2006) (quoting Pa. S.S.J.I. § 4.16). To state a breach of contract claim under Pennsylvania law, a plaintiff must allege "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant

damages." Omicron Systems, Inc. v. Weiner, 860 A.2d 554, 564 (Pa. Super. 2004) (brackets and quotation marks omitted).

RDP points to evidence in the record demonstrating that during Paul's employment with RDP he (1) created and delivered a spreadsheet to Stephansen indicating that RDP had not paid Stephansen what was owed under its licensing agreement; (2) plotted to bring about the termination of RDP's exclusive license to the Tekkem technology, including by forcing RDP into bankruptcy; (3) agreed to indemnify Stephansen and pay any attorney's fees arising from Stephansen's licensing dispute with RDP; and (4) planned to start his own company, secure the Tekkem license, and compete against RDP. See RDP's MSJ at 8-10 (citing exhibits). Nordetek and Paul make no effort to point to contradictory evidence in the record, instead focusing upon RDP's asserted failure to show damages. See Nordetek's Resp. to RDP's MSJ at 25 ("Both of RDP's counterclaims for breach of fiduciary duty and breach of contract require that RDP prove damages."). Paul's position as an officer at RDP, see RDP's MSJ at 7 (citing Ex. 16 to RDP's MSJ (describing Paul's position as Secretary-Treasurer and Director of RDP and offering his resignation)) -- which counterclaim defendants do not dispute -- unquestionably placed him in a fiduciary relationship with RDP.

40

The evidence RDP cites demonstrates that Paul intentionally failed to act in good faith and solely for the benefit of RDP in all matters for which he was employed.  RDP has thus established that Paul (1) had a fiduciary duty to RDP and (2) breached this duty.

In ruling on Nordetek and Paul's motion for summary judgment, we drew the inference in RDP's favor that it suffered an injury as a result of Paul's conduct.  In ruling on RDP's motion, however, we must draw all reasonable inferences in counterclaim defendants' favor, and we are constrained to note that RDP has not yet pointed to any evidence that it suffered actual injury due to Paul's conduct or incurred costs in the course of its efforts to mitigate such injury.  We will thus grant summary judgment in RDP's favor only with respect to the "duty" and "breach" elements of its fiduciary duty claim against Paul, leaving for trial the questions of injury and causation.

As for RDP's breach of contract claim against Paul, it points to the existence of a contract to which Paul was a party, RDP's MSJ at 10-11 (citing Ex. 1 to RDP's MSJ ("Shareholder Agreement"), and notes that "Paul Christy breached that contract by competing against RDP."  Id. at 11.  In our January 8, 2010 Opinion, we explained that "[o]n the record before us, RDP is

41

likely to succeed in showing that RDP and Nordetek (through Paul)

are 'striving for [the same] custom' -- because that is, in fact,

what they are doing."   Nordetek Envtl., 677 F. Supp. 2d at 842.

As counterclaim defendants have presented no evidence that would

undermine this conclusion, we now decide that, for the reasons

given in our earlier Memorandum, Paul competed against RDP in

violation of the Shareholder Agreement, which mandated that

> For a period of two years after the date on
> which a Shareholder's employment terminates
> for any reason, that Shareholder shall not
> engage either directly or indirectly in any
> manner or capacity whatsoever (including
> principal, agent, partner, officer, director,
> shareholder, employee, consultant or
> otherwise) in any business competitive with
> the business of the Corporation in the United
> States, Canada or anywhere in the world that
> the Corporation is currently doing business,
> does business in the future or where the
> corporation is pursuing business
> possibilities.

Shareholder Agreement ¶ 9(b).  As we noted in 2010, Paul violated

this Agreement not only by seeking customers in competition with

RDP, but "by getting the Tekkem license for Nordetek in the first

place."  Nordetek Envtl., 677 F. Supp. 2d at 842.  But, for the

reasons described above, we cannot conclude at this time that RDP

has established that it suffered damages as a result of Paul's

breach.  We will thus grant summary judgment in RDP's favor on

42

this claim only as to the elements of "contract" and "breach,"
leaving the question of damages for trial.

## IV.  RDP's Motion to Enjoin Arbitration Proceedings

Turning to RDP's motion to enjoin arbitration, RDP
notes that "[f]ive months after Judge Cahn rejected Paul
Christy's request to require RDP to increase its payments, Paul
Christy filed a second arbitration against RDP."  RDP's Mot.
Enjoin at 3.  RDP argues that this "second arbitration is an
attempt to evade both this Court's order that he waived his right
to arbitrate the amount of damage he did to RDP, and Judge Cahn's
refusal to increase the payments RDP is currently making," id.
(citations omitted), and that "[t]his Court should therefore
enter an injunction protecting its judgment that 'plaintiffs
waived any right to arbitrate' their claims, see Dkt. 110 at ¶
(mm), as well as its jurisdiction over those claims."  Id. at 5.

RDP predicates its motion on the All Writs Act, which
provides that "[t]he Supreme Court and all courts established by
Act of Congress may issue all writs necessary or appropriate in
aid of their respective jurisdictions and agreeable to the usages
and principles of law."  28 U.S.C. § 1651(a).  RDP notes that the
Supreme Court has "'recognized the power of a federal court to

issue such commands under the All Writs Act as may be necessary
or appropriate to effectuate and prevent the frustration of
orders it has previously issued in its exercise of jurisdiction
otherwise obtained.'"  RDP's Mot. Enjoin at 4 (quoting <u>United
States v. N.Y. Tel. Co.</u>, 434 U.S. 159, 172 (1977)).

      The Order we issued that RDP suggests must now be
protected provides, <u>inter alia</u>, that "the plaintiffs waived any
right to arbitrate."  Aug. 9, 2010 Order at ¶¶ mm (docket entry #
110).  The arbitration that RDP seeks to enjoin concerns "RDP
Technologies' ('RDP') failure to pay Paul Christy, a minority
shareholder in RDP who resigned as an employee from RDP on
September 18, 2009, the amounts due to him in accordance with the
Amended and Restated Shareholder Agreement and the Order entered
on July 25, 2011 by the Philadelphia County Court of Common Pleas
decreeing the value of RDP to be $6,490,000 as of September 17,
2009."  Ex. 643 to RDP's Mot. Enjoin at 2.  RDP suggests that
"[i]f the Court does not enter an injunction, and instead permits
Paul Christy to prosecute his second arbitration, there is a
possibility that the arbitrators will do exactly what this Court
(and Judge Cahn) have said the arbitrators cannot do, namely
adjudicate the amount of damage Paul Christy did to RDP, and

therefore the net amount RDP must pay Paul Christy or that Paul Christy must pay RDP." RDP's Mot. Enjoin at 6-7.

Reading our August 9, 2010 Order in context, it is plain that we ruled only that Paul and Nordetek had waived any right to arbitrate the claims pending before this Court. No party has asserted before this Court any claim respecting Paul's entitlement to a payout under the Shareholder Agreement. We thus discern no conflict between Paul's second arbitration and our August 9, 2010 Order, especially because the scope of this arbitration appears to exclude any consideration of damages that Paul may owe RDP as a result of RDP's claims before this Court. As a result, we will deny RDP's motion to enjoin Paul's second arbitration pursuant to the All Writs Act.[9]

---

[9] In a passing comment, RDP suggests that Paul's second arbitration "violat[es] the 'first filed rule.'" RDP's Mot. Enjoin at 3. As our Court of Appeals explained in EEOC v. Univ. of Pennsylvania, 850 F.2d 969, 971 (3d Cir. 1988) (internal brackets, ellipsis, and quotation marks omitted), aff'd, 493 U.S. 182 (1990), "[t]he first-filed rule encourages sound judicial administration and promotes comity among federal courts of equal rank. It gives a court 'the power' to enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court." Given that (1) the issue of Paul's entitlement to a payout under the Shareholder Agreement has never been before this Court, and, in any event, (2) no other federal court has pending before it proceedings involving the same parties and the same issues as in this case, the first-filed rule does not apply here.

(continued...)

**V.** <u>**RDP's Motion to Sanction Lisa Christy**</u>

Finally, RDP urges that Lisa Christy, Paul's wife, should "be held in contempt because she failed to truthfully answer the questions put to her during her deposition, and because the answers to questions she actually gave under oath were almost uniformly evasive." RDP's Mot. Sanctions at 2. As the Supreme Court noted in <u>California Artificial Stone Paving Co. v. Molitor</u>, 113 U.S. 609, 618 (1885), "[p]rocess of contempt is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct."

While we did issue an Order in this matter instructing Lisa to "APPEAR for an additional day of deposition, lasting no longer than seven additional hours, and . . . answer truthfully and completely all questions posed within the analysis outlined in this Order," Nov. 28, 2011 Order at ¶ 3 (docket entry # 148), our review of the deposition transcript does not suggest that

---

[9](...continued)
More importantly, our holding at this time does not foreclose RDP's right to invoke our equitable powers to prevent any windfall to Paul should the second arbitration produce a valuation before a damages verdict before us becomes final.

46

Lisa countermanded this instruction.  We will thus deny RDP's
motion for contempt.

                        BY THE COURT:

                        __\s\Stewart Dalzell